**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| | x | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, | : : : | |
| | : | |
| Plaintiffs, | : | |
| | : | Court No. 23-00136 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| | x | |

## <u>PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs

Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation

(collectively, "Baroque") respectfully move for judgment on the administrative record. For the

reasons set forth in the accompanying Memorandum of Law in support of its motion, Baroque

requests that the Court determine that the U.S. Department of Commerce's results in

*Multilayered Wood Flooring from the People's Republic of China: Final Results of*

*Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (May 31, 2023), and the

accompanying Issues and Decision Memorandum, is not supported by substantial evidence on

the record and is otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Francis J. Sailer

Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

Dated: February 23, 2024

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, | x : : : |
| Plaintiffs, | : : |
| | : Court No. 23-00136 |
| v. | : : |
| UNITED STATES, | : : |
| Defendant, | : : |
| | : x |

**ORDER**

Upon consideration of the Motion for Judgment on the Administrative Record filed by

Plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation

(collectively "Baroque") and upon all other papers and proceedings herein, the Court

**ORDERS** that Baroque's Motion is granted; and further

**FINDS** that the contested results of the U.S. Department of Commerce ("Commerce") in

*Multilayered Wood Flooring from the People's Republic of China: Final Results of*

*Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (May 31, 2023), is not

supported by substantial evidence on the record, and is not otherwise in accordance with law;

and further

**ORDERS** that this matter is remanded to Commerce for reconsideration of the Final

Results in accordance with the decision of this Court.

**SO ORDERED.**

_____

Timothy M. Reif, Judge

Dated: _____, 2024
        New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |  |
|---|---|---|
| _____ | x | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, | : : : | |
|  | : | |
| Plaintiffs, | : | |
|  | : | Court No. 23-00136 |
| v. | : | |
|  | : | **PUBLIC VERSION** |
| UNITED STATES, | : | |
|  | : | |
| Defendant, | : | |
|  | : | |
| _____ | x | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Francis J. Sailer
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: February 23, 2024

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 .................................................................1

A.  Administrative Decision Under Appeal...............................................................1

B.  Reasons For Contesting The Administrative Decision........................................1

C.  Issues Presented And Summary Of Argument ....................................................1

   1.  Is Commerce's calculation of the benchmark for plywood unlawful? ...........1

   2.  Is Commerce's application of adverse facts available to consider certain of Baroque's input suppliers to be governmental authorities unlawful?.................................2

STATEMENT OF FACTS ...................................................................................2

STANDARD OF REVIEW ..................................................................................4

ARGUMENT ....................................................................................................5

I.  COMMERCE'S TIER 2 BENCHMARK SELECTION FOR THE PLYWOOD LTAR PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW ......................................................................5

A.  Legal Background on the Selection of Product Specific Benchmarks .................5

B.  Commerce Failed to Select Product Specific Benchmarks for Plywood............10

   1.  Commerce Failed To Address Record Evidence Demonstrating That ITTO Grade Specific Plywood Prices Are The Most Product-Specific to Baroque's Plywood ........ 12

   2.  Commerce's Reasoning Is Unsupported By Record Evidence ...................... 15

II.  COMMERCE UNLAWFULLY APPLIED AFA TO WHETHER CERTAIN OF BAROQUE'S INPUT SUPPLIERS WERE GOVERNMENT AUTHORITIES .........................18

A.  Legal Framework For AFA Determinations In CVD Proceedings ....................18

B.  The Application of AFA to the GOC for the Government Authority Status of Specific Input Suppliers Is Unsupported by Substantial Evidence .........................................21

   1.  Background and Relevant Facts.................................................................. 21

   2.  Argument.................................................................................................... 26

      a.  Commerce Did Not Address Specific Input Suppliers, Rendering its Determination Unreviewable .................................................................. 26

      b.  Commerce Failed to Notify the GOC of Any Deficiency ................... 30

CONCLUSION....................................................................................................34

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*,
    61 F. Supp. 3d 1306 (CIT 2015).................................................................7, 21, 31

*Changzhou Trina Solar Energy Co. v. United States*,
    352 F. Supp. 3d 1316 (CIT 2018).......................................................................20, 26

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)...............................................................................................4

*Elec. Consumers Res. Council v. FERC*,
    747 F.2d 1511 (D.C. Cir. 1984)............................................................................27

*F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000)............................................................................20

*Gerald Metals, Inc. v. United States*,
    132 F.3d 716 (Fed. Cir. 1997)...............................................................................5

*GODACO Seafood Joint Stock Co. v. United States*,
    435 F. Supp. 3d 1342 (CIT 2020).........................................................................27

*Guizhou Tyre Co. v. United States*,
    348 F. Supp. 3d 1261 (CIT 2018).........................................................................20

*Hitachi Energy USA Inc. v. United States*,
    34 F.4th 1375 (Fed. Cir. 2022) ............................................................................31

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349 (CIT 2015).........................................................................10

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)...............................................................................4

*Maverick Tube Corp. v. United States*,
    857 F.3d 1353 (Fed. Cir. 2017).............................................................................31

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009).............................................................................19

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)........................................................................19, 20

*NSK Ltd. v. United States*,
    910 F.Supp. 663 (1995) ..................................................................30

*Risen Energy Co. v. United States*
    570 F. Supp. 3d 1369 (CIT 2022) ...............................................6, 7

*Saha Thai Steel Pipe Pub. Co. v. United States*,
    2022 WL 17369301 (CIT Dec. 2, 2022) .........................................32

*Save Domestic Oil, Inc. v. United States*,
    357 F.3d 1278 (Fed. Cir. 2004) ........................................................5

*Shandong Huarong Mach. Co. v. United States*,
    435 F. Supp. 2d 1261 (CIT 2006) ...................................................19

*Sigma Corp. v. United States*,
    841 F. Supp. 1255 (CIT 1993) ........................................................32

*SKF USA, Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ........................................................5

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ........................................................5

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*,
    23 CIT 804 (1999) ...........................................................................30

*Timken U.S. Corp. v. United States*,
    421 F.3d 1350 (Fed. Cir. 2005) ......................................................27

*WelCom Prods., Inc. v. United States*,
    865 F. Supp. 2d 1340 (CIT 2012) .....................................................5

*Zhejiang Dunan Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) .........................................20, 26, 29

**Regulations**

19 C.F.R. 351.511 .................................................................................3, 6, 7

**Statutes**

19 U.S.C. § 1516 .......................................................................................4

19 U.S.C. § 1677 ............................................................................. *passim*

**Administrative Decisions**

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) ............................................................8

*Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 19,657 (Apr. 28, 2017)..........................10

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016).................................7

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009)........................................................................................................10

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021) ...............................................................................9, 10, 15

*Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78799 (Dec. 31, 2014).......................................30

*Countervailing Duties; Final Rule,* 63 Fed. Reg. 65,348 (Nov. 25, 1998)....................................21

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017) ........................................................................................................................8

*Crystalline Silicon, Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018) .........................................7

*Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005) ...................................8

*Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 Fed. Reg. 35,639 (June 24, 2008)..............................8

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (May 31, 2023)............................................................................................................. *passim*

*Multilayered Wood Flooring from the People's Republic of China: Preliminary Results and Partial Recission of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 78,644 (December 22, 2022)....................................................3, 4, 11, 25

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative*
   *Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) ..............................22

Plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") and Riverside Plywood Corporation ("Riverside") (collectively "Baroque") submit this Memorandum of Law to support their Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A. ADMINISTRATIVE DECISION UNDER APPEAL

Baroque seeks review of the U.S. Department of Commerce's ("Commerce" or the "Department") final results of the tenth administrative review ("AR10") of the countervailing duty ("CVD") order on multilayered wood flooring ("MLWF") from the People's Republic of China ("China"), published as *Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (May 31, 2023) (**PR 367**) ("*Final Results*"), accompanying Issues and Decision Memorandum (May 24, 2023) (**PR 361**) ("IDM").

### B. REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Baroque's reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C. ISSUES PRESENTED AND SUMMARY OF ARGUMENT

#### 1. Is Commerce's calculation of the benchmark for plywood unlawful?

Yes. For the Final Results, the Department weight-averaged data from the International Tropical Timber Organization ("ITTO") and UNComtrade export data to calculate a Tier 2 benchmark price for the provision of plywood for less than adequate renumeration ("LTAR"). Commerce's benchmark calculation and its rejection of Baroque's arguments that the Department should only use the ITTO C/CC grade prices categories are unsupported by substantial evidence and not in accordance with the law. Commerce is required to select the most product-specific data for the calculation of benchmarks, and record evidence demonstrates that

1

Grade C/CC ITTO data was the most specific to the inputs actually used by Baroque in the production of subject merchandise. In contrast, UNComtrade includes many different types of plywood of both species and grade. This issue is identical to Baroque's challenge of two previous reviews, currently before this court. *See Evolutions Flooring Inc. v. United States*, Ct. No. 21-591 (CIT filed Nov. 23, 2021) and *Baroque Timber Industries (Zhongshan) Co., Ltd. et al v. United States*, Ct. No. 22-210 (CIT filed July 18, 2022).

> **2.** **Is Commerce's application of adverse facts available to consider certain of Baroque's input suppliers to be governmental authorities unlawful?**

Yes. Commerce unlawfully applied adverse facts available ("AFA") to consider certain of Baroque's input suppliers to be governmental authorities. Necessary information for these sixteen suppliers was not missing from the record and the Government of China ("GOC") responded to all questions related to these suppliers. Thus, substantial evidence exists to demonstrate that these individually owned suppliers (including two affiliates) are not government authorities. Commerce's finding that the GOC did not provide certain unrequested information, without either requesting that information or specifying a deficiency in the GOC's responses, prevents the application of AFA under 19 U.S.C. § 1677e.   This issue is identical to Baroque's challenge of the previous review currently before this court.  *See Baroque Timber Industries (Zhongshan) Co., Ltd. et al v. United States*, Ct. No. 22-00210

## STATEMENT OF FACTS

On February 7, 2022, Commerce initiated AR10 and the next month selected Plaintiff Baroque and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), as mandatory respondents in the review. Respondent Selection Memo (March 10, 2022) (**PR 63; CR 8).**

Baroque submitted its Initial CVD Questionnaire Response on May 12, 2022, identifying its usage of the alleged subsidy programs in the proceeding.

2

Baroque submitted additional information in its Supplemental Questionnaire Response on July 15, 2022.  On October 11, 2022, Baroque submitted timely factual information for Commerce's use in the valuation of the benchmarks for reported plywood, veneer/fiberboard, paint, and glue purchases. Baroque Benchmark Data Submission (Oct. 11, 2022) (**PR 291-296**). This submission included ITTO export price data for Commerce to use in calculating the benchmark for plywood and veneer. *Id.* at 1, Exhibit 2. Rebuttal Benchmark information was submitted a few days later. Baroque Benchmark Rebuttal Submission at Exhs. 2 and 3 (Oct. 20, 2022) (**PR 300-304; CR 156-160**). An expert affidavit from Chunping Dai, an associate professor of wood science at the University of British Columbia was submitted in a Second Benchmark Submission on November 1, 2022. Baroque Second Benchmark Submission (Nov. 1, 2022) (**PR 309-310; CR 162-163**).

Commerce published its preliminary results on December 22, 2022, and preliminarily assigned Baroque a CVD rate of 15.93 percent. *Multilayered Wood Flooring from the People's Republic of China: Preliminary Results and Partial Recission of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 78,644, 78,646 ("*Preliminary Results*") (**PR 321**), accompanying Preliminary Decision Memorandum (**PR 316**) ("PDM").  In rendering this determination, Commerce made two determinations relevant to this review.  First, Commerce applied AFA to the GOC for failure to provide necessary information and documentation for a government authority determination of Baroque's input suppliers.  As a result, as AFA, Commerce found that all of Baroque's suppliers were government authorities.  PDM at 14-18. Second, Commerce calculated a Tier 2 benchmark under 19 C.F.R. 351.511 by averaging UNComtrade export data under various HTS codes related to plywood with plywood prices taken from the ITTO publication.  PDM at This resulted in a combined *ad valorem* CVD rate of

6.23% for Baroque.

On January 31, 2023, Baroque filed its Administrative Case Brief. (**PR 341; CR 175**). Baroque challenged certain aspects of the *Preliminary Results*, including, *inter alia*, that Commerce should:

> (1) only use ITTO grade specific prices in its calculation of the Tier 2 benchmark for plywood; and
>
> (2) not apply AFA to the government authority determination for certain Baroque input suppliers.

*Id.* at 4-15, 18-61. Baroque also incorporated by reference arguments made by the Government of China. *Id.* at 61.

On May 31, 2023, the Department published its *Final Results* and assigned Baroque a final CVD rate of 17.06 percent. *Final Results*, 88 Fed. Reg. at 34,829 (May 31, 2023) (**PR 367**). In the *Final Results*, Commerce rejected certain arguments made by Baroque with regard to the: (1) use of ITTO data in both the plywood benchmark calculation; and (2) application of AFA for Baroque's input suppliers. IDM Comments 4, 7C (**PR 361**).  Commerce continued to average the ITTO prices with the UNComtrade data for the plywood benchmark and continued to apply AFA for the government authority determination of certain input suppliers.

Other relevant facts are discussed in the context of the arguments below.

## STANDARD OF REVIEW

The court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself

justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012).

## **ARGUMENT**

I.    **COMMERCE'S TIER 2 BENCHMARK SELECTION FOR THE PLYWOOD LTAR PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce in the *Final Results* declined to exclusively use ITTO data to calculate benchmark prices for plywood. This determination was unsupported by substantial evidence as this data was the most specific to Baroque's plywood purchases.

### A.    LEGAL BACKGROUND ON THE SELECTION OF PRODUCT SPECIFIC BENCHMARKS

The statute governing the selection of benchmarks for use in LTAR calculations provides as follows:

> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than

> adequate remuneration.
>
> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E)(iv). Under its regulations, Commerce sets forth the basis for identifying appropriate market-determined benchmarks for measuring the adequacy of remuneration for government-provided goods or services. 19 C.F.R. § 351.511(a)(2). These potential benchmarks are listed in hierarchical order by preference: (1) "a market-determined price for the good or service resulting from actual transactions in the country in question" (tier one); (2) "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question.  Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, *making due allowance for factors affecting comparability*" (tier two); or (3) "assessing whether the government price is consistent with market principles" (tier three). *Id*. (emphasis added). At issue in this case is the benchmark for plywood under tier two of Commerce's analytical framework. The issue with regard to plywood is the same as in Baroque's challenge of two previous reviews, currently before this court. *See Evolutions Flooring Inc. v. United States*, Ct. No. 21-591 and *Baroque Timber Industries (Zhongshan) Co., Ltd. et al v. United States*, Ct. No. 22-00210.

This court recently confirmed Commerce's obligation under the statute and regulations to calculate benchmarks using the most accurate data available. *Risen Energy Co. v. United States* 570 F. Supp. 3d 1369 (CIT 2022). At issue in that case was Commerce's tier two benchmark for ocean freight, which it calculated using data sourced from Descartes and Xeneta. *Id*. at 1377-78. Plaintiff argued that the Descartes data was flawed and inaccurate, while Commerce maintained

that its benchmark calculation was lawful because it represented a "world market price." *Id*. at

1378. This Court agreed with Plaintiff that given the record evidence, accuracy was key, noting

that "in some contexts, Commerce's choice might be viewed as a world market price. Here,

however, the Descartes data likely does not add to the accuracy of the benchmark calculation

when there is the clearly acceptable Xeneta data available." *Id.* at 1379. This Court held:

> Thus, the court remands to Commerce to reconsider the flaws raised by
> Plaintiffs. The court acknowledges that in some contexts, such data might
> result in a reasonably determination of the world market price. Here,
> however, ***Commerce should also consider the language and purpose of
> the controlling regulation to decide whether it is necessary to use the
> Descartes data to arrive at a "world market price" and discuss the
> identified flaws in the data. Presently, the analysis does not consider
> these flaws and whether the resulting Descartes data reasonably
> "reflect[ ] the price a firm actually paid or would pay if it imported the
> product*.*"

*Id*. (emphasis added). *See also Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 61 F. Supp. 3d

1306, 1341 (CIT 2015) ("import benchmark's 'comparability' means it must bear a reasonably

realistic resemblance to the importing market's reality or it will not be in accordance with the

statute.").

Commerce has applied this product-specificity practice in the past when selecting

benchmarks under section 351.511. *See*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or

Not Assembled Into Modules, from the People's Republic of China: Final Results of

Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), IDM

Comment 3 ("Commerce's practice is normally to rely on data reflecting the narrowest category

of products encompassing the input product, which, in this case, would be the annual IHS Markit

data (which reflects prices for aluminum frames, while the Comtrade data encompasses a broader

range of aluminum products)."); *see also Certain Uncoated Paper from the People's Republic of

China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016),

IDM at 3 ("Provision of Caustic Soda for LTAR" ("As noted above, our approach in this regard is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and when the record evidence indicates that the respondent firm purchases the good in question on a grade-specific basis.")); *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) (finding a species-specific benchmark for timber to be more appropriate than a generic timber value); *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), IDM Comment 1 (selecting a region-specific benchmark in order to "conduct the most accurate 'apples-to-apples' comparison between U.S. PNW and B.C. Coast log prices").

Commerce has specifically followed this logic in rejecting non-product specific HTS categories in favor of more product-specific benchmarks in other cases. In the CVD investigation on aluminum foil from China, Commerce initially valued the benchmark for ingot averaging the HTS provision for alloyed aluminum ingot and the separate HTS for unalloyed aluminum ingot in the benchmark for primary aluminum. However, in the final determination, Commerce changed its benchmark because the respondent only purchased unalloyed ingot:

> The benchmark for primary aluminum currently includes unalloyed aluminum ingot, HTS 7601.10, and alloyed ingot, HTS 7601.20. Because the respondent purchased unalloyed aluminum ingots, consistent with our practice, we have revised the benchmark to include only unalloyed aluminum ingot, HTS 7601.10, for this final determination.

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), IDM Comment 16; *Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 Fed. Reg. 35,639 (June 24, 2008), IDM Comment 15 ("the relevant

section of India's Harmonized Tariff Schedule which shows that that this is a basket category for all PP films that are 'flexible, plain.' Therefore, we have excluded these Indian export statistics from your benchmark calculation").

Commerce has recognized in other cases that the grade of a particular product can impact the price of that product and, in those circumstances, has removed certain grades from the benchmark when record evidence demonstrates that the respondent has not purchased those grades. Commerce addressed whether to remove X-grade hot rolled steel ("HRS") from the benchmark when record evidence demonstrated that the respondent only purchases non-X-grade HRS from government sources in *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021) ("*CWP from Turkey*"), IDM Comment 1. In rejecting the petitioner's calls for the benchmark to include both X-grade and non-X-grade HRS, Commerce explained that:

> Commerce must consider factors affecting comparability, such as product quality and similarity, in determining the appropriate benchmark to measure the adequacy of remuneration for the HRS provided by Turkish authorities. In the Preliminary Results, we found that X-series grade and non-X-series grade HRS are not comparable according to the evidence on the record of this review. The Borusan Companies have clearly segregated their HRS purchases into X-series and non-X-series grade HRS. The Borusan Companies have also provided product catalogues and invoices, which demonstrate that X-series grade and non-X-series grade HRS each possess distinct physical characteristics and, thus, the two HRS grades are not comparable. Although we are examining whether HRS was provided for LTAR during the POR, regardless of grade, the subsidy benefit analysis should take into account our finding that X-series and non-X-series grade HRS are not comparable grades of HRS. . . .
>
> Product grade, which in this case manifests itself in the form of X-series and non-X-series grade HRS, affects comparability, as evidenced by the product catalogue and invoice information the Borusan Companies submitted on the record.

*Id*.

Commerce then made clear that it "cannot allow the practice of using broad averages to overcome Commerce's regulatory obligation to utilize benchmarks that are more comparable if record information permits it." *Id*. Finally, it concluded that "***Commerce delineates by grade or product characteristic when such data are available and where record information indicates that the market for the good in question accounts for such grade or product characteristics in the ordinary course of business***." *Id*. (emphasis added); *see, e.g.*, *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), IDM at 21 (where Commerce delineated by steel grade in the LTAR benefit calculation); *Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 19,657 (Apr. 28, 2017), PDM at 54-56 (where Commerce delineated by coniferous species in the LTAR benefit calculation).

The cases discussed above confirm that the statute, Commerce's regulations, as well as judicial and Commerce precedent, require that Commerce select the most product-specific data in calculating benchmarks. As discussed below, Commerce failed to do so in this instance, and therefore failed in its obligation to calculate CVD rates as accurately as possible. *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (CIT 2015). Calculating a subsidy benefit based on data that consists of products that Baroque does not purchase, cannot and does not achieve this objective and subverts Commerce's legal obligations.

## B.    COMMERCE FAILED TO SELECT PRODUCT SPECIFIC BENCHMARKS FOR PLYWOOD

In its benchmark submissions, Baroque submitted bi-monthly reports from ITTO which contained plywood prices from various countries that were grade specific.  Benchmark

Submission at Exhibit 2D (**PR 291-296**). This included Ghana export prices that were BB/CC grade, Brazil C/CC grade, and Peru prices that were B/C or C/C grade. *Id*. Other parties submitted UNComtrade export data under various HTS provisions for plywood. Petitioner Benchmark Data at 2 and Exhibit 1-A (**PR 269, 271**); Jiangsu Senmao Benchmark Data at 1 and Attachment 3 (**PR 281, 284**). In the *Preliminary Results*, as in the *Final Results*, Commerce created a benchmark for plywood by averaging UNComtrade export data under various HTS provisions and prices reported in ITTO. PDM at 45-48 (**PR 316**); Riverside Preliminary Calculation Memorandum (Dec. 16, 2022) at 6-7 (**PR 319**; **CR 170**), accompanying Preliminary Calculation Worksheets, Tab: "Plywood Bench" (**CR 171**).

In its Administrative Case Brief, ITTO data to create the benchmark for plywood, because it was only pricing on the record that was grade-specific and was, therefore, closest to the inputs actually used by Baroque in the production of subject merchandise. Case Brief at 5-12 (**PR 341**; **CR 175**). Grade-specificity is critical because different grades of plywood have vastly different prices. *Id*. In contrast, UNComtrade includes all grades of plywood. *Id*.

In the *Final Results*, Commerce continued to average the ITTO and UNComtrade[1] data together. IDM at Cmt. 7C (**PR 361**). Specifically, Commerce averaged:

| Source | Description |
|--------|-------------|
| HTS 4412.10 | Plywood, veneered panels and similar laminated wood; of bambo |
| HTS 4412.31 | Plywood; consisting only of sheets of wood (not bamboo), each ply 6mm or thinner, with at least one outer ply of tropical wood, (as specified in subheading note 1, chapter 44, customs tariff) |
| HTS 4412.32 | Plywood; consisting only of sheets of wood (not bamboo), each ply 6mm or thinner, with at least one outer ply of non-coniferous wood, (without an outer ply of tropical wood as specified in subheading note 1, chapter 44, customs tariff) |

---

[1] Also included was export data under some of the same HTS provisions compiled by Stats.NZ. This data was weight-averaged with the UNComtrade data before being averaged with the ITTO data and was considered essentially the same as the UNComtrade data. For convenience, we consider UNComtrade and Stats.NZ as the same.

| HTS 4412.33 | Plywood; with sheets of wood only; not bamboo; each ply 6mm or less, with at least one outer ply of alder, ash, beech, birch, cherry, chestnut, elm, eucalyptus, hickory, horse chestnut, lime, maple, oak, plane, poplar, aspen, robinia, tulipwood or walnut |
|---|---|
| HTS 4412.34 | Plywood; consisting only of sheets of wood (not bamboo), each ply 6mm or thinner, with at least one outer ply of non-coniferous wood not listed in subheading 4412.33 |
| HTS 4412.39 | Plywood; consisting only of sheets of wood (not bamboo), each ply 6mm or thinner, not containing an outer ply of non-coniferous or tropical wood (as specified in subheading note 1, chapter 44, customs tariff) |
| HTS 4412.94 | Blockboard, laminboard and battenboard (not bamboo, and other than plywood consisting only of sheets of wood each ply 6mm or thinner) |
| HTS 4412.99 | Plywood; not containing an outer layer of non-coniferous wood, not containing a layer of particle board |
| ITTO Brazil | Parica Domestic Plywood Prices (exlu. Taxes) USD/KG and Brazil-Pinewood EY Exports USD/KG |
| ITTO Peru | Peru Export Plywood FOB Callao USD/KG |
| ITTO Ghana | Ceiba Plywood, Ofram Plywood, Asanfina Plywood USD/KG (converted from EU/KG) |

Baroque Final Calc. Worksheet at "Plywood Bench" and "ITTO – Plywood USD/KG" tab (CR 181).

For the reasons discussed below, this Commerce determination was unsupported by substantial record evidence and not in accordance with the law.

1. **Commerce Failed To Address Record Evidence Demonstrating That ITTO Grade Specific Plywood Prices Are The Most Product-Specific to Baroque's Plywood**

In making its determination, Commerce wholly disregarded substantial record evidence Baroque submitted demonstrating that ITTO grade specific data is the most product-specific and therefore the most appropriate data to use in the calculation of the plywood benchmark.

Record evidence demonstrates that the plywood market is delineated both by species and by grade and that grade in particular has a significant impact on price. The plywood market around the world and in the United States is divided into Grade A, B, C, and D (hybrid grades like CC, CD, etc. are also present). Baroque Benchmark Rebuttal Submission (Oct. 20, 2022) at

2, Exhibit 7 (**PR 300-304; CR 156-160**). "Most plywood is graded upon the finish of the

**exterior layers**, specifically the amount and type of defects that are allowed in these layers." *Id*.:

*CDX Plywood* at 1/10. Since wood flooring consists of face veneers of high-quality wood placed

on top of plywood, C grade and below plywood is sufficient for subject merchandise: "CC grade.

. . is often used as the underside of veneers . . . The structure is sound but there will be defects

on the underside of the material. These can include open knots, discoloration, and splits. These

defects mean that our veneered plywood is suitable for applications where only one good face is

needed." *Id*.: *Kitronik* at 5 (unnumbered).

The information contained in Exhibit 7 of Riverside Plywood's Benchmark Rebuttal

Submission demonstrates the importance of grade in plywood valuation. Moreover, this fact is

further confirmed by an expert statement submitted to rebut Petitioner's benchmark information.

Second Benchmark Submission at 2, Exhibit SB-1 (Nov. 1, 2022) (**PR 309; CR 162**). Professor

Dai, a Wood Sciences professor at the University of British Columbia states as follows:

> 6.  Unlike in other industries or applications (such as wooden cabinets or wooden
>     furniture), the plywood used in MLWF is of a low-quality because it is used
>     for the core of the product, which cannot be seen by the consumer;

> 7.  Based upon my industry experience, most Chinese producers of MLWF
>     choose low grade, fast growing wood species, such as poplar or eucalyptus, to
>     produce plywood for MLWF;

> 8. There are several factors that influence the price of plywood. These are species
>    type, grade (A, B, C, D), overall thickness and size. The two biggest
>    influences on price are species type and grade, with grade being the most
>    important. There is a significant price difference between Grade AB plywood
>    and Grade CD plywood.

> 9. Different wood species types have significantly different prices due to
>    desirability of appearance and growth. Slow growing hardwoods - like oak,
>    cherry and walnut that are desired for their appearance and hardness for use in
>    cabinetry and furniture - are much more expensive than fast growing woods
>    like eucalyptus which is used almost exclusively for non-decorative, structural
>    applications. For example, eucalyptus may be priced as low as one-third or

PUBLIC VERSION

one-fourth of any other popular hardwood (e.g., see Attachment 1: ITTO Report Vol 24, page 17);

10. And for the same type of wood, different grades of plywood vary in cost, and therefore in market prices;

11. Grade of plywood is largely determined by the top face of the plywood, and inner plies are always low, C or D grades (Attachment 2: PS-1-2010-APA, pages 16-17, Tables 2 and 3);

12. ***I have requested materials and supporting documents for the plywood Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") used in producing MLWF***;

13. I have examined and analyzed the well-recognized American Plywood Association (APA) Structural Plywood Standard (Attachment 2: PS-1-2010-APA, pages 16-21); Some pictures on which I have relied to make judgment are provided in (Attachment 3: Veneer grade of same species);

14. ***I believe the plywood Baroque Timber used in production of MLWF is Grade D or Grade C/D plywood based upon a review of pictures of Baroque's plywood (Attachment 4: Photos of Eucalyptus veneer used by Baroque Timber) and interviews with employees***;

15. Reviewing the Harmonized Tariff Schedule ("HTS") categories for plywood that were placed on the record – i.e., 4412.33, 4412.39 and 4412.32 – ***the only characteristic accounted for in these categories is species (there is a reference to the per ply thickness but not overall thickness of the plywood)***;

*Id*. Exhibit SB-1 (emphases added).

The record evidence outlined above establishes the following facts:

- Plywood comes in a variety of different grades and these grades significantly impact price;

- Plywood used for subject merchandise is Grade C or D, generally, since a high-quality face veneer is placed on top of the plywood;

- The plywood that Baroque Timber uses in its production is Grade C/D; and

- The HTS provisions used for plywood do not distinguish grade and therefore include all grades of plywood.

Since grade is a significant factor affecting comparability and reflects "prevailing market

14

conditions," Commerce is mandated by statute to account for it. 19 U.S.C. § 1677(5)(E)(iv). Yet Commerce entirely failed to do so in its *Final Results*. Commerce has followed a practice in the past, most recently in *CWP from Turkey*, *supra*, in which it considers grade in the benchmark when:

1) evidence shows that there are different grades of the product that have different prices;

2) evidence shows that the respondent only purchased certain types of grades; and

3) the grade specific benchmarks are able to be extracted from the data.

In this case, all three of those circumstances are present. Since the ITTO prices are the only plywood prices on the record that identify grade, Commerce should have used the grade specific prices as the sole benchmark price for plywood in this review.

### 2. <u>Commerce's Reasoning Is Unsupported By Record Evidence</u>

Commerce cited the following reason for dismissing Baroque's arguments that the only ITTO data should be used: "Riverside did not adequately support its arguments that the UNComtrade data are inappropriate to calculate plywood benchmarks for Baroque Timber's plywood purchases." IDM at Cmt. 7C (**PR 361**). Riverside, however, provided substantial evidence demonstrating that its plywood input is limited to a particular grade and also demonstrated that different grades have significantly different prices.

First, the record **does** in fact contain substantial evidence demonstrating that Baroque's plywood input is limited to a particular grade. Specifically, Baroque conclusively demonstrated that it does not purchase certain types of plywood and uses only eucalyptus plywood. *See* Riverside Benchmark Rebuttal Submission Exhibits 4 (**PR 300-304**; **CR 156-160**); *see also* Riverside Second Benchmark Submission Exhibit SB-2 (**PR 309, CR 162**). In its benchmark submission, Baroque provided Commerce with supplier certifications certifying that the plywood

Baroque purchased was made of C/D grade only. Baroque Benchmark Rebuttal Submission at Exhibit 4 (**PR 300-304**; **CR 156-160**). This record evidence was never called into question and provides uncontroverted proof that Baroque's plywood input is limited to lower grade purchases.

Second, Commerce cursorily dismissed the witness statement provided by Baroque. As demonstrated in the excerpts above, Professor Dai provided comments on the industry generally, but also commented on Baroque specifically, after a careful review of information provided by Baroque to him. Mr. Dai examined "materials and supporting documents for the plywood . . . {Baroque Timber} . . . used in producing MLWF" and he further based his analyses on "a review of pictures of Baroque's plywood (Attachment 4: Photos of Eucalyptus veneer used by Baroque Timber) and interviews with employees." *See* Baroque Second Benchmark Submission at Exhibit SB-1 (**PR 309, CR 162**).

Third, record evidence demonstrates that different grades are not used to produce subject merchandise. Specifically, Baroque provided various articles and website printouts discussing the different grade and pricing criteria for plywood to assist Commerce in selecting the proper world price for the eucalyptus plywood that Baroque reported. Baroque Benchmark Rebuttal Submission, Exhibit 7 (**PR 300-304**; **CR 156-160**). These documents established, *inter alia*, the qualitative differences between the different grades of plywood. Information from ANDERSON PLYWOOD explains, for example, that Grade A plywood is used "where excellent appearance is very important as in cabinets and furniture." *Id.*: *Plywood Grading Information* at 2 (unnumbered). In contrast, Grades C and D "provide sound surfaces but allow unlimited color variation. Repairs in increasing size ranges allowed respectively from C to D. Applications – where surface will be hidden or a more natural appearance is desired." *Id.*

Another source submitted by Baroque explains that CC grade plywood is used precisely for applications like flooring: "This is often used as the underside of veneers . … The structure is sound but there will be defects on the underside of the material. These can include open knots, discolouration, and splits. These defects mean that our veneered plywood is suitable for applications where only one good face is needed." *Id*.

Further, as discussed above, the statements provided by Professor Dai – who was retained as an independent industry expert – confirm that Baroque did not use higher grade plywood in the production of subject merchandise, and that using data that includes higher grade plywood to calculate the benchmark would be distortive and inaccurate. Riverside Second Benchmark Submission at Exhibit SB-1 (**PR 309; CR 162**).

These expert opinions combined with the above information demonstrate the importance of grade in the pricing of plywood and show that Baroque only used lower grade eucalyptus in the manufacture of its MLWF.   The above evidence further shows that AB plywood grades are significantly more expensive CD grades.  For example,

- "The grade refers to the quality and appearance of the plywood's face and back veneers. A has the highest quality and is the most expensive, and D is the least expensive."  Rebuttal Benchmark at Exh. 7 (Types of Plywood – The Home Depot) (**PR 309; CR 162**).

- "CDX grade plywood is . . . .plywood is the least expensive grade of multi-layered veneer plywood . . . {and} is not intended for visible applications, where appearance is important,"  Id. at CDX Plywood.

Since the UNComtrade plywood HTS categories do not delineate between grades, these categories necessarily cover all grades of plywood, including high prices A grade plywood.

When Commerce used UNComtrade pricing, it therefore distorted the plywood benchmark by including this higher priced plywood.  Thus, the benefit calculated did not evaluate the adequacy remuneration under the 19 U.S.C. § 1677(5)(E)(iv) by comparing a market price and a subsidized price but instead, at least partially, evaluated price differences due to product mix. This demonstrates that Commerce's determination to include UNComtrade data in establishing a benchmark for plywood is unsupported by substantial evidence and not in accordance with the law.

## II.    COMMERCE UNLAWFULLY APPLIED AFA TO WHETHER CERTAIN OF BAROQUE'S INPUT SUPPLIERS WERE GOVERNMENT AUTHORITIES

In the *Final Results*, Commerce applied AFA to the GOC for failing to provide requested information regarding the government authority status of respondents' input suppliers. As AFA, Commerce found that all of Baroque's input suppliers were government authorities. This determination is not supported by substantial evidence or in accordance with law.

### A.    LEGAL FRAMEWORK FOR AFA DETERMINATIONS IN CVD PROCEEDINGS

To be consistent with the law, Commerce's AFA finding must satisfy three criteria: (1) it must identify a gap in the record; (2) it must identify how the offending party failed to cooperate to the best of its ability; and (3) the application of AFA to *each* element of the subsidy analysis (financial contribution, specificity, government authority, etc.) must be supported by substantial evidence.

The statutory provisions for the application of facts otherwise available and for the application of adverse inferences are separate, but related. The use of facts otherwise available is governed by 19 U.S.C. § 1677e(a):

(a) In general

> If-
> (1) necessary information is not available on the record, or
> (2) an interested party or any other person-
>> (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
>> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
>> (C) significantly impedes a proceeding under this subtitle, or
>> (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
>> the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

The use of "adverse inferences" (*i.e.*, AFA), is governed by 19 U.S.C. § 1677e(b):

> (b) Adverse inferences. If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

The statute accordingly requires satisfaction of both of these separate findings, *i.e.*, an adverse inference cannot be applied unless it is appropriate to use facts otherwise available. *See, e.g.*, *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1289 (CIT 2006) ("Absent a valid decision to use facts otherwise available, Commerce may not use an adverse inference"). Moreover, reliance on facts otherwise available is only appropriate to "fill gaps" in the record necessary for Commerce to complete its calculation. *See Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003) (stating that the use of facts otherwise available is to "fill in the gaps" when "Commerce has received less than the full and complete facts needed to make a determination"); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1255 (Fed. Cir. 2009) ("The legislative history of the URAA thus reveals that Congress intended

§ 1677e(a) to provide Commerce with gap-filling power to facilitate its implementation of the antidumping laws"); *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) ("Commerce can only use facts otherwise available to fill a gap in the record").

In addition to showing that the information is missing from the record, Commerce is also required to show that the interested party "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). In determining whether a party cooperated to the best of its ability, the courts have instructed that Commerce cannot apply AFA for a "failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel*, 337 F.3d at 1381; *see Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1326 (CIT 2018) ("The use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA"); *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (CIT 2018) ("Compliance with the 'best of its ability' standard is determined by assessing whether the respondent puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation"). As the U.S. Court of Appeals for the Federal Circuit has stated, "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

As discussed below, Commerce failed to meet the requisite criteria described above in its AR10 AFA determinations.

PUBLIC VERSION

**B.    THE APPLICATION OF AFA TO THE GOC FOR THE GOVERNMENT AUTHORITY STATUS OF SPECIFIC INPUT SUPPLIERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

In its *Final Results*, Commerce found every input supplier reported by both mandatory respondents for the various input for LTAR programs (*i.e.*, plywood, veneers, paint, glue and fiberboard) to be government authorities on the basis of AFA. Specifically, Commerce found that the GOC did not provide certain information requested in the Input Supplier Appendix[2] for each supplier and therefore AFA was warranted. As AFA, Commerce determined that all input suppliers were government authorities. This finding is unsupported by substantial evidence and unlawful for certain of Baroque's input suppliers. More specifically, for **sixteen** input suppliers that were either owned by individuals, including two that were non-cross-owned affiliates of Baroque, the GOC in fact provided all information requested by Commerce to show that these suppliers were not government authorities and, thus, there is not a gap in the record with regard to these suppliers. These suppliers are identified in **Attachment 1** to this brief.

### 1.    Background and Relevant Facts

For a countervailable subsidy to be found under the law, the entity providing the subsidy must be an "authority." 19 U.S.C. § 1677(5)(B). "'Authority' is defined {by 19 U.S.C. § 1677(5)(B)} as a country's 'government' or any 'public entity' within the country's territory." *Borusan*, 61 F. Supp. 3d at 1314. Commerce treats entities that are owned by a government as "authorities." *Countervailing Duties; Final Rule,* 63 Fed. Reg. 65,348, 65,402 (Nov. 25, 1998).  This is not in dispute here.  Where there is no or minimal government ownership, as is the issue with sixteen of Baroque's input suppliers, Commerce analyzes "the totality of record evidence and whether it demonstrates that the government has meaningful

---

[2] A sample Input Producer Appendix can be found in the Initial CVD Questionnaire (May 23, 2021) (**PR 65-66**).

control over an entity such that it possesses, exercises, or is vested with government authority in order to determine whether it is an "authority" under section 771(5)(B) of the Act." *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021), IDM at Comment 1.

To assist in this analysis, Commerce requires the GOC to submit an Input Producer Appendix for each supplier reported by the mandatory respondents. GOC IQR at Exhibit LTAR-1 (**PR 65-66**). The GOC submitted this information in its initial questionnaire response at Exhibit LTAR-1 and Exhibit LTAR-2 (**PR 93-102; CR 35-54**) and in its supplemental response at Exhibit SQ-2 (**PR 227; CR 73-77**). At the outset, it is important to understand the difference between the information the GOC submitted *in this case* in its input supplier appendix responses and the information the GOC submits *in virtually every other case*. In almost every case, the GOC refuses to provide the requested documents or answer many of the questions. More specifically, the GOC refuses to provide information regarding the two most important questions in the appendix. These relate to ownership and Chinese Communist Party ("CCP")/Government Entity involvement:

> 2. For all input producers that are not majority Government-owned and that produced the input purchased by the respondent companies during the, please provide the original Chinese and full translations of the following:
>
> a. Full corporate name of the company and address (please include the address where the company is registered and the address of each facility. Identify the address of the facility(ies) where the input product is produced).
> b. Articles of Incorporation.
> c. Capital Verification Reports.
> d. Articles of Groupings.
> e. Company by-laws.
> f. Annual Report(s) pertaining to the POR, and the two preceding years.
> g. Articles of Association.
> h. Business group registration.

       i. Business license(s).
       j. Tax Registration documents

GOC IQR at Exhibit LTAR-2 (**PR 93-102; CR 35-54**) (hereinafter "The Documents Question").

And:

> 3. Commerce understands that for each level of Government, i.e., central, provincial, municipal, county, township and village ("county, township, and village" will hereafter be referred to collectively as "local"), there are corresponding (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), and (8) the Discipline Inspection Committees of the CCP. Commerce also understands that, in accordance with the CCP Constitution, a (9) CCP committee, branch, or "primary organization" needs to be formed in any enterprise with three or more party members, regardless of state ownership. For the purposes of this questionnaire, we refer to officials of any of these 9 entities as "Government or CCP officials." Please explain whether a CCP committee, branch or "primary organization" has been formed within the enterprise. Please also explain any decisions taken by the entity that are subject to review or approval by the Government or the 9 entities listed above, as either an owner or regulator, or both (*e.g.*, mergers/acquisition, issuance of shares, change in capital structure, change in leadership positions or board composition, *etc.*).

*Id*. at Exhibit LTAR-1 at p. LTAR-48 (hereinafter the "9 Entities Question"). Often the GOC only provides information contained in its Enterprise Credit Information Publicity System ("ECIPS"), which is the country's business registration system that identifies ownership, and outright refuses to provide a response to the 9 Entities Question. This failure to provide information always results in AFA and every input supplier being found to be a government authority. **This case, however, is different.**

In this case, the GOC provided detailed responses (and documentation where requested) to all questions in the Input Supplier Appendix, including the two questions above. For each supplier listed in **Attachment 1**, the GOC provided incontrovertible evidence on each

companies' ownership, including ECIPS information for each company and all the documents

requested in the Documents Question (where such documents existed). This information showed

that fifteen of these companies were owned by individuals and one was owned by foreign

companies. *See* GOC Initial QRE at Exhibit LTAR-2 (**PR 93-102; CR 35-54**); GOC Supp QRE

at Exhibit SQ-2 (**PR 227; CR 73-77**).  Two of these suppliers, were non-cross-owned affiliates

of Baroque. Baroque Affiliation Response at Exhibit 1 (**PR 71; CR 11-12**). Commerce does not

appear dispute this evidence and did not find that the ownership information provided was

deficient or missing. IDM at Comment 4.

Then, for each of these suppliers, either in the IQR or in its supplemental questionnaire

response, the GOC responded fully to the 9 Entities Question as follows:

> There is no primary party organization in this producer. There is no
> decision taken by the producer that are subject to the review or approval
> by the Government or the 9 entities listed in the question. As demonstrated
> in the Articles of Association of the producer, the decisions are made
> within internal organizations of the producer without reference to any
> external review or approval.

GOC IQR at Exh. LTAR-1, pp. LTAR-48-52; GOC Supp. Response at Exh. SQ-2.

In addition to the Documents Question and the Nine Entities Question, the supplemental

questionnaire contained a different follow up question in response to the GOC's initial response:

> 17. For all producers from whom the respondents purchased inputs during
> the POR, please identify whether any owner, director, or manager is a
> member or representative of any of the following entities: (1) Chinese
> Communist Party (CCP) Congresses, (2) CCP Committees, (3) CCP
> Standing Committees, (4) People's Congresses, (5) Standing
> Committees of People's Congresses, (6) other Government
> administration entities, including village committees, (7) the Chinese
> People's Political Consultative Conferences (CPPCC), (8) the
> Discipline Inspection Committees of the CCP, and (9) a CCP
> committee, branch, or "primary organization." Please also explain any
> decisions taken by each entity that are subject to review or approval by
> the GOC or the nine entities listed in Commerce's questionnaire, as
> either an owner or regulator, or both (*e.g.,* mergers/acquisition,

issuance of shares, change in capital structure, change in leadership positions or board composition, *etc.*).

**Response: The GOC has confirmed that, for the companies that the GOC was able to collect and submit requested documents in the IQR and Exhibit SQ-2, the owners, directors, or managers are not members or representatives of any of the above mentioned 9 entities. Further, those companies have submitted signed statements which clarify that, all decisions and operations of the company are made independently, internally by the company, and not subject to any external inference by any third-party organizations, institutions, individuals, etc.**

GOC Supp Response at 9-10 (hereinafter the "CCP Question"). The GOC fully responded to this question. The GOC did not receive supplemental questionnaire after this response indicating that the response was deficient.

Finally, while the GOC responded fully to each question in the Input Supplier Appendix as well as the Supplemental Questionnaire, it also provided additional, unsolicited information regarding certain suppliers to demonstrate the companies' lack of government control. This information included signed certifications from these suppliers.[3]

Commerce again did not issue any supplemental questions on the information the GOC provided. However, in its *Preliminary Results*, Commerce found that the GOC failed to provide the information requested and otherwise failed to act to the best of its ability. PDM at 14-18 (**PR 316**). Commerce then found, as AFA, that all input suppliers were government authorities.

Both the GOC and Baroque filed administrative case briefs challenging this AFA determination. Baroque specifically addressed fifteen of its individually owned suppliers (and one foreign owned supplier) and the factual information on the record showing that these suppliers were not government authorities. Case Br. at 21-54 (**PR 341**; **CR 175**). Two of these

---

[3] GOC Initial QRE at Exhibit LTAR-2 (**PR 93-102; CR 35-54**); GOC Supp QRE at Exhibit SQ 2 (**PR 227; CR 73-77**).

eight suppliers, [

                    ], are non-cross owned affiliates (*i.e.*, affiliated companies in which Baroque

did not have a controlling interest). *See* Baroque Affiliation Response at Exh. 1. (**PR 71; CR 11-**

**12**).

In the *Final Results*, Commerce maintained its position that AFA was warranted for the

GOC's failure to provide requested information. Specifically, Commerce found that:

> As a result of incomplete responses to Commerce's questionnaires, we
> find that the GOC failed to cooperate by not acting to the best of its ability
> to comply with our requests for information. Consequently, we determine
> that the GOC withheld information, and that an adverse inference is
> warranted in selecting from the facts available. As AFA, we find that CCP
> officials are present in each of the mandatory respondents' privately-
> owned input producers as individual owners, managers, and members of
> the boards of directors, and that this gives the CCP, as the government,
> meaningful control over the companies and their resources.

    2.    **Argument**

        a.    **Commerce Did Not Address Specific Input Suppliers,
               Rendering its Determination Unreviewable**

Commerce's determination in its *Final Results* that the GOC failed to cooperate with

regard to **all** input suppliers is indecipherable, necessitating a remand. The first step in the

application of AFA is to determine whether information is missing from the record. *Zhejiang*

*Dunan Hetian Metal Co.*, 652 F.3d at 1348; see *Changzhou Trina Solar Energy Co., Ltd.*, 352 F.

Supp. 3d at 1326 ("The use of facts available allows Commerce to render determinations when

information is missing and it may use an adverse inference if respondents fail to cooperate, but is

not permitted to skip either of these steps on the way to use of AFA"). In its *Final Results*

Commerce did not specifically address any of the sixteen input suppliers that Baroque raised in

its brief. Instead, Commerce's determination only speaks in generalities about the information

provided rendering a review of whether and what information was missing or deficient for **each specific input supplier** impossible. *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ("[ ]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review'"); *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (agency decisions must be "reached by 'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choices made").

A determination whether an entity is a government authority within the meaning of the statute is a particular factual finding specific to that entity. Commerce's determination as to *each* input supplier must be supported by substantial evidence. Commerce cannot use the failure to provide certain information for one input supplier (or a certain group of input suppliers) as an imputed finding that information is missing for a different, specific supplier. This is particularly true in this case where the GOC provided different kinds and documentary information for certain input suppliers. This means that in order for Commerce's AFA determination to be supported by substantial evidence it is "Commerce's burden to provide enough information to allow the court to discern reasonably which particular evidence Commerce determined was missing." *GODACO Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1354–55 (CIT 2020). Commerce has not done that here.

In this case, the GOC was required to provide information requested in the Input Supplier Appendix for a large number of input suppliers. For example, Baroque reported more than 100 input suppliers. Baroque IQR at Exh. 11a, 11b (**PR 106-109; CR 56-67**). The GOC provided basic ownership information for many of these suppliers. GOC IQR at Exhibit CUT-1, PLY-1, FB-1, VEN-1, SAWN-1, GLUE-1 and PAINT-1 (**PR 93-102; CR 35-54**). However,

Baroque did not challenge the application of AFA to all of its suppliers. Instead, Baroque limited

its arguments to specific input suppliers where full information was provided. Commerce did not

address these suppliers specifically.

> For example, Commerce explained:

>> we disagree with the GOC and Riverside that it provided Commerce with
>> sufficient information to determine whether any of the mandatory
>> respondents' input producers are privately-owned or wholly foreign-
>> owned entities. We explained in the *Preliminary Results* that the GOC's
>> responses to the Input Producer Appendix for the inputs being investigated
>> were deficient, and that the ECIPS information and the information
>> supplied from the mandatory respondents' input suppliers were not
>> sufficient for our analysis of whether the input producers identified by the
>> company respondents are authorities under the Act.

IDM at Cmt. 4. For the specific suppliers Baroque addressed in its administrative case brief, the

GOC did not *only* provide ECIPS information. Instead, the GOC provided ECIPS information,

and every document Commerce requested regarding ownership (*i.e.*, a response to the

Documents Question), to the extent those documents existed. Thus, Commerce's discussion of

whether ECIPS information alone is sufficient for its purposes is moot with regard to these

sixteen suppliers.

> Next, Commerce discusses generally that the GOC provided "articles of incorporation,

capital verification reports, company by-laws, business licenses, and financial statements for . . .

certain individually- or wholly foreign-owned suppliers," which Commerce acknowledges is

"helpful in identifying the individual owners, board members, officers, and managers of the

company." *Id*. However, Commerce then concludes that "this documentation lacks information

as to whether the owners and shareholders of the companies have any CCP involvement" and

that the GOC did not "respond in full to Commerce's questions regarding the role of CCP

officials and organizations in the management and operations of the input suppliers." *Id*. This

statement ignores the fact that the GOC provided full responses to all CCP questions for the

sixteen suppliers Baroque addresses in its brief.  For sixteen of the suppliers, the GOC responded

to the 9 Entities Question as follows:

> There is no primary party organization in this producer. There is no
> decision taken by the producer that are subject to the review or approval
> by the Government or the 9 entities listed in the question. As demonstrated
> in the Articles of Association of the producer, the decisions are made
> within internal organizations of the producer without reference to any
> external review or approval.

GOC IQR at Exh. LTAR-1, pp. LTAR-48-52 (**PR 93-102; CR 35-54**); GOC Supp. Response at

Exh. SQ-2 (**PR 227; CR 73-77)**

In addition, the GOC fully responded to the CCP Question that none of these sixteen

suppliers had "owners, managers, and directors were Chinese government or CCP officials

during the POR." GOC Supp. Response at 9-10. Commerce provides no explanation why

responding fully to the Nine Entities Question in this manner results in the information being

rendered missing from the record. If the information is not missing, facts available and adverse

inferences cannot be applied.  *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348.

Ignoring this information, Commerce inexplicably focuses a supplier that had a primary

party organization, in the previous review, stating that the "the summary report primarily

indicates the influence of the CCP over the employees in the company." IDM at Cmt. 4. It is not

clear how Commerce is using this information to support its AFA determination. This relates to a

supplier from a previous review, not this review.

Taken together, it is apparent that Commerce has failed to identify with particularity what

precise necessary information it requested but that was missing for each supplier and why, with

regard to each of those suppliers, adverse inferences are warranted.

### b.    Commerce Failed to Notify the GOC of Any Deficiency

Commerce does not, however, end it there. Commerce goes on in its decision to explain that the GOC's narrative responses to the Nine Entities Question and CCP Question, and additional certifications from the specific suppliers, were not the information Commerce wanted in response to these questions because of, in part, information submitted nine years ago in another unrelated review, *Citric Acid from China 2012*.[4]  Commerce ultimately concludes that "GOC did not provide any government documentation to support its claim that the independently-owned suppliers were not government authorities" and that "the GOC withheld information." IDM at Cmt. 4. There are several errors in this analysis.

First, neither the Nine Entities Questions nor the CCP Question requested documentation. Yet Commerce determined that documentation was "missing" from the record, necessitating AFA. Both of these questions only ask the GOC to indicate whether or not certain circumstances exist for each supplier. If the answer is yes, the questions ask the GOC to explain. If the answer is no, Commerce does not provide any further direction on how to respond. It is axiomatic that "it is Commerce, not the respondent, which bears the burden of asking questions[ ]" and that Commerce must ask "clear" questions "to let the respondent know what information it really wants". *Ta Chen Stainless Steel Pipe, Ltd. v. United States,* 23 CIT 804, 820 (1999); s*ee also NSK Ltd. v. United States,* 910 F.Supp. 663, 671 (1995) ("[ ]espondents should not be required to guess the parameters of Commerce's interpretation of a phrase in the statute"). Commerce cannot lawfully deem information necessary that it does not ask for.

Second, the failure to request documentation that Commerce deems "sufficient" or "necessary" runs afoul of 19 U.S.C. § 1677m(d). The first step in the application of AFA is for

---

[4] *Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78799 (Dec. 31, 2014).

Commerce to identify one of the five categories of deficiencies: when (1) "necessary information is not available on the record, or" an interested party (2) "withholds information that has been requested," (3) "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," (4) "significantly impedes a proceeding ... or," (5) "provides such information but the information cannot be verified" 19 U.S.C. § 1677e(a)(1)–(2). Once one of the categories has been identified Commerce "shall, *subject to section 1677m(d) of this title*, use the facts otherwise available in reaching the applicable determination." *Id*. (emphasis added). The Federal Circuit has further explained that:

> Section 1677e(a)(2)(D) requires that the authorization to rely on adverse facts available is subject to § 1677m(d), which requires Commerce to provide notice and an opportunity to remedy a deficiency. Commerce has no authority to apply adverse facts and inferences unless the respondent has failed to provide requested information when notified of the deficiency, and has not acted to the best of its ability in responding to such requests. 19 U.S.C. § 1677e(a).

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1385 (Fed. Cir. 2022).

In this case, Commerce did not provide the GOC with any notice that the specific information provided regarding the sixteen suppliers at issue was deficient in any way. For example, for several of these suppliers, the GOC provided full answers to the Documents Question and the Nine Entities Question in the initial questionnaire response. GOC IQR at Exhs. LTAR-1, LTAR-2 (**PR 93-102; CR 35-54**). In the first supplemental questionnaire issued to the GOC, Commerce did not provide any indication that the GOC's answers that the suppliers had no primary party organization was deficient. GOC Supp. Response at 9-10 (**PR 227; CR 73-77**). Commerce simply repeated the Nine Entities Question without any reference to the GOC's initial questionnaire response. *Id*. at 9. Repeating the question without specifying the deficit in the information already provided is insufficient for purposes of 1677m(d). *See Borusan*, 61 F. Supp. 3d at 1345-48, *aff'd sub nom. Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir.

31

2017) (Commerce must provide a sufficiently detailed explanation of the "nature of the deficiency" and must permit the respondent to correct the deficiency).

Similarly, in the supplemental questionnaire, Commerce asked the GOC for the first time: "For all producers from whom the respondents purchased inputs during the POR, please identify which owners, managers, and directors were Chinese government or CCP officials during the POR." GOC Supp. Response at 10. The GOC fully responded to this question. Commerce then used the GOC's response to this question and the failure to provide "official documents" as the basis for applying AFA. IDM at Cmt. 4. We again stress that Commerce's questionnaire only requested an answer to its question and did not reference the need for any documentation. Any question that requires documentation normally states so explicitly. The GOC went a step further and provided some certifications for certain suppliers to back up its statement that none of the producers had CCP officials in them. GOC Supp QRE at Exhibit SQ-2 (**PR 227; CR 73-77**). If Commerce required documentation for answers to this question, and more importantly wanted specific documentation that was provided in an unrelated review *nine years ago*, then it should have expressly requested this information. "The law requires respondents to be diligent, not clairvoyant." *Saha Thai Steel Pipe Pub. Co. v. United States*, 2022 WL 17369301, at *11 (CIT Dec. 2, 2022); *see also Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (CIT 1993) ("Commerce cannot expect a respondent to be a mind-reader").

Third, Commerce's reliance on *Citric Acid from China 2012* as essentially the sole basis for determining that the GOC did not provide the information requested of it and did not act to the best of its ability is unreasonable. The facts of that case were extremely case specific and do not translate to this review. Indeed, the issue in that case was that for two individually owned suppliers the owner of both had been Secretary of the Party Committee of Liujiadu Village prior

PUBLIC VERSION

to the POR but no longer held that position during the POR. Commerce explained the

information provided in the IDM:

> GOC provided a certified letter from the CCP Committee of the village indicating that the owner of Companies B and C held the position of Secretary from June 2009 to December 2011. 216 The Department established at verification through official government documentation provided by the GOC and the CCP (e.g., stamped originals of election notification from the CCP Committee of Lijiaxiang Town), that the owner of Companies B and C did not serve as Secretary for the Party Committee of Liujiadu Village in the PRC during the POR and that the village does not geographically overlap with the locations of the producers' operations. 217 The Department was also able to establish at verification that another person was elected to the position of Secretary for the Party Committee of Liujiadu Village on December 28, 2011, ending the owner of Companies B and C's tenure as Secretary before the POR. In addition, the December 28, 2011 election notification announced the approval of another person for Secretary of the Party Committee for the village in which Companies B and C are located.

*Citric Acid from China 2012* at IDM Cmt. 2. This type of "documentation" was only possible

because the owner had been secretary of a specific government entity and then was no longer

part of that entity. Commerce failed to specify *in the instant review* what sort of documentation

could be provided for a scenario where none of the owners or managers are part of (and were

never part of) any of the Nine Entities. Indeed, we note that Commerce did not require in *Citric*

*Acid from China 2012* that the GOC demonstrate with official documentation that the owner was

not part of any other government entity; it only required documentation to show that the owner

was no longer part of the government entity he had been involved with. It is therefore entirely

unreasonable, and indeed arbitrary and capricious, to use the specific factual scenario presented

in *Citric Acid from China 2012* as the basis for determining that the GOC did not act to the best

of its ability in this case.

PUBLIC VERSION

## CONCLUSION

For the reasons discussed above, Baroque requests that this Court hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law, and remand the *Final Results* with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Francis J. Sailer
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  February 23, 2024

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Memorandum of Law in Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 10,440 words, less than the 14,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Counsel to Plaintiffs, Baroque Timber*
*Industries (Zhongshan) Co., Ltd. and*
*Riverside Plywood Corporation*

Dated: February 23, 2024

PUBLIC VERSION

**ATTACHMENT 1**

PUBLIC VERSION

| Special Note | Supplier | Ownership | Answered Documents Question ? | Answered CCP Question | Answer to Nine Entities Question | Exhibit |
|---|---|---|---|---|---|---|
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| affiliate | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 / Baroque Affiliation Response at Exh. 1 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 |
| affiliate | [ | ] | yes | yes | no primary party organization | GOC Initial QRE at Exhibit LTAR-1 and LTAR-2 / Baroque Affiliation Response at Exh. 1 |