## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
                                                                    )
BAROQUE TIMBER INDUSTRIES (ZHONGSHAN)     )
CO., LTD. and RIVERSIDE PLYWOOD CORP.,               )
                                                                    )
             Plaintiffs,                                       )
                                                                    )
       v.                                                         )          Ct. No. 23-00136
                                                                    )
UNITED STATES,                                              )
                                                                    )
             Defendant,                                      )
_____)

---

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                                    BRENDAN JORDAN
JonZachary Forbes                            Trial Attorney
Attorney                                            U.S. Department of Justice
Office of the Chief Counsel                 Civil Division
for Trade Enforcement and Compliance   Commercial Litigation Branch
U.S. Department of Commerce            P.O. Box 480
Washington, D.C.                              Ben Franklin Station
                                                        Washington, D.C. 20044
                                                        Telephone: (202) 616-0342
                                                        E-mail: Brendan.D.Jordan@usdoj.gov

June 25, 2024                                   Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ..................................................................1

    I.     Administrative Determination Under Review ........................................1

    II.    Statement Of Issues..................................................................................2

STATEMENT OF FACTS ..........................................................................................2

    I.     Plywood Benchmark ................................................................................3

    II.    Government Authorities............................................................................3

    III.   Preliminary Results .................................................................................5

    IV.   Final Results.............................................................................................5

SUMMARY OF ARGUMENT ....................................................................................6

ARGUMENT .............................................................................................................7

    I.     Standard Of Review .................................................................................7

    II.    Commerce's Calculation Of The Benchmark Prices For Plywood Is Supported By Substantial Evidence And Otherwise In Accordance With Law ........................7

           A.  Legal Framework For Calculating Benchmark Prices.......................................8

           B.  Commerce's Calculation Of The Benchmark Price For Plywood Is Supported By Substantial Evidence And Otherwise In Accordance With Law ...............10

    III.   Commerce's Determination That Baroque's Input Suppliers Are Government Authorities Based On AFA Is Supported By Substantial Evidence And Otherwise In Accordance With Law ....................................................18

           A.  Commerce's Determination That There Was A Gap In The Record And That AFA Is Warranted Is Supported By Substantial Evidence ..............................19

                1.  Legal Framework For The Government Authorities Determination .........19

                2.  Legal Framework For Adverse Facts Available .........................................20

                3.  Substantial Evidence Supports Commerce's Determination That The GOC Did Not Provide All Requested Information....................................22

4.  Substantial Evidence Supports Commerce's Application Of An Adverse Inference In Selecting Among The Facts Available ....................................25

B.  Commerce Provided Adequate Notice Of The GOC's Deficient Responses Under 19 U.S.C. § 1677m(d) ..............................................................................30

1.  Baroque Failed to Exhaust Its Remedies ....................................30

2.  Commerce Complied With 19 U.S.C. § 1677m(d) And Provided Adequate Notice And An Opportunity To Remedy ..................................33

CONCLUSION..............................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Altex, Inc. v. United States*,
   370 F.3d 1108 (Fed. Cir. 2004)........................................................................................7

*Archer Daniels Midland Co. v. United States*,
   968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ................................................................9

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017).....................................................................................30

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ..........................................................19, 37

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007)..............................................................................30, 32

*Dorbest Ltd. v. United States*,
   604 F.3d 1363 (Fed. Cir. 2010)...................................................................................31

*Ellwood City Forge Co. v. United States,*
   582 F. Supp. 3d 1259 (Ct. Int'l Trade 2022) ........................................................31, 33

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268 (Fed. Cir. 2012)..................................................................................8, 9

*Essar Steel Ltd. v. United States*,
   721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ................................................................9

*Fine Furniture (Shanghai) Ltd. v. United States*,
   748 F.3d 1365 (Fed. Cir. 2014)..............................................................................21, 24

*Fujitsu Gen. Ltd. v. United States*,
   88 F. 3d 1034 (Fed. Cir. 1996).....................................................................................7

*Gerber Food (Yunnan) Co. v. United States*,
   601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009) ..............................................................31

*Guizhou Tyre Co., Ltd. v. United States*,
   348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ..............................................................10

*Hyundai Electric & Energy Systems Co., Ltd. v. United States*,
   15 F.4th 1078 (Fed. Cir. 2021) ...................................................................................34

*KYD, Inc. v. United States*,
  607 F.3d 760 (Fed. Cir. 2010)........................................................................21, 24

*Maverick Tube Corp. v. United States*,
  857 F.3d 1353 (Fed. Cir. 2017)................................................................................34

*Mitsubishi Heavy Indus., Ltd. v. United States*,
  275 F.3d 1056 (Fed. Cir. 2001)..................................................................................7

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003)................................................................................21

*NSK Ltd. v. United States*,
  481 F.3d 1355 (Fed. Cir. 2007)................................................................................34

*Papierfabrik August Koehler SE v. United States*,
  843 F.3d 1373 (Fed. Cir. 2016)................................................................................21

*Peer Bearing Company-Changshan v. United States*,
  298 F. Supp. 2d 1328 (Ct. Int'l Trade 2003) ...........................................................10

*Prime Time Commerce LLC v. United States*,
  495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021) .....................................................30, 31

*Pt. Kenertec Power System v. United States*,
  Slip. Op. 21-175 (Ct. Int'l Trade 2021) ...................................................................19

*Risen Energy Co. v. United States*,
  570 F. Supp. 3d 1369 (Ct. Int'l Trade  2022) .............................................12, 13, 18

*Saha Thai Steel Pipe Public Co., Ltd. v. United States*,
  605 F.Supp.3d 1348 (Ct. Int'l Trade 2022) .............................................................31

*Saha Thai Steel Pipe Public Company Ltd. v. United States*,
  663 F.Supp.3d 1356 (U.S. Ct. Int'l Trade 2023) .................................................21, 37

*Sunpreme Inc. v. United States*,
  946 F.3d 1300 (Fed. Cir. 2020)..................................................................................7

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009).....................................................................................................7

*Yama Ribbons and Bows Co., Ltd. v. United States*,
  606 F. Supp. 3d 1345 (Ct. Int'l Trade 2022) .....................................................19, 27

*Zhongce Rubber Grp. Co. Ltd. v. United States,*
   352 F. Supp. 3d 1276 (Ct. Int'l Trade 2018) ......................................................31, 32


**Statutes**

19 U.S.C. § 1516a(b) ..............................................................................................7

19 U.S.C. § 1677(5)(B) .................................................................................. *passim*

19 U.S.C. § 1677e(a) ...................................................................................... *passim*

19 U.S.C. § 1677e(b) ............................................................................................21

19 U.S.C. § 1677m(d) ................................................................................... *passim*

19 U.S.C. § 1677m(e) ..........................................................................................37

28 U.S.C. § 2637(d) ...................................................................................... 30, 33


**Rules**

U.S. Ct. Int'l Trade R. 56.2 ....................................................................................1


**Regulations**

19 C.F.R. § 351.309(c)(2) .....................................................................................32

19 C.F.R. § 351.511(a) .................................................................................. *passim*

19 C.F.R. § 351.523(c)(1) .....................................................................................16

19 C.F.R. § 351.525(b)(6) .......................................................................................2


**Administrative Determinations**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity
   to Request Administrative Review,*
   86 Fed. Reg. 68,215 (Dep't of Commerce Dec. 1, 2021) ..........................................2

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*,
   75 Fed. Reg. 59,209 (Dep't of Commerce Sept. 27, 2010) ......................................................16

*Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*,
   86 Fed. Reg. 35741 (July 7, 2021).........................................................................................26

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*,
   81 Fed. Reg. 3,110 (Dep't of Commerce Jan. 2, 2016) ...........................................................15

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*,
   74 Fed. Reg. 4,936 (Jan. 28, 2009) .........................................................................................13

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*,
   86 Fed. Reg. 6,866 (Jan. 25, 2021) .........................................................................................13

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*,
   87 Fed. Reg. 26343 (May 4, 2022) ..........................................................................................32

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*,
   83 Fed. Reg. 9,274 (Mar. 5, 2017)...........................................................................................16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*,
   81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016)........................................................10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*,
   83 Fed. Reg. 34,828 (July 23, 2018).........................................................................................14

*Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*,
   70 Fed. Reg. 56,640 (Dep't of Commerce Sept. 28, 2005) ......................................................16

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   87 Fed. Reg. 6,487 (Dep't of Commerce Feb. 4, 2022) .............................................................2

*Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
   73 Fed. Reg. 35,639 (June 24, 2008) ...................................................................16, 17

*Multilayered Wood Flooring from the People's Republic of China:  Amended Antidumping and Countervailing Duty Orders,*
   77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012) ..............................................2

*Multilayered Wood Flooring from the People's Republic of China:  Countervailing Duty Order,*
   76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011) ............................................2

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018,*
   86 Fed. Reg. 59,362 (Dep't of Commerce Oct. 27, 2021)..........................................15

*Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019,*
   87 Fed. Reg. 36305 (June 16, 2022) .........................................................................27

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020,*
   88 Fed. Reg. 34,828 (Dep't of Commerce May 31, 2023) ......................................1, 5

*Multilayered Wood Flooring From the People's Republic of China:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2020,*
   87 Fed. Reg. 78,644 (Dep't of Commerce Dec. 22, 2022)..........................................5

*Welded Line Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020,*
   87 Fed. Reg. 38061 (June 27, 2022) .........................................................................32

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
                                                    )
BAROQUE TIMBER INDUSTRIES (ZHONGSHAN)              )
CO., LTD. and RIVERSIDE PLYWOOD CORP.,             )
                                                    )
          Plaintiffs,                               )
                                                    )
     v.                                             )          Ct. No. 23-00136
                                                    )
UNITED STATES,                                      )
                                                    )
          Defendant,                                )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully

responds to the motion for judgment on the agency record filed by plaintiffs, Baroque Timber

Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corp. (collectively, Baroque),

challenging the Department of Commerce's final results in the tenth administrative review of the

countervailing duty order covering multilayered wood flooring from the People's Republic of

China.  As explained below, the motion should be denied because the final results are supported

by substantial evidence and are otherwise in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     Administrative Determination Under Review**

The administrative determination under review is *Multilayered Wood Flooring From the*

*People's Republic of China: Final Results and Partial Rescission of Countervailing Duty*

*Administrative Review; 2020*, 88 Fed. Reg. 34,828 (Dep't of Commerce May 31, 2023) (*Final*

*Results*) (P.R. 367), and accompanying Issues and Decisions Memorandum (IDM) (P.R. 361).

The period of review is January 1, 2020, through December 31, 2020.

II.    **Statement Of Issues**

1.    Whether Commerce's inclusion of certain datasets in its calculation of the benchmark for plywood is supported by substantial evidence and otherwise in accordance with law.

2.    Whether Commerce's application of facts available with an adverse inference to find that certain input suppliers are government authorities is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

The Department of Commerce has published a countervailing duty order on multilayered wood flooring from the People's Republic of China.  *See Multilayered Wood Flooring from the People's Republic of China:  Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011); *see also Multilayered Wood Flooring from the People's Republic of China:  Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).  On December 2, 2020, Commerce issued a notice that interested parties could request an administrative review of that order.  *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 86 Fed. Reg. 68,215 (Dep't of Commerce Dec. 1, 2021).  Following timely requests, Commerce initiated the administrative review.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 6,487 (Dep't of Commerce Feb. 4, 2022) (P.R. 13).

Commerce selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. (Jiangsu Senmao) and Baroque[1] as mandatory respondents.  *See* Countervailing Duty Administrative

---

[1]  Commerce's respondent selection memorandum identifies Baroque's cross-owned affiliate, Riverside Plywood Corp., as the selected mandatory respondent.  However, Commerce previously found the two companies to be cross-owned affiliates pursuant to 19 C.F.R. § 351.525(b)(6) in a

Review of Multilayered Wood Flooring from the People's Republic of China: Respondent Selection (Mar. 10, 2022) (P.R. 63, C.R. 8).

## I.    **Plywood Benchmark**

Plywood is one of the inputs used to produce multilayered wood flooring.  On October 11, 2022, Baroque submitted factual information for Commerce's use in the valuation of the benchmarks for reported plywood purchases.  *See* Baroque Benchmark Data Submission (Oct. 11, 2022) (PR 291-296).  This submission included International Tropical Timber Organization (ITTO) export price data including  Ghana export prices that were BB/CC grade, Brazil C/CC grade, and Peru prices that were B/C or C/C grade.  *Id*. at 1, Exhibit 2.  Domestic petitioner, the American Manufacturers of Multilayered Wood Flooring (AMMWF) and Jiangsu Senmao submitted world export price data from the United Nations Comtrade database (UN Comtrade). *See* AMMWF Benchmark Data Submission at 2 and Ex. 1-A (P.R. 269); Jiangsu Senmao Benchmark Data Submission at 1 and Attachment 3 (P.R. 281).  AMMWF further submitted benchmark data from the New Zealand Official Statistics Database (Stats.NZ).  AMMWF Benchmark Data Submission at 2-3 and Ex. 2-A (P.R. 269).

## II.    **Government Authorities**

In its initial questionnaire, Commerce requested from the GOC information regarding the ownership of the input producers identified by the respondents, including articles of incorporation, capital verification reports, articles of groupings, company by-laws, annual reports, articles of association, business group registrations, business licenses, and tax registration documents.  *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated March 14, 2022 (Initial Questionnaire) at II-1–II-43 (P.R. 65).  Commerce also requested information concerning

---

prior segment of this proceeding, and therefore treated the two companies as a single entity for purposes of this administrative review.

whether any individual owners, board members, or senior managers involved with these producers were government or Chinese Communist Party (CCP) officials and the role of any CCP primary organization within the producers. *Id.*

In its response, the GOC confirmed the identity of companies that produced and supplied inputs to the mandatory respondents but it did not provide all the requested information. Specifically, although the GOC provided information such as articles of incorporation, financial statements, appointment documentation, and certifications pertaining to GOC involvement, the GOC only provided such information for a small percentage of the companies which supplied inputs to the mandatory respondents during the period of review. *See* IDM at 54-57; *see also* GOC Initial Questionnaire Response (May 11, 2022) at Exhibit LTAR-2 (C.R. 44-45). Further, the GOC submitted identical statements from input suppliers stating in part, "{e}ven if the company has established the primary party organization, the party organization does not participate in the company's daily operation and management. Even if the company's shareholders, directors, managers, and other senior managers are the representatives of the People's Congresses and the CPPCC at all levels, their status will not affect the company's internal operation and management." *See* GOC Initial Questionnaire Response at Exhibit LTAR-2 (C.R. 44-50).

In the Section II Supplemental Questionnaire, Commerce again asked the GOC for the missing information regarding the input suppliers. *See* Section II Supplemental Questionnaire at 8-9 (P.R. 119). In its response, the GOC submitted similar information to what it submitted in its initial questionnaire response. *See* GOC's Letter, "Supplemental Questionnaire Response," dated July 14, 2022 at Exhibit SQ-2 (C.R. 73-77).

### III.    Preliminary Results

On December 22, 2022, Commerce published its preliminary results.  *See Multilayered Wood Flooring From the People's Republic of China:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 78,644 (Dep't of Commerce Dec. 22, 2022) (P.R. 321), and accompanying Issues and Decisions Memorandum (PDM) (P.R. 316).  The preliminary results included two determinations relevant to this action.  First, Commerce preliminarily determined to calculate a benchmark price of plywood by averaging data from the ITTO, the UN Comtrade, and Stats.NZ export data.  PDM at 46-47.  Commerce determined that each of these datasets were comprised of market prices for products comparable to the inputs purchased by respondents that would have been available during the period of review.  Commerce found that it was appropriate to utilize the UN Comtrade and Stats.NZ data for plywood because they encompass the grades of plywood purchased by respondents during the period of review even though these data sets are not specific to particular grades of plywood.  Second, Commerce made a preliminary determination to apply facts available with an adverse inference (AFA) to find that domestic suppliers of certain inputs were "authorities" of the government of China (GOC) after determining that the GOC had failed to cooperate by not acting to the best of its ability.  *Id.* at 14-18.

### IV.    Final Results

Following the parties' submission of case and rebuttal briefs, Commerce published its final results.  *Final Results*, 88 Fed. Reg. 34,828.  With respect to the calculation of the plywood benchmark and Commerce's application of AFA, Commerce did not make any changes from the preliminary results.  Commerce calculated a final countervailable subsidy rate of 17.06 percent for Baroque and its cross-owned affiliates, 3.26 percent for Jiangsu Senmao, and 13.04 percent for the non-selected companies.  *Final Results*, 88 Fed. Reg. at 34,829.

# SUMMARY OF ARGUMENT

This Court should sustain Commerce's final results. Plaintiffs' challenges fail to demonstrate that the final results lacked substantial evidence or were not in accordance with law.

First, Commerce's determination to average UN Comtrade, Stats.NZ, and ITTO data for purposes of calculating tier 2 plywood benchmark prices is supported by substantial evidence and in accordance with law. As required by regulation, Commerce identified the available datasets of world market prices for plywood that encompassed the purchases of parties. Specifically, Commerce utilized both the UN Comtrade and Stats.NZ global datasets of prices, and the more limited dataset available from ITTO. The UN Comtrade and Stats.NZ data for plywood are not specific to particular grades of plywood, but they do encompass the grades of plywood purchased by respondents during the period of review. Baroque argues that Commerce should have excluded the UN Comtrade and Stats.NZ data entirely and used only the ITTO data. However, Commerce reasonably concluded that to discard the UN Comtrade data and rely on these geographically limited datasets would be inconsistent with 19 C.F.R. § 351.511(a)(2)(ii), which instructs Commerce to take the average of all "commercially available world market price{s}." That decision should be sustained.

Further, Commerce's determination that certain input suppliers of the respondents are government authorities within the meaning of 19 U.S.C. § 1677(5)(B) is supported by substantial evidence and in accordance with law. Commerce has reasonably found that the GOC exercises significant control over economic activity in China. Therefore, Commerce requested certain information from the GOC to determine whether the government or CCP persons or organizations exercise control in any of the reported input suppliers. The GOC did not provide the requested information and did not cooperate to the best of its ability. Though the GOC did provide certain information from a small subset of the input suppliers, even for this small subset the information

was not complete and Commerce reasonably determined that this information was insufficient to demonstrate freedom from government or CCP control for each of the input suppliers in question.

## ARGUMENT

### I.    Standard Of Review

Commerce's determinations, findings, or conclusions in a countervailing duty proceeding are upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal."  *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).  Substantial evidence is "more than a mere scintilla" and is evidence that "a reasonable mind might" accept as adequate.  *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) (citation omitted).  The agency's findings may be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists.  *Id*. at 1308-09.  The Court must sustain the determination if it is "reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion."  *Altex, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004).

### II.    Commerce's Calculation Of The Benchmark Prices For Plywood Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce's calculation of the tier 2 benchmark price for plywood was supported by substantial evidence and in accordance 19 C.F.R. § 351.511(a)(2)(ii).  Baroque argues that when calculating the benchmark price for plywood, Commerce should have excluded UN Comtrade and

Stats.NZ[2] data and should have relied exclusively on ITTO data that were more specific to the products at issue.  Baroque Br. at 5-18.  However, Commerce reasonably determined to include in its plywood benchmark calculation the robust global UN Comtrade and Stats.NZ data rather than to rely solely on the ITTO data, which was a narrow dataset of prices from only Brazil and Peru.

A.    <u>Legal Framework For Calculating Benchmark Prices</u>

When foreign entities export goods to the United States, countervailing duties are applied to offset subsidies provided to the exporters by foreign governments.  Under the countervailing duty statute, a subsidy requires that the exporter receive a "benefit."  19 U.S.C. § 1677(5)(B).  Among other things, a benefit is conferred where "goods…are provided…for less than adequate remuneration."  *Id.* § 1677(5)(E)(iv).  In determining whether government-subsidized goods have been provided for less than adequate remuneration, Commerce must identify a benchmark price (market price) to compare with the price of the goods receiving a government subsidy.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) (*Essar II*).  If the exporter is receiving government-subsidized goods for less than the benchmark price, it is receiving a "benefit."

Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good. . . resulting from actual transactions."  19 C.F.R. § 351.511(a)(2)(i).  This is known as a "tier 1" benchmark.  *See Essar II*, 678 F.3d at 1273.  When using a tier 1 benchmark, the goal is to identify actual transactions within the relevant market, and to define that market as specifically as possible, in order to most accurately reflect the price of the specific product at issue.

---

[2] Throughout its brief, Baroque treats "UNComtrade and Stats.NZ as the same."  *See* Baroque Br. at 11 n.1.

However, when data for actual transactions within the relevant market are not available, Commerce calculates a "tier 2" benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(ii), which provides:

> If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, {Commerce} will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, {Commerce} will average such prices to the extent practicable, making due allowance for factors affecting comparability.

In other words, where actual data from the market at issue are not available, Commerce uses broad, worldwide data and takes the average of that data to reasonably approximate the market price. When calculating a tier 2 benchmark price, Commerce is not required to use data for products that are "nearly identical" to the product purchased by the exporter. *See Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (Ct. Int'l Trade 2014). Rather, the regulation requires only "that the selected benchmarks be comparable." *Id.* (concluding that Commerce could use a general benchmark price for sulfuric acid, without differentiating by grade); *see also Essar II*, 678 F. 3d at 1273-74 ("Though the Australian iron ore is not identical to NMDC's iron ore, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue."). If Commerce determines that multiple datasets are sufficiently reliable and representative, "Commerce must average all commercially available world market prices to arrive at the benchmark figure." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1293 (Ct. Int'l Trade 2010) (*Essar I*) (citing 19 C.F.R. § 351.511(a)(2)(ii)).

"The factors relied upon by {Commerce} when determining appropriate benchmark(s) for valuing an input depend on the facts surrounding the data/information placed on the record of a proceeding and therefore must be evaluated on a case-by-case basis." *See*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying IDM at Comment 6. "The court's role is not to assess whether the benchmark data Commerce used was the 'best available,' but rather whether Commerce's choice was reasonable." *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) (citing *Peer Bearing Company-Changshan v. United States*, 298 F. Supp. 2d 1328, 1336 (Ct. Int'l Trade 2003)).

### B. Commerce's Calculation Of The Benchmark Price For Plywood Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Consistent with 19 C.F.R. § 351.511(a)(2)(ii), Commerce averaged UN Comtrade and Stats.NZ data with ITTO data for purposes of calculating plywood benchmark prices to compare to the prices of plywood purchased by respondents during the period of review. IDM at 74-76. This was a reasonable methodology that was supported by substantial evidence and in accordance with the legal framework described above.

The record included a UN Comtrade dataset consisting of data reported by about 90 countries for plywood transactions during the period of review. *See* AMMWF Benchmark Data Submission (Oct. 11, 2022) at 1-5, Exhibit 1-A (P.R. 269); Senmao Benchmark Data Submission (Oct. 11, 2022) at Attachments 1-3 (P.R. 281). Additionally, AMMWF also submitted benchmark data from Stats.NZ. *See* AMMWF Benchmark Data Submission at 2-3, Exhibit 2-A (P.R. 269). The record also included an ITTO dataset, submitted by Baroque, including relevant plywood data from Ghana, Brazil, and Peru. *See* Baroque Benchmark Data Submission (Oct. 11, 2022) at Exhibit 2 (P.R. 291).

Commerce determined that each dataset was comprised of market prices for products comparable to the inputs purchased by respondents, and that would have been available during the period of review.  Commerce therefore averaged the prices to calculate its benchmark price for plywood.  *See* IDM at 74-76; *see also* 19 C.F.R. § 351.511(a)(2)(ii) ("Where there is more than one commercially available world market price, {Commerce} will average such prices to the extent practicable, making due allowance for factors affecting comparability.").

Baroque argues that Commerce's calculation of the benchmark price was unreasonable because it was not limited to data only for certain grade plywood.  Baroque contends that Commerce should have therefore relied exclusively on the narrow ITTO dataset of prices for grade plywood from Ghana (BB/CC grade), Brazil (C/CC grade), and Peru (B/C or C/C grade).  Baroque Br. at 5-18.  However, as explained above, Commerce's practice is to consider whether a dataset represents comparable—not identical—commercially available world market prices, and if so, to include it in the calculation of the benchmark, narrowing it to a more relevant subset if appropriate.

Here, Commerce determined that the UN Comtrade and Stats.NZ data, although not differentiated by grade, were usable as a world market price in its tier 2 benchmark because the UN Comtrade and Stats.NZ data indisputably contains the C/D grade plywood purchases by Baroque and is a broad world market price.  In the final results, Commerce averaged this robust UN Comtrade and Stats.NZ data with the ITTO data.  IDM at 74-76; PDM at 45-47.  In this manner, Commerce fulfilled its obligation to "average {world market prices} to the extent practicable, making due allowance for factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(ii).  Commerce also explained that its analysis was irrespective of Baroque's claims that all of its plywood purchases were of C/D grade.  *See* IDM at 75.

11

Baroque cites various cases that, it argues, show that Commerce must only use "the most product-specific data in calculating benchmarks." Baroque Br. at 5-10. According to Baroque, these cases indicate that Commerce acted unreasonably by including UN Comtrade data at all, because those data were not differentiated by grade and therefore could not be limited to include exclusively grade C/CC plywood. However, this argument confuses the standards for calculating tier 1 and tier 2 benchmarks.

Because a tier 1 benchmark draws on actual transactions from the actual relevant market, it is therefore appropriate for Commerce to choose transactions that are as similar to the product at issue as possible. A tier 2 benchmark, a world market price, however, is calculated when real transactions from the relevant market are not available. Accordingly, where data is available, Commerce draws on datasets with commercially available world market prices and takes the average, as required by 19 C.F.R. § 351.511(a)(2)(ii), to approximate a reasonable benchmark price for a world market price. Commerce tailors those datasets to the extent possible by using only the subheadings of the data that match the product at issue. *See*, *e.g.*, PDM at 47. Baroque asks this Court to find that Commerce acted irrationally in choosing to utilize robust geographically broad datasets and in choosing not to exclusively rely on narrow datasets from two limited geographic regions, because, according to Baroque, Commerce must use the most product-specific data in calculating benchmarks. Baroque Br. at 12. Baroque's characterization of the legal background and Commerce's policy of selecting a tier 2 benchmark under 19 C.F.R. § 351.511(a)(2)(ii), however, is flawed.

A closer look at the cases that Baroque relies on illustrates the flaws of Baroque's characterizations of the law and Commerce's policy regarding tier 2 benchmarks. First, Baroque cites *Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022), for the

proposition that Commerce must use "the most accurate data available." Baroque Br. at 6-7. However, in *Risen*, the Court *rejected* reliance on a narrow, geographically limited dataset in a tier 2 benchmark calculation, precisely what Baroque contends that Commerce should have done here. The Court in *Risen* found that Commerce erred by relying exclusively on a dataset of transactions between the United States and China, rather than finding a "world market price," as required by the regulation. *Id.* at 1378. The Court reasoned that this dataset was "sourced from limited samples," and that including it in the calculation risked "overvaluing the United States to China route data." *Id.* at 1379. The same result could occur here were Commerce to rely only upon a narrow subset of ITTO data from three countries located in two regions, and disregard the global UN Comtrade dataset. Accordingly, while the Court in *Risen* emphasized the importance of using data that contributed to the "accuracy" of the benchmark price, "a more accurate world market price" was achieved by including *broader* datasets, not a narrower, geographically limited dataset.

Also, Baroque's citations to two instances where Commerce narrowed price datasets by grade to calculate tier 1 benchmarks are inapposite in the tier 2 context. *See* Baroque Br. at 9-10 (citing *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021), and accompanying IDM at Comment 1; *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), and accompanying IDM at 21). However, the facts in *CWP Turkey* are distinct from those in the instant review. *See* IDM at 76 (distinguishing this case from *CWP Turkey*). Further, unlike in *CWP From Turkey*, Commerce could not calculate a tier 1 benchmark in this case because it found that the domestic market for the input is distorted by the

government's involvement in the market.  *See* PDM at 45. Although Commerce was able to

distinguish by grade in *Pressure Pipe from China*, that was because on the specific facts of that

case Commerce found certain grades "incompatible with the production process used to produce

{subject merchandise}."  *Pressure Pipe from China* IDM at 21.  Here, however, Commerce found

that respondents had not shown that the additional grades of plywood included in the UN

Comtrade and Stats.NZ dataset would be incompatible with producing multilayered wood

flooring.

Baroque then cites decision memoranda from several past countervailing duty reviews to

argue that Commerce select "the most product-specific data in calculating benchmarks."  Baroque

Br. at 10.  However, again, these cases are, in fact, consistent with Commerce's calculation in this

case.

For instance, Baroque cites *Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing

Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), and accompanying IDM

at Comment 3, to argue that Commerce should narrow further from the dataset in the UN

Comtrade data.  In Baroque's opinion, such narrowing would result in the use of the narrowest

dataset possible.  In that case, Commerce found two datasets it could use for a tier 2 calculation:

UN Comtrade data that were less product-specific (including various sorts of aluminum products),

but that had the advantage of being reported on a monthly basis, and IHS Markit data that more

accurately represented the specific product in question (aluminum frames) but was reported only

on an annual basis.  *Id.*  Commerce considered it to be a "strength" that the IHS Markit data was

more narrowly tailored than UN Comtrade data, but ultimately Commerce averaged both datasets

to arrive at its benchmark price.  Similarly, here, Commerce averaged the more robust Comtrade

data with the more narrowly tailored ITTO data.  Thus, Commerce's reasoning in *Crystalline Silicon Photovoltaic* case supports Commerce's determination here, and does not support the argument that a global dataset should be thrown out entirely in favor of a narrower dataset that is limited to two specific geographical regions.

Next, Baroque cites *Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Dep't of Commerce Jan. 2, 2016), and accompanying IDM at 3, again arguing that it supports discarding the UN Comtrade data to arrive at a more narrowly tailored dataset.  But in that case, Commerce explained that it tailored a *global* dataset by using the HTS categories that represented the grades of paper used by the respondent, explaining that Commerce will "deriv{e} benchmark prices by grade *when such data are available*."  *Id.* (emphasis added).  This is consistent with Commerce's practice, and with what Commerce did here.  In the prior review of this order, Commerce removed certain HTS subheadings from a UN Comtrade dataset covering wood species shown by respondents not to properly represent their plywood purchases.  *See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Dep't of Commerce Oct. 27, 2021).  Commerce has used the same narrowed set of HTS subheadings in this review, consistent with its practice.  *See* IDM at 74, PDM at 46-50.  In other words, Commerce has narrowed the UN Comtrade and Stats.NZ datasets to the most product-specific HTS categories.  Baroque does not argue that Commerce should *more* narrowly tailor the UN Comtrade and Stats.NZ dataset, but instead argues that, because the UN Comtrade data and Stats.NZ data cannot be more narrowly tailored, Commerce should ignore the datasets completely and rely solely on ITTO data.  This position is inconsistent with Commerce's regulations and practice.  Commerce is not required to discard the UN

Comtrade and Stats.NZ datasets entirely only because that data could not be filtered by grade in the manner preferred by the respondent.

Baroque also cites another case where Commerce relied on a dataset limited to the specific species of timber used by the respondent.  Baroque Br. at 8 (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Dep't of Commerce Sept. 27, 2010)). Again, it is true that Commerce will narrow a benchmark by species or grade when those data are available, but in this case, after narrowing down UN Comtrade data and Stats.NZ data to the most product-specific categories possible, Commerce could not further filter the UN Comtrade dataset by grade.

Baroque then cites a case where Commerce calculated a benchmark price for purposes of upstream subsidy calculations under 19 C.F.R. § 351.523(c)(1) by finding an appropriate "surrogate" market.  Baroque Br. at 8-10 (citing *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Dep't of Commerce Sept. 28, 2005), and accompanying IDM at Comment 1).  This case is inapposite. Calculating surrogate values in the context of upstream subsidy calculations is an entirely distinct process, guided by different criteria, from calculating average world market prices for a tier 2 benchmark under 19 C.F.R. § 351.511(a)(2)(ii), *see id.* at Comment 5.

Baroque next argues that Commerce has "reject{ed} non-product specific HTS categories in favor of more product-specific benchmarks."  Baroque Br. at 8 (citing *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), and accompanying IDM at Comment 16; *Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing*

*Duty Determination*, 73 Fed. Reg. 35,639 (June 24, 2008), and accompanying IDM at Comment 15.

In *Aluminum Foil from China*, the record included a Global Trade Atlas dataset consisting of two subheadings. Commerce reasonably determined to use only the data from the subheading that matched the input used by the respondent. *Aluminum Foil from China* IDM at Comment 16. In *Woven Sacks from China*, Commerce used World Trade Atlas data but narrowed it to "the most specific harmonized tariff category available" available, and excluded data from a single country based on evidence that that country's data was an overbroad "basket category." *Woven Sacks from China* IDM at Comment 15. In short, all these cases illustrate that Commerce will narrow a global dataset to the extent possible, but in none of them did Commerce discard a global dataset entirely when it could not be further narrowed.

Importantly, Commerce also found that if it were to accept Baroque's argument that Commerce may only rely on data for plywood of the same grade that Baroque claims it purchased, it could not even use the ITTO benchmark data as it covers multiple grades such as C/CC, BB/C, etc., while Baroque claims it only purchased C/D grades. IDM at 76. In other words, the ITTO benchmark data would be disqualified on the same basis by which Baroque seeks to disqualify other datasets. This practical flaw further demonstrates the reasonableness of Commerce's approach here.

In sum, Commerce's tier 2 calculation here is reasonable and consistent with its regulatory approach: Commerce found robust data from worldwide markets and then narrowed those data to the extent it is able to do so to reflect the appropriate product. IDM at 76. Here, in constructing a world market price benchmark under tier 2, Commerce reasonably included in its calculation datasets from UN Comtrade and Stats.NZ that cover the grades of plywood purchased by

17

Baroque.  To discard these datasets entirely in favor a far more limited dataset from only Ghana,

Brazil and Peru, simply because that dataset is, according to Baroque, more product-specific,

would turn the tier 2 process on its head and result in the same error the Court identified in *Risen*:

giving undue weight to a geographically narrow dataset rather than calculating an average world

market price, as required by the regulation.

**III.    Commerce's Determination That Baroque's Input Suppliers Are Government
Authorities Based On AFA Is Supported By Substantial Evidence And Otherwise In
Accordance With Law**

Commerce's determination that the mandatory respondents' input suppliers are

"authorities" within the meaning of 19 U.S.C. § 1677(5)(B) based on adverse facts available is

supported by substantial evidence and is in accordance with law.  In its opening brief, Baroque

fails to appreciate the distinction between government ownership and government control and

fails to acknowledge the record evidence showing Commerce's repeated requests to the GOC to

supply information on CCP involvement.  Despite repeated requests, the GOC failed to provide

sufficient evidence demonstrating that the CCP did not have influence or control over the input

suppliers.  The record contains substantial evidence to support Commerce's determination to

apply AFA and find that the producers who supplied inputs to the mandatory respondents are

"authorities" within the meaning of section 19 U.S.C. § 1677(5)(B).  Accordingly, this Court

should affirm Commerce's determination.

**A.    Commerce's Determination That There Was A Gap In The Record And That
AFA Is Warranted Is Supported By Substantial Evidence**

Commerce's determination that there was a gap in the record with respect to the GOC's

control over input suppliers and Commerce's determination that the GOC failed to cooperate by

not acting to the best of its ability are supported by substantial evidence and in accordance with

law.  Baroque's argument to the contrary incorrectly assumes that an analysis of ownership

interests alone is necessarily sufficient to demonstrate the absence of government control. Substantial evidence also supports Commerce's determination that the GOC failed to provide necessary information, despite Commerce's issuance of a supplemental questionnaire specifically asking for information to support the GOC's claim that there was no CCP involvement.

1.    **Legal Framework For The Government Authorities Determination**

A subsidy may be found where an authority provides a financial contribution "to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). An "authority" is defined as "a government of a country or any public entity within the territory of the country." 19 U.S.C. § 1677(5)(B). Congress has not defined "public entity," leaving it to Commerce to supply a reasonable interpretation of the term. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2015). Although government ownership of a company is "highly relevant" to establishing an "authority," it "is not dispositive." *Pt. Kenertec Power System v. United* States, Slip. Op. 21-175 (Ct. Int'l Trade 2021) (sustaining Commerce's determination that the government lacked "meaningful control" after it analyzed the presence and function of government personnel within the management structure in addition to ownership). An "authority" under 19 U.S.C. § 1677(5)(B) may include a privately-owned entity where the government has "'meaningful control over the compan{y} and their resources.'" *Yama Ribbons and Bows Co., Ltd. v. United States*, 606 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2022) (affirming Commerce's AFA determination that there are CCP officials are present in each of the company's privately-owned input suppliers and therefore meaningful government control exists and the suppliers are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B))(internal citation omitted); *see also* Memorandum, "Public Bodies Analysis Memo," dated July 13, 2023, (Public Bodies Memorandum) at Attachment I at 3 (P.R. 140-156) (finding that "certain enterprises that

have little or no formal government ownership are public bodies if Commerce determines that the government exercises meaningful control over them").

Commerce has previously determined that even "truly private ownership in China does not necessarily mean autonomy from the state" as there are efforts to exert control over private firms through executive and manager membership in the CCP.  Public Bodies Memorandum at 24-25 (P.R. 140-156) (the "Chinese government is also exerting increasing control over firms in which it has no ownership stake whatsoever" by recruiting private sector executives and managers into the CCP).

Further, the "CCP may, for the limited purpose of applying the U.S. CVD law to China, properly be considered to be the 'government' as defined {by 19 U.S.C. § 1677(5)(B)}." Memorandum, "The Relevance of the Chinese Communist Party for the Limited Purpose of Determining Whether Particular Enterprises Should Be Considered to be "Public Bodies" Within the Context of a Countervailing Duty Investigation," dated May 18, 2012 at 33 (P.R. 139).  Thus, information about the presence and role of CCP officials in the management and operation of a respondent's privately-owned input suppliers is necessary to the determination of whether these producers are "authorities" within the meaning of 19 U.S.C. §1677(5)(B).  *See id*.

2.    **Legal Framework For Adverse Facts Available**

Commerce uses facts otherwise available to fill a gap in the record when necessary information is not available on the record, or when an interested party: (1) withholds information that has been requested by Commerce, (2) fails to provide information by a deadline established by Commerce, (3) significantly impedes a proceeding, or (4) provides information that cannot be verified.  *See* 19 U.S.C. § 1677e(a).  Commerce may use an adverse inference when selecting among the facts otherwise available when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with {Commerce's} request for information{.}"

20

19 U.S.C. § 1677e(b)(1).  An interested party fails to cooperate by not acting to the best of its ability when it does not exert its "maximum effort to provide Commerce with *full and complete* answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added).

To avoid the application of adverse facts available, respondents "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question."  *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (*citing Nippon Steel*, 337 F.3d at 1382).  Commerce may lawfully apply an adverse inference based upon the GOC's failure to provide requested information, even where the respondents cooperate.  *See*, *e.g.*, *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (finding that a collateral impact on a cooperating party does not render the application of adverse inferences in a countervailing duty investigation improper); *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371-73 (Fed. Cir. 2014) (affirming Commerce's application of adverse inferences when China did not provide requested information despite the respondents' cooperation).

This Court has held that where Commerce states that it: (1) needs certain information (2) by a certain deadline, Commerce may infer a lack of cooperation from an interested party's failure to comply with either of those requests.  *See Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 663 F. Supp. 3d 1356 (Ct. Int'l Trade 2023).  Further, whether a particular party has cooperated to the best of its ability is not determined by whether that party provided more information than it did in another proceeding, but by whether the party made the "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp.*, 337 F.3d at 1382 (emphasis added).

3.    **Substantial Evidence Supports Commerce's Determination That The GOC Did Not Provide All Requested Information**

As a preliminary matter, Baroque only contests Commerce's AFA determination with respect to 16 input suppliers.  *See* Baroque Br. at 21 and Attachment 1.  The case before this Court specifically concerns the application of AFA to the 16 suppliers identified by Baroque and resulting determination that they are authorities within the meaning of 19 U.S.C. § 1677(5)(B).  In its initial questionnaire, Commerce asked the GOC to "identify any individual owners, members of the board of directors, or senior managers who were {Chinese} Government or CCP officials during the POR."  Initial Questionnaire at II-37  (P.R. 65).  After receiving two extensions, the GOC replied that "there are no individual owners, members, of the board of directors, or senior managers who were Government or CCP officials during the POR at {these producers}" and that "there is no central informational database to search for such information."  GOC's Letter, "Initial Questionnaire Response," dated May 11, 2022 (Initial Questionnaire Response) at LTAR-66— LTAR-69  (C.R. 44).  However, Commerce was unable to use this information the GOC provided to determine if there was meaningful government control over these companies to determine if they were "authorities" under 19 U.S.C. § 1677(5)(B) and thus issued a supplemental questionnaire.  *See* Section II Supplemental Questionnaire (P.R. 119-120).

Commerce's supplemental questionnaire repeated the question regarding CCP involvement in senior management and the board and asked the GOC to reconcile its statement that no CCP officials are involved with the board or senior management with a CCP Opinion document stating that "CCP committees at all levels must implement ideological work in the private economy sector."  *Id*. at 8.  The GOC again provided a deficient response.  The GOC stated that, based on sworn statements from the companies that decisions are made internally, the "managers are not members or representatives of {the CCP}" and that it "believes" there is no

discrepancy between the CCP Opinion document because it only refers to the "purpose of improving the rule of law and moral standards of private economic personnel."  GOC Section II Questionnaire Response) (C.R. 73-77).

Commerce also asked about the CCP Constitution's requirement that a branch or committee be formed in any enterprise with three or more party members regardless of state-ownership and whether such an entity has been formed within the company and for the GOC to "explain any decisions taken by that entity that are subject to review or approval by the Government or the {CCP}."  *See* Section II Supplemental Questionnaire at 7-8 (P.R. 119).  The GOC again responded with bald assertions that the CCP did not control input suppliers.  *See* GOC's Letter, "GOC Second Supplemental Questionnaire Response," dated October 21, 2022 (Second Supplemental Questionnaire Response) at Exhibit SQ2-3 at 9-21 (P.R. 308). Furthermore, Commerce placed information in the record describing the difference between ownership and control and Commerce's presumption of significant CCP involvement in privately-owned enterprises and that those entities "are public bodies if Commerce determines that the government exercises meaningful control over them."  Public Bodies Memorandum at Attachment I at 3 (P.R. 140-156).

The GOC responded evasively to Commerce's specific questions and argued in its response that the CCP is not a government authority, that the question is irrelevant to whether the suppliers at issue are "public bodies," that the presumption that the presence of a primary organization in a company is not enough to make a company a government authority, and that the party cannot attempt to interfere in the company.  *See* GOC Initial Questionnaire Response (C.R. 44) at LTAR-70-78; *see also* GOC Second Section II Supplemental Questionnaire Response

(October 21, 2022) (P.R. 308) at Exhibit SQ2-3 at 9-21.  Nowhere in its response did the GOC actually answer whether such entities were formed within the input suppliers.  *Id.*

Furthermore, many of the answers to similar questions were either hypothetical in nature, *see*, *e.g.*, Second Section II Supplemental Questionnaire Response (P.R. 308) at Exhibit SQ2-3 at 14 (response stating that "even if a {manager} is a member {of CCP}, this circumstance would not make the management and business operations of the company {} subject to any intervention by the GOC"), or put the burden on Commerce to collect the information from other parties, *see*, *e.g.*, *id.* at 20 (response stating, "if the Department insists on the necessity of this information, the Department should collect this information through the respondents, via their suppliers directly."). In other words, instead of providing the necessary information responsive to Commerce's specific information requests, the GOC came up with a host of reasons to justify its refusal to provide such information.  Although Baroque claims the GOC fully and completely answered Commerce's questions to the best of its ability, evidence on the record demonstrates the GOC failed to provide requested information on the presence and role of CCP, the GOC's governing party, in each input supplier.  Thus, Commerce reasonably determined that necessary information was missing from the record, that the GOC withheld requested information, and that the GOC significantly impeded the proceeding within the meaning of 19 U.S.C. § 1677e(a)(1), (a)(2)(A) and (C).  IDM at 56.

Further, Commerce reasonably applied an adverse inference to find that input suppliers are authorities because there was a gap in the record regarding necessary information about the CCP's presence and control and the GOC failed to cooperate by not acting to the best of its ability to comply with the request for information.  Commerce may lawfully apply an adverse inference based upon the GOC's failure to provide requested information, even where the respondents cooperate.  *See*, *e.g.*, *KYD*, 607 F.3d at 768; *Fine Furniture*, 748 F.3d at 1371-73.

24

Baroque argues that Commerce "imputed" a finding that information is missing for a specific supplier to other input suppliers because the final determination "only speak{s} in generalities" and did not specifically discuss each of the 16 suppliers for which it provided ownership information.  *See* Baroque Br. at 26-29.  Commerce specifically addressed the input suppliers for which the GOC provided ownership information:

> "In the GOC's response, the GOC provided documentation related to a small subset of the input suppliers . . . Specifically, for certain individually-owned or wholly-foreign owned producers, the GOC provided business registration information from its Enterprise Credit Information Publicity System and certain other company-specific information (e.g., capital verification reports).    However, *this documentation is not sufficient* for our analysis of whether the input producers identified by the company respondents are authorities under the Act, because *it lacks information as to whether the owners and shareholders have any CCP involvement.*"

PDM at 15 (emphasis added).  The individually owned suppliers mentioned, for which ownership information was submitted, include the 16 suppliers Baroque claims Commerce did not address. Nor did Commerce "impute" the deficiencies of the other input suppliers onto these 16; rather, Commerce determined that the information for each of these suppliers is also missing information on CCP involvement and is, therefore, also deficient.  *See id.*

### 4.    Substantial Evidence Supports Commerce's Application Of An Adverse Inference In Selecting Among The Facts Available

Commerce lawfully applied an adverse inference based on the facts available because Commerce rationally determined that the GOC withheld the necessary information that Commerce requested, *see* 19 U.S.C. § 1677e(a)(2)(A) and (C), and therefore did not cooperate to the best of its ability.  Commerce reasonably determined that the information the GOC failed to supply was necessary to determine whether the producers are authorities given Commerce's understanding, based on record evidence, that the CCP exerts significant control over economic activities in China.  *See* Memorandum "Placing Documents on the Record," dated July 13, 2023

(Additional Documents Memorandum) at Attachment "Section 129 Determination of the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe; Light-Walled Rectangular Pipe and Tube; Laminated Woven Sacks; and Off-the-Road Tires from the People's Republic of China: An analysis of Public Bodies in the People's Republic of China in Accordance with the WTO Appellate Body's Findings in WTO DS379" at 35-36 (*citing CCP Constitution*, Article 32; and Article 19 of the *2006 Company Law*) (P.R. 138); *see also* 19 U.S.C. § 1677e(a)(1).

Commerce supported its determination with substantial evidence in the form of the Public Bodies Memorandum, which expands on the connection between the CCP and control of private entities. *See* IDM at 54 (*citing* Public Bodies Memorandum at Attachment 1, 34) (P.R. 361); *see also* Article 19 of the 2006 Company Law (stating that an organization of CCP shall be set up in all companies, whether state, private, domestic or foreign-invested, "to carry out activities of the Chinese Communist Party") (P.R. 138); *and CCP Constitution*, Article 32 (stating that all organizations, including private commercial enterprises, are required to establish "primary organizations of the party" or party committees if the firm employs at least three party members) (P.R. 138). Commerce further justified the necessity of receiving this information by discussing *Metal Lockers* and the *2019 Multilayered Wood Flooring Review*, which found that "Chinese law requires the establishment of CCP organizations" in all companies so privately owned organizations may be subject to the CCP's "controlling influence in the company's affairs" and that a CCP report "primarily indicates the influence of the CCP over the employees in the company" despite GOC claims that it did not. IDM at 57 (*citing Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 FR 35741 (July 7, 2021) (*Metal Lockers*), and accompanying IDM at

Comment 5; and *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 36305 (June 16, 2022) (*2019 Multilayered Wood Flooring Review*), and accompanying IDM at 27) (P.R. 361).

Baroque argues that Commerce's reliance on the *2019 Multilayered Wood Flooring Review* was improper, reasoning that "Commerce inexplicably focuses a supplier that had a primary party organization, in the previous review. . ." and that "it is not clear how Commerce is using this information" as it "relates to a supplier from a previous review." Baroque Br. at 29. However, Commerce indicated that the 2019 review was provided "as an example" and used it to further demonstrate how the CCP "guided" privately-owned input suppliers which makes information on CCP presence and influence necessary to the investigation. *See* IDM at 57 (P.R. 361).

Commerce also reasonably determined that the GOC withheld information, and as a result, significantly impeded the proceeding. *See* 19 U.S.C. §§ 1677e(a)(2)(A) and (C). Baroque argues that the GOC did not withhold information that Commerce requested because it provided information on the ownership of the 16 input suppliers. *See* Baroque Br. at 26-29. However, Commerce's requests for information were not limited to questions regarding the suppliers' ownership structure. Commerce does not dispute that the GOC provided information on the *ownership* of the 16 input suppliers, including ECIPS, articles of incorporation, financial statements, and appointment documentation. *See* IDM at 54-56. However, the determination of whether the CCP exerts *control* requires assessing the presence and control of the company by the CCP as well as its ownership. *See Yama Ribbons and Bows*, 606 F. Supp. 3d 1345.

Accordingly, Commerce requested information about the presence and role of CCP officials in addition to the information the GOC provided concerning ownership. *See* Section II

Supplemental Questionnaire (P.R. 119-120).  Commerce asked the GOC multiple times to "identify any owners, members of the board of directors, or managers of the input suppliers who were government or CCP officials during the POR."  *See* PDM at 14-15.  Commerce also requested information concerning whether any individual owners, board members, or senior managers involved with these producers were government or CCP officials and the role of any CCP primary organization within the producers.  IDM at 54.  Specifically, to the extent that the owners, managers, or directors of a producer are CCP officials or are otherwise influenced by certain CCP-related entities, Commerce requested information regarding the means by which the GOC may exercise control over company operations and other CCP-related information.  *Id*.  In response, the GOC did not attempt to provide this information and simply stated that it does not keep a central database for such information.  *Id*.

However, Commerce noted that in prior CVD proceedings, the GOC was able to obtain the information requested independently from the companies involved and that a central database was not necessary to obtain the requested information.  IDM at 58 (citing *Citric Acid from China 2012*) (P.R. 367).  This served as a strong indication that the GOC did not take reasonable measures to secure the necessary information.  Baroque claims that in *Citric Acid from China 2012*, the documentation supporting a lack of CCP involvement was only possible to acquire for a person who had previous CCP membership, and therefore, it does not show that the GOC could have provided the information where it claimed company officials had no previous membership.  *See* Baroque Br. at 30.  Baroque argues that a certification from every CCP entity would be needed to show that a member was never part of the CCP.  *Id*.  The fact remains that the GOC never submitted a signed certificate from *any* CCP entity.  Therefore, its argument that a

government document or signed certificate from the CCP would be insufficient is purely speculative.

Commerce reasonably declined to find the documentation the GOC submitted from the input suppliers claiming no party affiliation compelling as "Commerce's request for information from the GOC is a request for government information *independent from* company information." IDM at 58 (relying on *Citric Acid from China 2012*) (emphasis added). Furthermore, Commerce found the company certifications were "pro forma in nature, lacking particular details for examining possible government involvement in each company" because they do not definitively deny the involvement by the government or the CCP in the input suppliers. *Id*. at 55. Instead, they merely state rhetorically that "even if an owner, a director, or a manager of a producer is a {CCP member} . . . this circumstance would not make the management and business operations . . . subject to any intervention by the GOC" and do not address whether any of the supplier's individual owners, managers, or board of directors are CCP officials. *See* GOC Initial Questionnaire Response at LTAR-75 (C.R. 44). Importantly, Baroque does not present any argument refuting Commerce's conclusion that the language provided in the certifications is too rhetorical or vague for Commerce's purposes. Due to the GOC's lack of government documentation and its *pro forma* and rhetorical answers, Commerce appropriately determined that the GOC withheld information from Commerce under 19 U.S.C. § 1677e (a)(2)(C).

Overall, Commerce provided the GOC with multiple opportunities to adequately respond to Commerce's request for information regarding whether the reported input suppliers are authorities within the meaning of 19 U.S.C. § 1677(5)(B) and that the GOC failed to provide the requisite information. The GOC's failure to provide full and complete answers providing the necessary information despite multiple requests is substantial evidence on the record that the

GOC did not cooperate to the best of its ability.  *See* IDM at 58.  Accordingly, Commerce's

finding based on AFA that the input suppliers were subject to Chinese government control was

rational, supported by substantial evidence, and in conformity with law.

**B.    Commerce Provided Adequate Notice Of The GOC's Deficient Responses Under 19 U.S.C. § 1677m(d)**

Baroque's argument that Commerce did not provide the GOC notice or an opportunity to

remedy its deficiencies is meritless.  After issuing the initial questionnaire, Commerce issued a

supplemental questionnaire where Commerce specifically provided the GOC opportunities to

address its deficient responses.  Commerce acted reasonably and in accordance with the law when

it determined that the GOC's responses were deficient because they did not contain necessary

information on CCP involvement in Baroque's input suppliers. Because the record contains

substantial evidence to support Commerce's compliance with 19 U.S.C. § 1677m(d), this Court

should reject Baroque's argument to the contrary.

**1.    <u>Baroque Failed to Exhaust Its Remedies</u>**

As a threshold matter, Baroque failed to exhaust its administrative remedies.  During the

administrative proceeding, Baroque never argued that Commerce failed to provide notice of its

deficient submissions.  This Court should not entertain the argument now.  This Court "where

appropriate, {shall} require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).

Therefore, "absent a strong contrary reason, the court should insist that parties exhaust their

remedies before the pertinent administrative agencies."  *Boomerang Tube LLC v. United States*,

856 F.3d 908, 912 (Fed. Cir. 2017) (*citing Corus Staal BV v. United States*, 502 F.3d 1370, 1379

(Fed. Cir. 2007)).  Parties must exhaust administrative remedies by raising all issues in their

initial case briefs before Commerce.  *See Prime Time Commerce LLC v. United States*, 495 F.

Supp. 3d 1308, 1313-14 (Ct. Int'l Trade 2021) (*citing Dorbest Ltd. v. United States*, 604 F.3d

1363, 1375 (Fed. Cir. 2010) (internal citation omitted)).

    This Court and the Federal Circuit have recognized limited exceptions to the exhaustion

requirement, involving situations where: (1) the plaintiff raised a pure question of law that did not

require further agency involvement, (2) the plaintiff did not have timely access to the confidential

record, (3) an intervening judicial interpretation since the administrative proceeding would have

changed the agency result, and (4) raising the argument at the administrative level would have

been futile. *See*, *e.g.*, *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1377

(Ct. Int'l Trade 2009).  Here, Baroque does not acknowledge that it failed to exhaust its

administrative remedies, nor does it argue that any of these exceptions apply.

    First, the issue of whether notice and opportunity for the GOC to respond was provided is

not a purely legal question and would require further involvement of the agency.  The pure-

question-of-law exception to administrative exhaustion only applies "when (1) plaintiff raises a

new argument; (2) this argument is of a purely legal nature; (3) the inquiry requires neither further

agency involvement nor additional fact finding or opening up the record; and (4) the inquiry

neither creates undue delay nor causes expenditure of scarce party time and resources." *Saha*

*Thai Steel Pipe Pub. Co., Ltd. v. United States*, 605 F.Supp.3d 1348, 1366 (Ct. Int'l Trade 2022)

(internal citations omitted).  Where "statutory construction alone" is not sufficient to resolve

Baroque's claim, and the allegations "require a record of Commerce's past practice," the "pure

question of law exception does not apply." *Ellwood City Forge Co. v. United States*, 582 F. Supp.

3d 1259, 1279-1280 (Ct. Int'l Trade 2022) (internal citations omitted).

    The question of whether the supplemental documents include notice and an opportunity to

remedy requires further agency involvement and fact finding.  *See Zhongce Rubber Grp. Co. Ltd.*

*v. United States*, 352 F. Supp. 3d 1276, 1280 (Ct. Int'l Trade 2018) (whether Commerce can

apply AFA to a respondent is "a highly factual question based on the record evidence.").  One

cannot simply conduct a statutory analysis to determine whether as a matter of fact Commerce

provided notice, whether the notice was received, and whether the notice Commerce issued

identified deficiencies.  Indeed, Baroque's own argument that Commerce's notice was deficient

involves factual comparisons between the instant review and Commerce's past practices.  *See*

Baroque Br. at 32 (arguing that "any question that requires documentation *normally* states so

explicitly.") (emphasis added).

The futility exception also does not apply.  This exception is narrow and has been applied

primarily in situations where parties "would be required to go through obviously useless motions

in order to preserve their rights."  *Corus Staal B.V.*, 502 F.3d at 1379 (quotation marks and

citation omitted).  It does not follow that it would have necessarily been futile for Baroque to raise

the issue of proper notice in its administrative case brief as Commerce has been persuaded by

such an argument when respondents have made the requisite showing.  *See*, *e.g.*, *Circular Welded

Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty

Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 26343 (May

4, 2022), and accompanying IDM at Comment 2 (wherein Commerce determined that

respondents did not have an opportunity to remedy any deficiency); *see also Welded Line Pipe

from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and

Preliminary Determination of No Shipments; 2019-2020*, 87 FR 38061 (June 27, 2022), and

accompanying IDM at Comment 2.  Accordingly, none of the exceptions to the exhaustion

requirement apply.  *See* 19 C.F.R. § 351.309(c)(2); *see also* Baroque Admin. Case Br. (Jan. 31,

2023) (P.R. 341) (C.R. 173) (devoid of any discussion of 19 U.S.C. §1677m(d)).

Moreover, Commerce, in its preliminary results, indicated that Commerce intended to apply AFA to the GOC's deficient submission.  *See* PDM at 11-18 (P.R. 316).  Despite being on notice of Commerce's intent to apply an adverse inference, Baroque never argued that Commerce had failed to provide it notice of its deficiencies, allegedly contrary to the statute.  By failing to present this argument to Commerce, Baroque deprived Commerce of the opportunity to evaluate its supplemental questionnaires and consider this argument in its final determination.  *See Ellwood City Forge*, 582 F.Supp.3d 1281 ("Had Plaintiffs {exhausted their remedies}, this Court would have had the benefit of the agency's reasoned judgment about both its interpretation of its legal authorities as well as its past practices.").  The Court should decline to consider Baroque's argument now that Commerce failed to provide it an opportunity to remedy the deficiency.  *See* 28 U.S.C. § 2637(d).

### 2.    Commerce Complied With 19 U.S.C. § 1677m(d) And Provided Adequate Notice And An Opportunity To Remedy

Even if this Court were to entertain Baroque's waived argument, substantial evidence supports a finding that Commerce fulfilled its obligations to notify the GOC of the deficiencies of its response and provide opportunities to remedy these deficiencies.  Commerce notified Baroque of its deficiency by requesting verifiable information and asking specific questions regarding CCP presence and influence in the supplemental questionnaire.  *See* Initial Questionnaire at II-5—II-38 (P.R. 65); *see also* Section II Supplemental Questionnaire (P.R. 119-120).  Commerce thus fulfilled its obligations under 19 U.S.C. § 1677m(d).

Under 19 U.S.C. § 1677m(d), when Commerce determines that a response to a request for information is deficient, it must inform the respondent of the deficiency and, to the extent practicable, provide the respondent with an opportunity to remedy or explain the deficiency.

Where a respondent had already failed to provide the information in the questionnaire, and the supplemental questionnaire notifies it of that defect, "§ 1677m(d) does not require more." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (*citing NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007) ("Commerce . . . satisfied its obligations under § 1677m(d) when it issued a supplemental questionnaire specifically pointing out and requesting clarification of {the} deficient response.")). The Federal Circuit has held that an adverse inference may be appropriate when an interested party has been notified of a defect in its questionnaire response and continues to provide a defective response. *See Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 15 F.4th 1078, 1090 (Fed. Cir. 2021).

Although Baroque claims that Commerce did not ask the GOC to identify CCP officials until the supplemental questionnaire, Baroque Br. at 32, the initial questionnaire requested that the GOC to "identify any individual owners, members of the board of directors, or senior managers who were Government *or CCP officials* during the POR." Initial Questionnaire at II-37 (P.R. 65) (emphasis added). After Commerce received the GOC's deficient response to the initial questionnaire, Commerce asked again about CCP involvement in the input suppliers in the supplemental questionnaire. *See* Section II Supplemental Questionnaire (at 7) ("For all producers from whom the respondents purchased inputs during the POR, please identify whether any owner, director, or manager is a member or representative of {the CCP} . . .") (P.R. 119). The supplemental questionnaire specifically stated that Commerce "identified certain areas in the {response} for which we require additional information." *Id*. at 1. Accordingly, Baroque's claim that it lacked notice or an opportunity to remedy its deficiencies runs counter to the record of Commerce, notably the supplemental questionnaire with detailed questions about specific CCP involvement. Because Commerce requested information in a supplemental questionnaire and

provided an opportunity to the GOC to remedy the deficient responses, Commerce complied with § 1677m(d).

In its opening brief, Baroque argues that each question must specifically request necessary documentary support for Commerce to reasonably determine that a lack of verifiable answers is not a full and complete answer.  *See* Baroque Br. at 31.  However, Commerce did specifically explain how the information was deficient by reiterating that with respect to the specific input suppliers at issue here, to "{p}lease explain what, if any, steps you took to verify or further examine the accuracy of this information, including what, if any, documentation was reviewed. Provide documentation to support your response."  Section II Supplemental Questionnaire (C.R. 70) at 7.  Baroque further ignores that, in the Initial Questionnaire, after asking for the presence and role of CCP officials, Commerce asked the GOC for supporting information with specific requests for the GOC to "explain how {it} developed the information," "what records did {it} review?" and to explain whether there are sources at the national, provincial, municipal, or local levels that would determine whether CCP officials held positions in the company.  GOC Initial Questionnaire Response at Exhibit LTAR-69 (C.R. 44).  These questions required the GOC to submit responses that could have provided a verifiable basis for the response it provided.  But the GOC did not respond adequately to these questions.

Furthermore, instructions provided in the Initial Questionnaire, and referenced in the supplemental questionnaire, directed that the GOC, "identify your source of information" and include "copies of source documents necessary to understand your response."  Initial Questionnaire at I-7 (P.R. 65).  Commerce explained that the information was necessary because it would be "used by the Department to prepare for verification."  *Id*.  Furthermore, Commerce provided a direct telephone number for two contact persons "should {the GOC} need further

assistance or information" in its cover letter. *Id*. at 3-4. Despite this notice and opportunity to remedy, the GOC did not provide full and complete answers including verifiable information. Therefore, the record contains substantial evidence that Commerce complied with the notice requirements of 19 U.S.C. § 1677m(d).

Baroque's argument that Commerce relied on *Citric Acid from China 2012* in lieu of expressly requesting information is also meritless. *See* Baroque Br. at 32-33. Commerce cited *Citric Acid* for the proposition that the GOC *could have* provided government information, despite the claimed absence of centralized database system, independent from company information that demonstrated CCP membership, not that the documentation needed to be the same. *See* IDM at 58 ("For instance, in *Citric Acid* from China 2012, we determined that two input suppliers were not authorities because of government documentation provided by the GOC.") (P.R. 361). The GOC repeatedly stated that it could not provide the information requested because there is no database that contains the information. *Citric Acid from China 2012* provides an example of how the GOC could have acquired information had it cooperated to the best of its ability. *See* IDM at 57-58.

Lastly, Baroque's argument that the supplemental questions did not adequately specify the deficiency in the information from the previous response overlooks the depth of deficiency in the GOC's responses. *See* Baroque Br. 31. In the supplemental questionnaire, Commerce specifically addressed each deficiency by explicitly repeating the precise information that was missing. *See e.g.*, Section II Supplemental Questionnaire at 1, 7 (stating "we have identified certain areas in the initial and supplemental questionnaire responses submitted by the GOC for which we require additional information" and restating the question, "{f}or all producers from whom the respondents purchased inputs during the POR, please identify which owners, managers,

and directors were Chinese government or CCP officials during the POR.") (P.R. 119-120).

Where Commerce has provided opportunities to report the companies' information, as it did here,

it has fulfilled the requirements of 19 U.S.C. § 1677m(e).  *See Saha Thai Steel Pipe*, 663 F .Supp.

3d at 1374 ("Having given Plaintiff at least two opportunities to report the companies'

information, Commerce was not required to 'issue a{n} {additional} supplemental questionnaire

to the effect of, 'Are you sure?'' ") (internal citations omitted).

Baroque argues that Commerce must outline the specific deficiency for each input

supplier, even if the entire response was deficient.  *See* Baroque Br. at 31-32 (*citing Borusan*, 61

F. Supp. 3d at 1344).  *Borusan* does not stand for that proposition.  In *Borusan*, the respondent

described its difficulties in gathering the information and had specifically asked to be relieved of

the burden, stating that it "stands ready to provide" the information "with the understanding that it

will require several weeks to do so."  61 F. Supp. 3d at 1344.  Because Commerce did not respond

to this request or issue any additional supplemental questionnaires before applying an adverse

inference, the Court found that Commerce had not provided a sufficiently detailed explanation of

the nature of the deficiency and had not provided the respondent with an opportunity to remedy

the deficiency.  *Id*.  By contrast here, the GOC did not request to be relieved of its burden or

express a willingness to produce more information upon further explanation from Commerce.

*Borusan* does not support the proposition that for Commerce to provide notice of a deficiency,

Commerce must specifically state why the lack of information in the previous response

necessitates repeating the request in each individual question.

Accordingly, Commerce satisfied its obligation under 19 U.S.C. § 1677m(d) by providing

notice of deficiency and an opportunity to remedy to the GOC.  Commerce's determination to

apply AFA to find that Baroque's input suppliers are authorities within the meaning of 19 U.S.C. § 1677(5)(B) is also supported by substantial evidence and in accordance with law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny the motion for judgment on the agency record and sustain Commerce's final results in their entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                                        /s/ Brendan Jordan
JonZachary Forbes                                  BRENDAN JORDAN
Attorney                                           Trial Attorney
Office of the Chief Counsel                        U.S. Department of Justice
for Trade Enforcement and Compliance               Civil Division
U.S. Department of Commerce                        Commercial Litigation Branch
Washington, D.C.                                   P.O. Box 480
                                                   Ben Franklin Station
                                                   Washington, D.C. 20044
                                                   Telephone: (202) 616-0342
                                                   E-mail: Brendan.D.Jordan@usdoj.gov

June 25, 2024                                      Attorneys for Defendant