# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ x | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, : | |
| : | |
| Plaintiffs, : | |
| : | Court No. 23-00136 |
| v. : | |
| : | **PUBLIC VERSION** |
| UNITED STATES, : | |
| : | |
| Defendant, : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ x | |

## PLAINTIFFS' REPLY BRIEF

Andrew T. Schutz
Francis J. Sailer
Jordan C. Kahn
Michael S. Holton

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: August 29, 2024

## TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................1

**ARGUMENT** ..........................................................................................................1

I.      ITTO BENCHMARK DATA ARE SPECIFIC TO THE PLYWOOD BAROQUE PURCHASED; UN COMTRADE DATA ARE NOT ................................................1

II.     COMMERCE'S AFA DETERMINATIONS AS TO CERTAIN INPUT SUPPLIER'S GOVERNMENT AUTHORITY STATUS IS UNLAWFUL ............6

      A.     THE COURT HAS AN INSUFFICIENT BASIS ON WHICH TO REVIEW COMMERCE'S DETERMINATION ...........................................................8

      B.     NECESSARY INFORMATION IS NOT MISSING ....................................11

      C.     BAROQUE DID NOT FAIL TO EXHAUST ADMINISTRATIVE REMEDIES ...........20

**CONCLUSION** ......................................................................................................22

## **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Agro Dutch Indus. Ltd. v. United States*,
    508 F.3d 1024 (Fed. Cir. 2007)................................................................21

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S*,
    426 F. Supp. 3d 1395 (CIT 2020)............................................................21

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
    352 F. Supp. 3d 1316 (CIT 2018)............................................................11

*Guizhou Tyre Co. v. United States*,
    557 F. Supp. 3d 1302 (CIT 2022)..............................................................8

*NSK Ltd. v. United States*,
    910 F.Supp. 663 (1995) ............................................................................12

*Risen Energy Co. v. United States*,
    570 F.Supp.3d 1369 (CIT 2022)............................................................4, 5

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*,
    23 CIT 804 (1999) ....................................................................................12

*Zhejiang Dunan Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011)................................................................11

**Regulations**

19 C.F.R. § 351.511 ...........................................................................................1, 3

**Statutes**

19 U.S.C. § 1677................................................................................... *passim*

**Administrative Decisions**

*Certain Metal Lockers and Parts Thereof from the People's Republic of China:*
    *Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,741
    (July 7, 2021) .............................................................................................18

*Flat Products From the Russian Federation: Final Affirmative Countervailing*
    *Duty Determination and Final Negative Critical Circumstances*
    *Determination*, 81 Fed. Reg. 49,935 (July 19, 2016) ..............................10

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) ................................8

*United States – Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India*, WT/DS436/AB/R (8 December 2014) ............................................8

## INTRODUCTION

Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation (collectively "Baroque") submit this Reply Brief in response to the Response Brief filed by Defendant (the "Government").  For the reasons outlined below, and in Baroque's 56.2 motion and brief ("Baroque Br."), the Court should reject the Government's arguments in full.

## ARGUMENT

**I.    ITTO BENCHMARK DATA ARE SPECIFIC TO THE PLYWOOD BAROQUE PURCHASED; UN COMTRADE DATA ARE NOT**

In its Final Results, Commerce failed to provide a reasoned explanation based on substantial evidence for including UN Comtrade data in the Tier 2 plywood benchmark (1) that are not grade specific, (2) where indisputable evidence exists that different plywood grades have *significantly* different prices, and (3) when record evidence demonstrates that UN Comtrade data is overbroad and includes grades of plywood that are materially and significantly different than the plywood used by Baroque. The Government's brief provides insufficient justification for Commerce's position.

The Government does not dispute that Commerce found the UN Comtrade data and ITTO data both to be "sufficiently reliable and representative" of a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Gov. Br. at 9. Commerce made this determination by averaging the two sources together based on 19 C.F.R. § 351.511(a)(2)(ii). In other words, Commerce determined that the UN Comtrade data and the ITTO data were both individually and independently reliable and representative of a world market price; therefore, Commerce averaged the commercially available world market prices.

What is in dispute is whether the UN Comtrade plywood data (which is not grade-

specific and contains all grades) satisfy the "prevailing market conditions" criteria outlined in 19 U.S.C. § 1677(5)(E)(iv), permitting Commerce to use this source as a tier 2 benchmark in the first place. As discussed in detail in Baroque's brief, record evidence shows that no subject merchandise producer in China would use plywood grades higher than those reported by the ITTO data. Baroque Br. at 11-17. Narrowing the benchmark data to only the ITTO data and excluding the UN Comtrade data that includes higher grade plywood ensures that the benchmark selected is sufficiently comparable to the input subject to the less than adequate remuneration program. That is, it prevents against calculating a benefit due differences in product characteristics as opposed to determining a benefit as a result of a LTAR subsidy.

Indeed, the Government in its brief acknowledges that Commerce considers "the facts surrounding the data/information placed on ***the record of a proceeding*** . . . {which} must be evaluated on a case-by-case basis." Gov. Br. at 10 (emphasis added) (citation omitted). We agree. The Government then goes on to explain that "Commerce's practice is to consider whether a dataset represents comparable. . . world market prices, and if so, to include it in the calculation of the benchmark, ***narrowing it to a more relevant subset if appropriate***." Gov. Br. 11 (emphasis added). Again, we agree. Here, the record indicates that Baroque did not purchase *or* use plywood grades greater than those reported by ITTO. Nor would any MLWF producer given that high quality face veneer is always placed on top of the plywood core obscuring any defects in the plywood.[1]

After explaining that Commerce's practice is to narrow the datasets where the record and data allow, the Government then attempts to rationalize why Commerce included non-grade-

---

[1] Second Benchmark Submission at  Exhibit SB-1 (Nov. 1, 2022) (PR 309; CR 162) ("the plywood used in MLWF is of a low-quality because it is used for the core of the product, which cannot be seen by the consumer.").

specific UN Comtrade HTS subheadings in the benchmark by distinguishing between tier 1

benchmarks and tier 2 benchmarks:

> Commerce draws on global datasets and takes the average, as required by 19 C.F.R. § 351.511(a)(2)(ii), ***to approximate a reasonable benchmark price. Commerce tailors those global datasets to the extent possible by using only the subheadings of the data that match the product at issue.***

Gov. Br. at 12 (emphases added). The Government essentially argues that it only narrows the

benchmark data where the HTS subheadings are specific enough to "match the product at issue."

*Id.* The Government's explanation concedes that the UN Comtrade data "could not be filtered by

grade" and, thus, do not match Baroque's plywood. *Id*. at 16. In other words, Commerce

concedes that the UN Comtrade data plywood subheading do not match the product at issue

because these headings do not specify grade (and therefore include all grades). It makes little

sense for Commerce to exclude only those HTS subheadings that are made up exclusively of

products not similar to the input being valued on the one hand but, knowingly, to include basket

subheadings that definitively include non-similar, and distortive products on the other. This is

inconsistent with the myriad cases outlined in Baroque's direct brief at pages 6-11. Further, when

prices are used for grade A or B plywood, the benefit being calculated for the subsidy is a result

of grade differences and ***not a result of the countervailable subsidy being received***.

Commerce's own regulations mandate that Commerce must make allowances for "factors

affecting comparability." 19 C.F.R. § 351.511(a)(2)(ii). As discussed above, the issue before this

Court is not whether the ITTO data are narrow or the UN Comtrade data are robust, but whether

the UN Comtrade data consists of products that are ***comparable to the product at issue based on

the record of the case***.

When the products are not comparable, Commerce is not assessing whether the adequacy

of remuneration is caused by a countervailable subsidy but rather is assessing the impact of

product differences. The Government implies that the non-grade-specific UN Comtrade data are comparable (or more "robust") than the grade-specific ITTO data simply because UN Comtrade data include all grades that *could* be purchased by the respondents. *See*, *e.g.*, Gov. Br. at 17. This robustness is exactly what makes the UN Comtrade data non-comparable. It is overinclusive of plywood of different (and higher) grades that Baroque did not purchase or use, making it distortive. Baroque presented a significant amount of evidence showing that:

- Plywood grades significantly impact price;

- Plywood used for subject merchandise is Grades C or D since a high-quality face veneer is placed on top of the plywood obscuring scars and defects in the plywood;

- The plywood that Baroque Timber uses in its production is Grade C/D; and

- The HTS provisions used for plywood do not distinguish grade and therefore include all grades of plywood.

*See* Baroque Br. at 12-17.

The question that should be asked in this case, given the significant record evidence submitted by Baroque, is: if the UN Comtrade data had been broken out by grade-specific subheadings similar to the species breakout (which Commerce excluded), would Commerce include the dissimilar grades in the average of the benchmark? The answer to this question is clearly "*no*" based on Commerce's own statements. Thus, there is no basis to use UN Comtrade data that include much more costly, grade A plywood.

The Government addresses several cases cited by Baroque supporting the proposition that Commerce's practice is to narrow and tailor global datasets based on the record evidence to match the product at issue. Specifically, the Government argues that *Risen Energy Co. v. United States*, 570 F.Supp.3d 1369 (CIT 2022), supports Commerce's position to include non-grade-

specific UN Comtrade data, because the "Court reasoned that this dataset was 'sourced from limited samples' and that including it in the calculation risked 'overvaluing the United States to China route data.'" Gov. Br. at 13 (citing *Risen*, at 1378). The Government's analysis entirely misses the mark of the court's reasoning in *Risen*. Based on the facts of that case, the court determined that the "narrow" Descartes ocean freight dataset was less accurate than the "broader" Xeneta ocean freight dataset for valuing ocean freight in the benchmarks. But this was not only because the Descartes data were limited or narrow. Rather, the court found that the Department did not address the "flaws" in the Descartes data (*i.e.*, (1) the data were from one company, and thus may not constitute a world price, (2) some of the data included less than a container load shipment rate, and (3) the data included inland freight "which would incur additional fees **not associated** with ocean freight or found in the Xeneta data"). *Id.* at 1379. In other words, like this case, the evidence in *Risen* showed that Descartes data were not specific to the input or services being valued, and the inclusion of the data skewed or did not add to the accuracy of the benchmark. *Id.* ("Presently, the analysis does not consider these flaws and whether the resulting Descartes data reasonably 'reflect{s} the price a firm actually paid or would pay if it imported the product.'"). While the specific facts are not the same, the dicta of *Risen* is the same as the Government's statement in its brief here: "Commerce's practice is to consider whether a dataset represents comparable—not identical—commercially available world market prices, and if so, to include it in the calculation of the benchmark, ***narrowing it to a more relevant subset if appropriate***." Gov. Br. at 11 (emphasis added).

This is no different than the other cases the Government tries to distinguish. There is no dispute that the specific facts are not the same as this case. However, all the cases stand for the idea and practice that "***in order to approximate a reasonable benchmark price . . . Commerce***

***tailors those global datasets to the extent possible by using <u>only the subheadings</u> of the data***

***that match the product at issue***" (emphasis added). Gov. Br. at 12. In this case, the UN

Comtrade data cannot be differentiated by grade and therefore include significantly higher grades

that substantial record demonstrates are not used by Baroque. Consequently, the inclusion of the

non-grade-specific UN Comtrade data do not add to the accuracy of the benchmark, but rather

cause the benchmark to be skewed by including prices **not associated** with Baroque's purchases

in the benchmark calculation.

   The Government argues that since Baroque purchased grade C and D plywood data, UN

Comtrade data (which covers all grades, including grade D) is a better data set than ITTO, which

only covers grades C/CC. Gov. Br. at 17.  The Government is correct that record evidence

conclusively demonstrates that Baroque purchased C and D grades of plywood. Baroque Br. at

12-15. This means that the ***highest*** grade of plywood Baroque purchased was Grade C. In other

words, Baroque purchased ***no grades higher than the grades covered by ITTO data***. It is

precisely because UN Comtrade data includes all grades that it should not be used. As noted by

Professor Dai: "{t}here is a significant price difference between Grade AB plywood and Grade

CD."[2] Given these facts, it defies reason that UN Comtrade data is more comparable than ITTO

data simply because UN Comtrade data includes Grade D data in addition to Grades A and B.

Even if ITTO data does not include Grade D, it is more similar to Baroque's purchases than any

data set that would include Grades A and B.

   Consistent with its practice, Commerce is required to select the most product-specific

data utilizing record evidence. Defendant's arguments concerning the "robust" nature of the non-

specific data are not reasoned or supported by substantial evidence. Moreover, Defendant's

---

[2] Second Benchmark Submission at Exhibit SB-1 (Nov. 1, 2022) (PR 309; CR 162).

arguments concerning the narrower ITTO data are irrelevant given the fact that Commerce already determined that the ITTO data individually and independently was reliable and representative of a world market price. Based on record evidence, the Court should direct the Commerce to recalculate the benchmark consistent with these arguments.

## II.    COMMERCE'S AFA DETERMINATIONS AS TO CERTAIN INPUT SUPPLIER'S GOVERNMENT AUTHORITY STATUS IS UNLAWFUL

In its direct brief, Baroque advances two main challenges to Commerce's application of AFA to the government authority determination for certain of its input suppliers: (1) that Commerce's "group" determination rather than individual determinations for each supplier, renders the decision unreviewable; and (2) even if reviewable, the Government of China ("GOC") responses were not deficient or missing, preventing AFA because there is no gap in the record. Baroque Br. at 26-33. Both challenges address whether, based on the evidence and the requirements of 19 U.S.C.§§ 1677e(a), Commerce lawfully rendered a decision based on AFA. Though Baroque believes that substantial evidence demonstrates that its input suppliers are not government authorities, that claim is not before this Court. Commerce's determination was based on AFA only. Commerce did not find that the information the GOC provided in this case demonstrated that Baroque's input suppliers were government authorities. Instead, Commerce found that the GOC failed to provide requested information and, thus, failed to cooperate to the best of its ability warranting the use of facts available with adverse inferences to fill that gap in the record. Baroque argued at length in its direct brief that this finding was unlawful. The Government does not adequately rebut Baroque's position.

A.    **The Court Has An Insufficient Basis On Which To Review Commerce's Determination**

The first challenge that Baroque makes in its brief relates to how Commerce rendered its determination. Baroque Br. at 26-29. Specifically, Baroque argued that Commerce erred by failing to make government authority determinations for each input supplier, particularly the individually owned suppliers identified in Attachment 1 to its direct brief. Baroque continued that failing to issue specific findings on how the GOC did not provide requested information or cooperate as to each of the sixteen suppliers (including two affiliates) made Commerce's determination unreviewable by this Court. As the court has explained:

> A court is obligated to review a decision of an administrative agency according to the reasoning the agency puts forth. . . .To do that, a court must be able to discern and evaluate that reasoning according to the applicable standard of review.

*Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1324 (CIT 2022).

Whether Baroque's input suppliers are government authorities is an individual determination based on the information provided by the GOC in its questionnaire responses (and any other information on the record). Indeed, Commerce must determine whether each individual supplier is "vested with government authority", thereby providing a countervailable subsidy to Baroque. If a supplier is not an authority, then the purchases from that supplier will not be countervailed. To determine whether an entity is an "authority" under section 771(5)(B) of the Act, Commerce reviews "the totality of record evidence and whether it demonstrates that the government has meaningful control over an entity such that it possesses, exercises, or is vested with government authority." *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021), IDM at Cmt. 13; *see also US – Anti-Dumping and Countervailing Duties (China)*; *United States –*

8

*Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India*, WT/DS436/AB/R (8 December 2014) at para. 4.29 ("the term 'public body' in Article 1.1(a)(1) of the SCM Agreement means 'an entity that possesses, exercises or is vested with governmental authority.'  Whether the conduct of an entity is that of a public body must in each case be determined on its own merits, with due regard being had to the core characteristics and functions of the relevant entity, its relationship with the government, and the legal and economic environment prevailing in the country in which the investigated entity operates."). Whether the GOC did or did not provide requested information for each supplier again is an individual determination since this information is used to determine whether ***that specific supplier is a government authority***. The Court must then determine whether Commerce lawfully concluded that the failure to provide that specific information created a gap in the record that needed to be filled to determine whether each supplier is a government authority. Finally, the Court must then determine whether substantial evidence supported Commerce's finding that information provided, or failed to be provided, for each specific supplier constituted the GOC's failure to cooperate to the best of its ability, i.e., whether adverse inferences were warranted. The Government in its brief does not address this claim that determinations must be made individually even though (1) specific information was provided for each specific supplier, creating a unique record for each[3], and (2) certain suppliers where non-cross-owned affiliates of Baroque, creating a unique factual scenario.

      Rather than address this specific argument, the Government misconstrues the arguments Baroque makes regarding Commerce's decision and the facts on the record.  It claims that

---

[3] The GOC provided separates responses for each of the 16 suppliers.  GOC IQR at Exh. LTAR-1, pp. LTAR-48-52 (PR 93-102; CR 35-54).

"Baroque's argument . . .  incorrectly assumes that an analysis of ownership interests alone is necessarily sufficient to demonstrate the absence of government control." Gov. Br. at 18-19. Baroque makes no such assumption.  Instead, the point Baroque makes is that 1) Commerce's AFA determination focuses on missing ownership information and missing information regarding CCP (i.e., the "9 entities) involvement as to every supplier; 2) because Commerce applied that determination to all suppliers rather than making individual supplier specific determination, it was incorrect as to certain suppliers that had no government ownership; and 3) since no ownership information was missing, the only question as to these specific suppliers was whether CCP involvement or the 9 Entity information was missing creating a gap.

Moreover, the Government is wrong that the focus of the government authority determination is solely on "meaningful control." Gov. Br. at 19.  While control is certainly a large part of it, the analysis instead is 1) whether there is meaningful control and 2) whether that control means that the company "possesses, exercises, and is vested with governmental authority." *See, e.g., Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (July 19, 2016), IDM at Cmt. 1 ("Rather, the totality of the record evidence demonstrates that the GOR has meaningful control of Gazprom and that the company pursues government policy objectives through Gazprom's business and operations; thus, Gazprom possesses, exercises, and is vested with governmental authority."); *see also Phosphate Fertilizers From the Kingdom of Morocco supra*.  Thus, the threshold legal question in this appeal is whether there is sufficient information on the record to make this determination or whether instead the information is

missing or deficient warranting the application of facts available with adverse inferences.

**B.    NECESSARY INFORMATION IS NOT MISSING**

The Government in its brief both distorts the information requested and information actually received, further underscoring the legal error in Commerce's determination. The first step in the application of AFA is to determine whether information is missing from the record. *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011); *see Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1326 (CIT 2018) ("The use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA").  As noted, Commerce must identify what information missing and why that information is necessary.  If necessary and missing, Commerce can only apply adverse inferences if the information is deficient in some way; these include: when (1) "necessary information is not available on the record, or" an interested party (2) "withholds information that has been requested," (3) "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," (4) "significantly impedes a proceeding ... or," (5) "provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a)(1)–(2).

In its brief, the Government seems to acknowledge that ownership information was not missing from these 16 suppliers.  Instead, the Government walks through the "control" information that believes Commerce properly identified as missing and deficient.  In reviewing these instances, it is critical for the Court to pay attention to the particular question being asked. As we outline in our direct brief, in many instances the questions asked do not request supporting documentation and, yet, Commerce found the answers deficient for just that reason. *See* Baroque

Br. at 30 (noting that neither the 9 Entities nor CCP questions ask for documents and only for explanation or yes/no responses).  It is axiomatic that "it is Commerce, not the respondent, which bears the burden of asking questions" and that Commerce must ask "clear" questions "to let the respondent know what information it really wants". *Ta Chen Stainless Steel Pipe, Ltd. v. United States,* 23 CIT 804, 820 (1999); s*ee also NSK Ltd. v. United States,* 910 F.Supp. 663, 671 (1995) ("respondents should not be required to guess the parameters of Commerce's interpretation of a phrase in the statute").  Put simply, a respondent cannot receive AFA for not providing documents it was never asked to provide.

First, the Government addresses the question where Commerce asked the GOC to "identify any individual owners, members of the board of directors, or senior managers who were {Chinese} Government or CCP officials during the POR." Gov. Br. at 22.  The full question reads:

> Please identify any individual owners, members of the board of directors, or senior managers who were Government or CCP officials during the POR. Where an owner, member of the board of directors or manager of the input producer, or any owner at any level of ownership of such producer, has been identified as an official of any of the nine entities named in Section F, above, please provide the information requested below with respect to that entity. (Please note that these questions do not pertain to general membership in the CCP.)

GOC IQR at LTAR 66 (C.R. 44/P.R. 102).  For each of the 16 individual suppliers, the GOC answered that "There are no individual owners, members, of the board of directors, or senior managers who were Government or CCP officials during the POR at this producer." *Id*. at LTAR-66-68.  Then, with respect to the question "Explain whether there are sources at the national, provincial, municipal, or local levels to determine whether company owners, members of the board of directors or managers were officials of any of the above nine entities", the GOC responded that "There is no central informational database to search for such information**."**  *Id*.

at LTAR 60.  On its face, the GOC fully answered the questions and none of these answers are deficient.

The Government then explains that "Commerce's supplemental questionnaire repeated the question regarding CCP involvement in senior management and the board and asked the GOC to reconcile its statement that no CCP officials are involved with the board or senior management with a CCP Opinion document stating that "CCP committees at all levels must implement ideological work in the private economy sector." Gov. Br. at 22.  There are two errors with this statement.

First, Commerce did *not* identify a deficiency in the GOC's response and, instead, merely repeated the question:

> 18. For all producers from whom the respondents purchased inputs during the POR, please identify which owners, managers, and directors were Chinese government or CCP officials during the POR.
>
> **Response:  The GOC has confirmed that, for those companies that the GOC was able to collect and submit requested documents in the IQR and Exhibit SQ-2, all of the owners, directors or managers were <u>not</u> Chinese government or CCP officials during the POR.**

GOC Supp Response at 10 (P.R. 227).

Second, Commerce then in another question identified what it believed was a *general* discrepancy in all of the GOC's responses was no CCP involvement in any of the companies; not that there was a specific deficiency in the GOC's response that none of the managers, directors or shareholders of the suppliers were CCP *officials*.  Commerce asked:

20. *The General Office of the CCP Central Committee Issued the Opinion on Strengthening the United Front Work of the Private Economy in the New Era* placed on the record by the petitioner on May 26, 2022, states that the CCP committees at all levels must implement ideological work in the private economy sector, and the CCP committees must aim this work at all private enterprises and private economy practitioners. Please respond to the following questions. Please explain the discrepancy between the apparent CCP's Opinion and your questionnaire response. Provide documentation to support your response.

> **Response:** The GOC believes there is no discrepancy between the CCP's Opinion and GOC's response. The Document referred in this question itself did not mention any possibility that the CCP would interfere with the operation and determination process of the companies in the private economy sector. Instead, the document only refers to the purpose of improving the rule of law and moral standards of private economic personnel. The documents referred to in the question does not indicate that the CCP committees have interference in the operation, management, or any other company affairs.

*Id.* at 10-11. Again, it is unclear why this response is deficient or how it means that the GOC's specific response that none of the 16 suppliers' managers, directors or shareholders are CCP officials is deficient. This document referenced in the question merely discusses improvements on how local CCP committees consult and communicate with private businesses; it does not discuss local CCP committee officials *becoming* managers, directors or shareholders of private companies. Petitioners May 25, 2022 Comments on the GOC IQR at Exh. 1 (P.R. 114). This is no different than local governments working with local business everywhere. Moreover, there is a massive leap from local political committees urging private companies to implement "ideological" policies to this document meaning that local CCP committees all now exert "meaningful control" of each private company such that "the company pursues government policy objectives through {the company's" business and operations; thus, "the company" possesses, exercises, and is vested with governmental authority." *Phosphate Fertilizers From*

*the Kingdom of Morocco supra.* In other words, in can both be true that local CCP committees are following this opinion *and* at these specific suppliers do not have any owners, manages or directors that are CCP officials. Thus, this document does not establish a discrepancy in the GOC's response and, more importantly, Commerce did not in fact cite any "discrepancy" between the GOC's response and this specific document as the basis for its AFA determination in its Final Results. IDM at Cmt. 4 (P.R. 361).[4]

Next the Government addresses the GOC's responses on whether primary party organizations are present in the reported suppliers. The Government states:

> Commerce also asked about the CCP Constitution's requirement that a branch or committee be formed in any enterprise with three or more party members regardless of state-ownership and whether such an entity has been formed within the company and for the GOC to "explain any decisions taken by that entity that are subject to review or approval by the Government or the {CCP}." *See* Section II Supplemental Questionnaire at 7-8 (P.R. 119). The GOC again responded with bald assertions that the CCP did not control input suppliers. *See* GOC's Letter, "GOC Second Supplemental Questionnaire Response," dated October 21, 2022 (Second Supplemental Questionnaire Response) at Exhibit SQ2-3 at 9-21 (P.R. 308).

Gov. Br. at 23. Again, there are a number of errors in this statement.

First, the GOC fully responded to the primary party question. For each of the 16 producers the GOC responded:

[



]

---

[4] We further note that this CCP Opinion was issued on September 15, 2020, and only covered a small portion of the POR, to the extent that it could even be implemented in the final months for 2020 in any sort of tangible way. The POR here is from January 1, 2020, to December 31, 2020.

GOC IQR at Exh. LTAR-1, pp. LTAR-48-52 (C.R. 44/P.R. 102).  In the supplemental

questionnaire issued to the GOC, Commerce did not address the specifics of the GOC's response

but instead just repeated the question.  The GOC then provided signed statements from the

suppliers, confirming that primary party organizations did not exist within these suppliers.  GOC

Supp. Response at Exh. SQ-2 (PR 227; CR 73-77).  Thus, the Government statement that

"Nowhere in its response did the GOC actually answer whether such entities were formed within

the input suppliers" is plain wrong.  Gov. Br. at 24.

Second, not only did the GOC full respond that each of these 16 suppliers did not have a

primary party organization, but this information does not contradict the information the

Government cites.  The CCP Constitution merely states that a primary party must be formed

where there are three or more party members. IDM at Cmt. 4 (P.R. 361).  This means that where

there are *not* three party members in the company, no primary party is necessary. Thus, it is

neither unreasonable nor contradicted on the record that there would be private companies

without a primary party organization. Indeed, with only about 100 million CCP members in

China[5] compared to a population of about 1.4 *billion*[6], this means only 7% of the publication in

China are party members. Thus, there are likely *many* companies that do not have three party

members.

Further, the Government states that information on the records shows "Commerce's

presumption of significant CCP involvement in privately- owned enterprises and that those

entities "are public bodies if Commerce determines that the government exercises meaningful

control over them."  Gov. Br. at 23, citing Public Bodies Memorandum at Attachment I at 3

---

[5] https://www.scmp.com/news/china/politics/article/3183669/chinas-communist-party-grows-near-97-million-its-made-younger
[6] https://data.worldbank.org/indicator/SP.POP.TOTL?locations=CN

(P.R. 140-156). This statement is misleading. This statement in the Public Bodies Memorandum is referring to the fact that *if there is involvement by a CCP official in the company*, then Commerce could find there is meaningful control. *Id*. The Public Bodies Memorandum does not state that there is a *presumption* of CCP control in private companies. Indeed, the Public Bodies Memorandum is actually called the "Update of the *2012 Public Bodies Analysis* of State-Invested Enterprises in China for Countervailing Duty Purposes" and focuses on state-invested enterprises (SIEs), not private companies in China. "By 'state-invested enterprise,' Commerce means enterprises in which the government of China has an ownership stake of any size." Public Bodies Memorandum at Attachment I at 3 (P.R. 140-156). The memorandum than reiterates its findings that public bodies can be: " (1) any enterprise in China in which the government has a full or controlling ownership interest is a public body; (2) enterprises in China in which the government has significant ownership that are also subject to certain government industrial plans may be public bodies; and (3) *certain enterprises that have little or no formal government ownership are public bodies if Commerce determines that the government exercises meaningful control over them*. *Id*. (emphasis added to identify the portion cited by the Government in its brief).

These are the only examples the Government provides of "missing" information from the record and, yet, the above clearly shows that the information was, in fact, not missing. The GOC did not fail to provide documents requested of it, answered each question fully, provided information directly from each of the input suppliers supporting the information provided and did not refuse to answer any questions put to it. Moreover, there is no information on the record that shows that this information is deficient and the Government's argument to the contrary fail.

First, the Government again cites to the CCP Constitution, to the 2006 Company Law, which repeats the three CCP member requirement, and to previous cases to support Commerce's deficiency finding.  These previous cases include "*Metal Lockers* and the *2019 Multilayered Wood Flooring Review*, which found that 'Chinese law requires the establishment of CCP organizations' in all companies so privately owned organizations may be subject to the CCP's 'controlling influence in the company's affairs' and that a CCP report 'primarily indicates the influence of the CCP over the employees in the company' despite GOC claims that it did not." Gov. Br. at 26, citing IDM at 57.

As already discussed above, the three member requirement supports, and not hurts, the GOC's claim that these 16 suppliers do not have CCP primary party organization.  These organizations are not required in all companies; therefore, it is entirely reasonable to *presume* that private companies do not have these entities within them.

*Metal Lockers* is factually distinguishable from this case.  In that case, the GOC did not respond to the 9 entities question, did not provide information regarding primary party organizations within the respondents' input suppliers, and did not answer questions about CCP officials within the suppliers.  Instead, the GOC simply argued that 1) "the information provided from ECIPS was sufficient for our analysis," and that 2) CCP involvement would not make the company a government authority.  *Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,741 (July 7, 2021), IDM at Cmt. 5.  That is not what Baroque argues here and the record in this case is completely different.

The reference to the *2019 Multilayered Wood Flooring Review* is also helpful, not hurtful.  In that case (currently before this court in Ct. No. 22-210), the GOC reported that one of

the respondents' suppliers had a primary party organization, while others did not.  The Government states in its brief that "Commerce indicated that the 2019 review was provided 'as an example' and used it to further demonstrate how the CCP 'guided' privately-owned input suppliers which makes information on CCP presence and influence necessary to the investigation." Gov. Br. at 27, citing IDM at 57 (P.R. 361). This demonstrates that the GOC's answers to the 9 entities question can and is reliable.  If the GOC states that the company does not have a primary party organization, it is evidence of that fact, just as the GOC's statement that the company does have a primary party organization, is, as the Government and Commerce admits, substantial evidence of that fact.

Finally, the Government again focuses on Commerce's reliance on *Citric Acid from China 2012.* Gov. Br at 28, citing IDM at 58 (P.R. 367).  The Government claims that this case "served as a strong indication that the GOC did not take reasonable measures to secure the necessary information" because in that case, the official was part of a local CCP organization and, then was not, which could be proved based on the local CCP organization's records.  In its direct brief, Baroque argued that requiring the GOC to poll each and every CCP organization in the entire country to demonstrate the negative that no company officials were part of that CC organization was unreasonable and onerous.  Baroque Br. at 33.  The Government responded that "The fact remains that the GOC never submitted a signed certificate from *any* CCP entity and "Therefore, its argument that a government document or signed certificate from the CCP would be insufficient is purely speculative."  Gov. Br. at 28-29.

The Government's response is confusing.  In this case, Commerce used the fact that the GOC did not provide a certification like in *Citric Acid from China 2012* as part of the basis for AFA.  Thus, it is very relevant that the facts in that case were completely different than here.  In

that case, the GOC only had to prove that a fact had changed and was no longer true (i.e., the CCP official was part of an organization in the past and no longer was during the POR). Here, the GOC is attempting to prove that a fact never existed in the first place (i.e., no officials from any CCP entity in the country or primary party organizations). Here, Commerce asks about involvement in the following: (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees, (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), (8) the Discipline Inspection Committees of the CCP, and (9) a CCP committee, branch, or "primary organization." This covers every level of society in China and hundreds, if not thousands, of entities. Commerce has provided no direction in how to demonstrate these facts, *in any case* other than when faced with the unique facts of *Citric Acid*.

In sum, the GOC in this review provided complete responses to the Department's questions for 16 suppliers. The Department's findings that both information is missing and deficient is not supported by the record rendering the application of AFA unlawful. This issue should therefore be remanded back to Commerce for reconsideration.

## C. BAROQUE DID NOT FAIL TO EXHAUST ADMINISTRATIVE REMEDIES

The Government's arguments that Baroque failed to exhaust administrative remedies by not raising its 19 U.S.C. § 1677m(d) claim below also fails. Gov. Br. at 41. First, Baroque argued at length below that the GOC's responses were not deficient, and that AFA was not warranted. This claim arises from that argument, Commerce had clear notice. Second, even if the 1677m(d) claim is unique from the arguments raised, the pure question of law exception applies. The question here is whether Commerce followed the express terms of an unambiguous statute; there

is no question of fact. *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007); *see, e.g.*, *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S,* 426 F. Supp. 3d 1395, 1410 (CIT 2020) ("BMB's argument is that the express terms of the statute prohibit Commerce from making any PMS adjustment to an importer's cost of production… for purposes of the sales below COP test, so that Commerce acted contrary to the statute, and thus contrary to law….The 'pure legal question' exception applies because no further factual development is required, so that requiring exhaustion would be futile."). As explained above, Commerce explained in its Final Results in response to Baroque's briefing that the GOC failed to provide sufficient documentation for the 9 Entities Question, warranting AFA, and yet neither the 9 Entities Question nor Commerce's supplemental question requested documentation. The failure to advise the GOC of this deficiency, which formed the basis for Commerce's AFA finding, is contrary to the unambiguous statutory requirements in section 1677m(d).

For these reasons, the Court should disregard the Government's claims concerning exhaustion.

**PUBLIC VERSION**

## **CONCLUSION**

For the reasons discussed above, Baroque requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law and remand the Final Results with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Francis J. Sailer
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  August 29, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 6,239 words, less than the 7,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Counsel to Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation*

Dated: August 29, 2024

12913425_1