Slip Op. 25-36

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. AND RIVERSIDE PLYWOOD CORPORATION,**

       Plaintiffs,

v.

**UNITED STATES,**

       Defendant.

**Before: Timothy M. Reif, Judge**

**Court No. 23-00136**

### OPINION AND ORDER

[Remanding Commerce's final results in the tenth administrative review of the countervailing duty order covering multilayered wood flooring from the People's Republic of China.]

Dated: April 3, 2025

Andrew T. Schutz, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., argued for plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation. With him on the briefs were Francis J. Sailer, Jordan C. Kahn and Michael S. Holton.

Brendan D. Jordan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., and JonZachary Forbes, Of Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., argued for defendant United States. With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director and Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.

\* \* \*

Reif, Judge:  Before the court is the motion for judgment on the agency record by plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation (collectively, "Baroque" or "plaintiff").[1]

Plaintiff invokes this Court's subject matter jurisdiction under 28 U.S.C. § 1581(c) and seeks review of the final results of the tenth administrative review by the U.S. Department of Commerce ("Commerce") of the countervailing duty ("CVD") order on multilayered wood flooring ("MLWF" or "subject merchandise") from the People's Republic of China ("China"), published as *Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (Dep't of Commerce May 31, 2023) ("Final Results"), PR 367, and accompanying Issues and Decision Memorandum (Dep't of Commerce May 24, 2023) ("IDM"), PR 361.

Plaintiff alleges that Commerce's Final Results were not supported by substantial evidence on the record and were otherwise not in accordance with law in regard to Commerce's: (1) calculation of the benchmark price for plywood; and (2) application of adverse facts available ("AFA") to find certain of Baroque's input suppliers to be government authorities.  *See* Pls.' Mot. for J. on the Agency R. ("Baroque Br."), ECF Nos. 27-28.

For the reasons discussed below, the court remands Commerce's calculation of the plywood benchmark and application of AFA to find certain of Baroque's input suppliers to be government authorities.

---

[1] Baroque Timber is a cross-owned affiliate of Riverside Plywood.

## BACKGROUND

On December 8, 2011, Commerce issued a CVD order on MLWF from China. *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011), *amended by Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).[2]

On February 4, 2022, Commerce initiated an administrative review of the CVD order on MLWF from China for the period of review ("POR") January 1, 2020, through December 31, 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 6,487 (Dep't of Commerce Feb. 4, 2022), PR 13.

On March 10, 2022, Commerce selected Baroque as well as Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") as mandatory respondents in the administrative review. Memorandum from U.S. Department of Commerce to Office of DIR/EC Pertaining to Interested Parties Respondent Selection (Mar. 10, 2022), CR8, PR 63.

On December 22, 2022, Commerce published its preliminary results, in which it calculated a preliminary countervailable subsidy rate of 15.93 percent for Baroque. *Multilayered Wood Flooring from the People's Republic of China: Preliminary Results and Partial Recission of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg.

---

[2] The amendment consisted of removing an incorrect Harmonized Tariff Schedule of the United States ("HTS") number from the scope of the orders. *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders,* 77 Fed. Reg. 5,484, 5,485 (Dep't of Commerce Feb. 3, 2012).

78,644 (Dep't of Commerce Dec. 22, 2022) ("Preliminary Results"), PR 321, and

accompanying Preliminary Decision Memorandum (Dep't of Commerce Dec. 15, 2022)

("PDM"), PR 316.

 In its preliminary results, Commerce calculated a benchmark price for plywood,

an input used to produce MLWF, by taking an average of two datasets in the record: a

dataset from the International Tropical Timber Organization ("ITTO") containing plywood

data from Ghana, Brazil and Peru and a global dataset from the United Nations

Comtrade database ("UN Comtrade").  PDM at 45-49.  Additionally, Commerce

preliminarily determined to apply an adverse inference that Baroque's input suppliers

were authorities of the Government of China ("GOC") because the GOC withheld

information that Commerce deemed necessary for analyzing Chinese Communist Party

("CCP") involvement in those suppliers.  *Id.* at 14-18.

 On May 31, 2023, Commerce published its Final Results, in which it calculated a

final countervailable subsidy rate of 17.06 percent for Baroque.  Final Results, 88 Fed.

Reg. at 34,829.  In its Final Results, Commerce continued to use both UN Comtrade

and ITTO data to calculate the plywood benchmark.[3]  IDM at 76.  Regarding the

application of AFA to find Baroque's input suppliers to be government authorities,

Commerce made no changes from the preliminary results.  *See id.* at 54.

---

[3] Commerce included also in its plywood benchmark calculation Stats.NZ export data.
*See* IDM at 76.  In its briefing, Baroque considers the Stats.NZ data and the UN
Comtrade data to be "essentially the same" and refers only to the UN Comtrade data for
"convenience."  Baroque Br. at 11 n.1.  The court does the same.

On June 30, 2023, and on July 31, 2023, Baroque filed summons and complaint, respectively, before the Court seeking judicial review of certain aspects of the Final Results.  Summons, ECF No. 1; Complaint, ECF No. 13.

On February 23, 2024, plaintiff filed its motion for judgment on the agency record. Baroque Br.

On February 27, 2025, the court heard oral argument.  *See* Oral Arg. Tr., ECF No. 42.

As noted, in its motion, plaintiff maintains that Commerce's Final Results were not supported by substantial evidence on the record and were otherwise not in accordance with law regarding Commerce's: (1) calculation of the benchmark price for plywood; and (2) application of AFA to find certain input suppliers to be government authorities.  *See* Baroque Br. at 1-2.

## JURISDICTION AND STANDARD OF REVIEW

Whether a court has subject matter jurisdiction to hear an action is a "threshold" inquiry.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The court exercises jurisdiction pursuant to 28 U.S.C. §1581(c).

The court will uphold Commerce's determinations in CVD proceedings unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  "The substantiality of evidence must take into account whatever

in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

A court "[is] obliged to set aside Commerce's determination if it is unsupported by substantial evidence on the record[ ] or otherwise not in accordance with law.  To fulfill that obligation, . . . Commerce [must] examine the record and articulate a satisfactory explanation for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (internal quotation marks and citations omitted) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

"[W]hen a statute grants an agency power to administer fact-intensive inquires, the agency's conclusion should be reversed only if the record is 'so compelling that no reasonable factfinder' could reach the same conclusion."  *Cooper (Kunshan) Tire Co. v. United States*, 45 CIT __, __, 539 F.Supp.3d 1316, 1325 (2021) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

"To be in accordance with law, the agency's decision must be authorized by the statute, and consistent with the agency's regulations."  *Yama Ribbons & Bows Co. v. United States,* 36 CIT 1250, 1253, 865 F. Supp. 2d 1294, 1297 (2012).  It is well-established that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted).  A reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## DISCUSSION

I.    **Whether Commerce's calculation of the benchmark for plywood is supported by substantial evidence and otherwise in accordance with law**

The court addresses first Baroque's challenge to Commerce's calculation of the plywood benchmark.  Specifically, Baroque challenges Commerce's inclusion of non-grade specific UN Comtrade data in Commerce's tier two plywood benchmark calculation.

A.    **Additional Background**

In the Final Results, Commerce calculated plywood benchmark prices by averaging the UN Comtrade data and the ITTO data placed on the record.  *See* IDM at 76.

The UN Comtrade dataset consists of data reported monthly by approximately 90 countries for plywood transactions during the period of review.  *See* Letter from Wiley Rein LLP to Secretary of Commerce Pertaining to AMMWF Benchmark Pricing Information (Oct. 11, 2022), Ex. 1-A, PR 269, 271; Letter from Husch Blackwell LLP to Secretary of Commerce Pertaining to Senmao Benchmark Submission (Oct. 11, 2022), attach. 1-3, PR 281-284.

The ITTO dataset contains plywood export prices from Brazil and Peru during the period of review, reported bi-monthly and differentiated by grade.  *See* Letter from Grunfeld, Desiderio, Lebowitz, Silverman, & Klestadt LLP to Secretary of Commerce Pertaining to Riverside Plywood and Baroque Benchmark Submission (Oct. 11, 2022), Ex. 2B, PR 291-295.  The relevant ITTO data are the C/CC grade prices from the "Brazil – Parica Domestic Plywood Prices," "Brazil – Pinewood EY Exports" and "Peru Export plywood" categories.  *Id.*

**B.     Legal Framework**

A countervailing duty is "a remedial measure that provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014). The countervailing duty imposed shall be "equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671(a).

Commerce will determine that a countervailable subsidy exists when a foreign authority provides a specific financial contribution to a party, and that party benefits therefrom. *See* 19 U.S.C. § 1677(5). A benefit is conferred where "goods or services are provided for less than adequate remuneration ['LTAR']," which is "determined in relation to prevailing market conditions for the good . . . which is subject to the investigation or review." *Id.* § 1677(5)(E)(iv). Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

To determine whether goods were provided for less than adequate remuneration, "Commerce must determine the proper benchmark price." *Essar Steel Ltd. v. United States,* 678 F.3d 1268, 1273 (Fed. Cir. 2012) (citing 19 C.F.R. § 351.511). The benchmark price is "the price that could have constituted adequate remuneration." *Fine Furniture,* 748 F.3d at 1368. To measure the adequacy of remuneration, Commerce "compares the respondent's reported costs for the input in question . . . with the calculated benchmark price, which is representative of the market price for the good at

issue." *Beijing Tianhai Indus. Co. v. United States*, 39 CIT __, __, 52 F. Supp. 3d 1351,

1356 n.9 (2015).

Under 19 C.F.R. § 351.511(a)(2), Commerce sets forth the "bases for identifying

an appropriate market-based benchmark for measuring the adequacy of the

remuneration of a government provided good or service." *Id.*  In order of preference,

the potential benchmarks are as follows: (1) market prices from actual transactions

within the country under investigation for the government-provided good (e.g., actual

sales, actual imports, or competitively run government auctions) ("tier one"

benchmarks); (2) world market prices that would be available to purchasers in the

country under investigation ("tier two" benchmarks); or (3) prices consistent with market

principles based on an assessment by the Department of the government-set price ("tier

three" benchmarks).  *Id.* (citing *High Pressure Steel Cylinders from the People's

Republic of China: Preliminary Affirmative Countervailing Duty Determination and

Alignment of Final Countervailing Duty Determination with Final Antidumping Duty

Determination*, 76 Fed. Reg. 64,301, 64,304 (Dep't of Commerce Oct. 18, 2011)).

"If there is no useable market-determined price with which to make the

comparison," then Commerce will calculate a tier two benchmark, "measuring the

adequacy of remuneration by comparing the government price to a world market price

where it is reasonable to conclude that such price would be available to purchasers in

the country in question."  19 C.F.R. § 351.511(a)(2)(ii).  In calculating a tier two

benchmark, if "there is more than one commercially available world market price,"

Commerce is required to "average such prices to the extent practicable, making due

allowance for factors affecting comparability."  *Id.*  "These factors ensure that the

composite benchmark reflects prevailing market conditions in the [producer's] home

country.  [The factors] include 'price, quality, availability, marketability, transportation,

and other conditions of purchase or sale.'"  *RZBC Grp. Shareholding Co. v. United*

*States,* 39 CIT __, __, 100 F. Supp. 3d 1288, 1305 (2015) (quoting 19 U.S.C. §

1677(5)(E)).

"The court's role is not to assess whether the benchmark data Commerce used

was [sic] the 'best available,' but rather whether Commerce's choice was reasonable."

*Guizhou Tyre Co. v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1261, 1274 (2018)

(citing *Peer Bearing Co.-Changshan v. United States*, 27 CIT 1763, 1770, 298 F. Supp.

2d 1328, 1336 (2003)).

**C.    Analysis**

For the reasons discussed below, the court is not able to conclude that

Commerce's calculation of the plywood benchmark is supported by substantial

evidence.  The court remands to Commerce to take the actions as set forth below.

In the Final Results, Commerce determined to calculate the final plywood

benchmark by averaging both the non-grade specific UN Comtrade data and the grade-

specific ITTO data from Brazil and Peru.  *See* IDM at 76.

In the IDM, Commerce explained that it continued to include the UN Comtrade

data in its calculation because Baroque "did not adequately support its arguments that

the UN Comtrade data are inappropriate to calculate plywood benchmarks for Baroque

Timber's plywood purchases."  *Id.* at 75.  Commerce acknowledged that Baroque

supported its arguments that plywood grade has a significant impact on price with

"certifications from Baroque Timber's suppliers, information on plywood industry grading

practices, and an expert witness statement." *Id.* However, Commerce disagreed that the record rendered the non-grade specific UN Comtrade data "unsuitable to benchmark purchases that consist of only a single grade." *Id.*

Commerce explained that while its practice is to "calculate product-specific benchmarks," Commerce in general "utilize[s] benchmarks derived from broad averages . . . [which] need not reflect goods that are identical to the government-provided good." *Id.* Given this practice, Commerce determined that there was "no basis . . . to remove [the UN Comtrade data] from the benchmark just because it includes all grades of [plywood] and no extraction of grade-specific information is possible." *Id.* at 76.

Additionally, Commerce cited its "practice to average multiple world market prices, pursuant to 19 C.F.R. [§] 351.511(a)(2)(ii)", in determining to average the UN Comtrade and ITTO data. *Id.* Following this practice, Commerce concluded that both the UN Comtrade and ITTO data are "world market prices suitable for benchmarking" plywood and determined to continue averaging such data in Commerce's final plywood benchmark. *Id.*

Baroque argues that the Court should instruct Commerce to recalculate its plywood benchmark for two reasons. First, Baroque asserts that Commerce's plywood benchmark calculation was unsupported by substantial evidence because Commerce disregarded "record evidence demonstrat[ing] that UN Comtrade data [are] overbroad and include[] grades of plywood that are materially and significantly different than the plywood used by Baroque." Pls.' Reply Br. ("Baroque Reply Br.") at 1, ECF Nos. 34-35. Baroque contends that the record demonstrates that Baroque "did not purchase *or* use plywood grades greater than those reported by ITTO" and that no MLWF producer in

China would ever use higher priced grade A or B plywood.  *Id.* at 2.  Therefore, Baroque

argues that the UN Comtrade data, which contain prices for grades A and B plywood,

are distortive and not comparable to the plywood actually purchased by Baroque.

Second, Baroque asserts that Commerce's inclusion of the UN Comtrade data is

unlawful because such inclusion was not in accordance with either the statute or

Commerce's own regulations.  Baroque notes that 19 U.S.C. § 1677(5)(E)(iv) mandates

that Commerce account for "prevailing market conditions" such as "price" and "quality"

when performing an LTAR benefit analysis.  *Id.*  Baroque notes further that Commerce's

regulations mandate that Commerce must make "due allowance for factors affecting

comparability" when measuring the adequacy of remuneration.  Baroque Br. at 6

(quoting 19 C.F.R. § 351.511(a)(2)).  Baroque argues that, by including the UN

Comtrade data, Commerce did not properly account for prevailing market conditions or

factors affecting comparability and as a result, the calculated benefit "is a result of grade

differences and *not a result of the countervailable subsidy being received.*"  Baroque

Reply Br. at 3.

As to Baroque's first argument, the court concludes that Commerce did not

address adequately the information in the record demonstrating that the UN Comtrade

data are overbroad and, on that basis, may not be comparable for purposes of the

plywood benchmark calculation.

In the IDM, Commerce acknowledged that the record demonstrated that plywood

grade has a significant impact on price and that Baroque purchased only lower grade

plywood.  However, notwithstanding that Commerce acknowledged this fact, Commerce

asserted that Baroque failed to demonstrate "that the UN Comtrade data are

inappropriate to calculate plywood benchmarks." IDM at 75. Commerce explained that

the HTS subheadings comprising the UN Comtrade dataset encompass Baroque's

plywood purchases and are therefore "world market prices suitable for benchmarking"

plywood. *Id.* at 76. Commerce asserted further that Baroque did not offer "any

information to rebut [Commerce's] conclusion that these HS subheading [sic] describe

Baroque Timber's plywood purchases." *Id.* at 75**.** Last, Commerce stated that its

practice "does not necessitate the exclusion of all broad or basket-category data" and

that "benchmarks need not reflect goods that are identical to the government-provided

good." *Id.*

     "The substantiality of evidence must take into account whatever in the record

fairly detracts from its weight." *Universal Camera Corp.*, 340 U.S. at 488; *see also*

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ("A reviewing

court must consider the record as a whole . . ..").  "While [the agency] need not address

every argument and piece of evidence, . . . it must address significant arguments and

evidence which seriously undermines [sic] its reasoning and conclusions." *Altx, Inc. v.*

*United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001) (internal

citation omitted).

     In this case, Baroque put forth "significant arguments and evidence," *id.* at 1117-

18, 167 F. Supp. 2d at 1374, that the inability to excise grade A and grade B prices from

the UN Comtrade data is a flaw causing the plywood benchmark to be skewed by

higher prices not associated with Baroque's actual purchases. *See* IDM at 71-73.

     Commerce explained that the HTS subheadings comprising the UN Comtrade

data describe Baroque's plywood purchases. *See id.* at 74. However, Commerce did

not explain how inclusion of the UN Comtrade data was justified under the statute and Commerce regulations, notwithstanding the alleged flaws.  In failing to offer such an explanation, Commerce failed to provide "a reasoned analysis or explanation" for rejecting Baroque's arguments and including the UN Comtrade data.  *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

For the same reason, the court is unable to conclude that Commerce's decision is supported by substantial evidence.  *See Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1333 (2018) ("*Trina Solar I*") (remanding where Commerce included Comtrade data in a benchmark calculation "without properly considering whether the Comtrade data was too flawed to be probative of the world market price for the input at issue");[4] *see also Changzhou Trina Solar Energy Co. v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1287, 1295 (2020) ("*Trina Solar III*") (sustaining Commerce's use of only non-Comtrade data because such data were "specific to the inputs used by the parties" and "probative of the world market price").

As to Baroque's second argument, the court reserves judgment as to whether Commerce's inclusion of the UN Comtrade data in the plywood benchmark violates

---

[4] In *Trina Solar I*, the Court ruled that Commerce "made little effort to counter claims that Comtrade data was based on too broad a product category to provide an accurate world market price."  *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1332 (2018).  In justifying its use of Comtrade data, Commerce stated only that "the HTS descriptions were suitable for constructing a world price."  *Id.*  The Court remanded to Commerce to either use only the non-Comtrade dataset in its benchmark calculation or else "explain why the inclusion of the Comtrade data does not produce a fatally inaccurate result."  *Id.* at 1333.

Commerce's statutory and regulatory obligations or whether a benchmark derived solely from the ITTO data would comply with such regulations.[5]

Accordingly, the court remands to Commerce to use solely the ITTO grade-specific data in its plywood benchmark calculation or explain: (1) the reason that the inclusion of the UN Comtrade data does not produce a fatally distortive benchmark; and (2) the reason that a plywood benchmark derived solely from the ITTO data would not meet Commerce's statutory and regulatory requirements.

## II.    Whether Commerce's application of AFA to find certain of Baroque's input suppliers to be government authorities was unlawful

The court addresses Baroque's challenge to Commerce's application of AFA to find certain of Baroque's input suppliers to be government authorities.  Specifically, Baroque argues that Commerce's application of AFA was unlawful for two reasons: (1) necessary information was not missing from the record; and (2) Commerce failed to specify deficiencies in the GOC's responses and did not permit the GOC to correct such deficiencies.

For the reasons set forth below, the court concludes that Commerce's application of AFA to find that certain of Baroque's input suppliers are government authorities was not in accordance with law.  The court remands to Commerce to take the actions as set forth below.

---

[5] In *Trina Solar I*, the Court ruled that Commerce "failed to properly make allowance for 'factors affecting comparability'" by averaging broad UN Comtrade data with a product-specific dataset.  *Trina Solar I*, 42 CIT at __, 352 F. Supp. 3d at 1332 (quoting 19 C.F.R. § 351.511(a)(2)(ii)).  In *Trina Solar III*, the Court ruled that "[r]elying on [a product-specific dataset] *alone* meets the comparability requirements of 19 C.F.R. § 351.511(a)(2)(ii) and is in accordance with Commerce's obligations under the regulations."  *Trina Solar III*, 44 CIT at __, 466 F. Supp. 3d at 1295 (emphasis supplied).

### A.    Additional Background

On March 14, 2022, Commerce issued its initial countervailing duty questionnaire to the GOC.  *See* Letter from U.S. Department of Commerce to Embassy of the People's Republic of China Pertaining to Government of China's Initial Questionnaire (Mar. 14, 2022) ("Initial Questionnaire"), PR 65.

In the "Input Producer Appendix" to the Initial Questionnaire, Commerce requested information pertaining to the ownership and structure of Baroque's input suppliers, as well as the presence or involvement of any CCP entities in those suppliers. *See* Initial Questionnaire at II-34 to II-38.  Specifically, Commerce asked the GOC "whether a CCP committee, branch or 'primary organization' has been formed" within any of the suppliers and whether "any decisions taken by [a supplier] are subject to review or approval by" the GOC or by any one of nine listed CCP-associated entities (the "nine entities question").  *Id.* at II-36.  Additionally, Commerce asked the GOC to "identify any individual owners, members of the board of directors, or senior managers who were Government or CCP *officials* during the POR" (the "CCP officials question"). *Id.* at II-37.

Further, Commerce asked the GOC to "explain how [it] developed the information used in [its] response . . . to determine whether or not company owners, members of the board of directors or managers were or were not *officials* of any of the above nine entities."  *Id.*  For this question, Commerce specifically asked the GOC to address the following points: (1) the "records question": "What records did you review to determine the information that was reported in the response?"; (2) the "government sources question": "Explain whether there are sources at the national, provincial, municipal, or

local levels to determine whether company owners, members of the board of directors

or managers were officials of any of the above nine entities"; (3) the "annual reports

question": "In addition to Government records (including CCP records), is there

information in the annual reports of the companies, such as biographical summaries,

that would indicate whether company owners, members of the board of directors or

managers were officials of any of the above nine entities?"; and (4) the "other

documents question": "Explain whether there are any other company records or

company documents that are submitted to the Government that would indicate a

person's *official* role with the Government, including the CCP."  *Id.*

On May 11, 2022, the GOC submitted its response to Commerce's Initial

Questionnaire.  *See* Response from DeKieffer & Horgan to Secretary of Commerce

Pertaining to Government of China's Section II Questionnaire Response (May 11, 2022)

("GOC IQR"), CR 35-54, PR 93-102.  For 16 input suppliers,[6] the GOC responded to the

nine entities question as follows:

> There is no primary party organization in this producer.  There is no decision
> taken by the producer that is subject to the review or approval by the
> Government or the 9 entities listed in the question.  As demonstrated in the
> Articles of Association of the producer, the decisions are made within
> internal organizations of the producer without reference to any external
> review or approval.

*Id.*, Ex. LTAR-1 at LTAR-48.

For the same 16 input suppliers, the GOC responded to the CCP officials

question as follows: "There are no individual owners, members, [sic] of the board of

---

[6] Baroque reported more than 100 input suppliers but challenges the application of AFA
to only 16.  *See* Baroque Br., attach. 1.

directors, or senior managers who were Government or CCP officials during the POR at this producer."  *Id.* at LTAR-66.

In response to the records question, the GOC explained that it "sent the relevant questions to the input suppliers" and reported the responses it received from those suppliers.  *Id.* at LTAR-69.  In response to the government sources question, the GOC responded that there "is no central informational database to search for such information."  *Id.*  In response to the annual reports question, the GOC responded that "[u]nder relevant Chinese laws, companies have no obligation to identify whether their owners, members of the board of directors, or managers are officials or representatives of any" of the nine entities.  *Id.*  In response to the other documents question, the GOC stated that "no other company records or company documents that are submitted to the government would indicate a person's official role with the government or CCP."  *Id.*

Commerce identified certain areas in the GOC IQR for which Commerce required additional information and on June 23, 2022, Commerce issued a supplemental questionnaire to the GOC.  *See* Letter from U.S. Department of Commerce to DeKieffer & Horgan Pertaining to Government of China's Supplemental Questionnaire (June 23, 2022) ("Supplemental Questionnaire"), CR 70, PR 119.  Commerce requested additional information as to how the GOC verified its responses (the "verification question"):

> For 16 input producers, you claimed that the CCP has no role in the decision making of the producers and the input producers are not required to carry out obligations on behalf of the GOC and/or CCP.  Please explain what, if any, steps you took to verify or further examine the accuracy of this information, including what, if any, documentation was reviewed.  *Provide documentation to support your response.*

*Id.* at 7 (emphasis supplied).

Further, Commerce asked the following question (the "CCP Opinion question") in response to the GOC's initial responses:

> *The General Office of the CCP Central Committee Issued the Opinion on Strengthening the United Front Work of the Private Economy in the New Era* placed on the record by the petitioner on May 26, 2022, states that the CCP committees at all levels must implement ideological work in the private economy sector, and the CCP committees must aim this work at all private enterprises and private economy practitioners.  Please respond to the following questions.  Please explain the discrepancy between the apparent CCP's Opinion and your questionnaire response.  *Provide documentation to support your response.*

*Id.* at 8 (emphasis supplied).

On July 14, 2022, the GOC submitted its response to Commerce's Supplemental Questionnaire.  *See* Response from DeKieffer & Horgan to Secretary of Commerce Pertaining to Government of China Supplemental Questionnaire Response (July 14, 2022) ("GOC SQR"), CR 73-77, PR 227.  Regarding verification, the GOC stated that it "went through all the Articles of Association of [the input suppliers at issue] and confirmed that, [sic] all the company affairs are conducted and determined internally [and that] [t]here is no interference from the CCP or any other parties."  *Id.* at 10.  Although the GOC provided signed statements from the suppliers, the GOC did not provide government documentation in support of its response.

In response to the CCP Opinion question, the GOC stated that there was "no discrepancy between the CCP's Opinion and GOC's response."  *Id.* at 11.  The GOC explained that the CCP's Opinion "only refers to the purpose of improving the rule of law and moral standards of private economic personnel" and "does not indicate that the CCP

committees have interference in the operation, management, or any other company affairs." *Id.* The GOC did not provide documentation in support of its response.

On October 6, 2022, Commerce sent a Second Supplemental Questionnaire to the GOC and on October 21, 2022, the GOC submitted its response. *See* Response from DeKieffer & Horgan to Secretary of Commerce Pertaining to Government of China's Second Section II Supplemental Questionnaire Response (Oct. 21, 2022) ("GOC SQR II"), PR 308.

### B.    Legal framework

A countervailable subsidy may be found where the entity providing the subsidy is an "authority." 19 U.S.C. § 1677(5)(B). An "authority" is defined as "a government of a country or any public entity within the territory of the country." *Id.* Commerce's "longstanding practice" is to treat "most government-owned corporations as the government itself." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,402 (Dep't of Commerce Nov. 25, 1998).

Commerce may make determinations on the basis of the facts otherwise available whenever "necessary information is not available on the record" or "an interested party or any other person" (1) withholds information requested by Commerce; (2) fails to submit such information on time or in the form and manner requested by Commerce; (3) significantly impedes the proceedings; or (4) provides information that Commerce is unable to verify. 19 U.S.C. § 1677e(a); *see also* 19 C.F.R. § 351.308(a).

In selecting from facts otherwise available, Commerce may use an inference that is adverse to the interests of a party "if [that] party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. §

1677e(b)(1); *see also* 19 C.F.R. § 351.308(c).  A respondent's failure to cooperate to "the best of its ability" is determined by "assessing whether [the] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  If Commerce determines that a response to a request for information does not comply with the request, Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency."  19 U.S.C. § 1677m(d).

If Commerce finds that further information submitted in response to such deficiency is unsatisfactory or untimely, Commerce may "disregard all or part of the original and subsequent responses."  *Id.*  However, Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements . . ." if: (1) the information is timely; (2) verifiable; (3) complete enough to be reliable; (4) the interested party demonstrates that it acted to the best of its ability in providing the information and meeting the requirements established by Commerce; and (5) Commerce can use the information without undue difficulties.  *Id.* § 1677m(e).

C.    **Analysis**

1.    **Whether Commerce determined reasonably that necessary information was missing from the record**

The court addresses first whether Commerce determined reasonably that it lacked necessary information to analyze whether certain of Baroque's input suppliers are government authorities.

Baroque argues that the GOC provided full and detailed responses to Commerce's inquiries and, therefore, necessary information was not missing from the record. Baroque Reply Br. at 11-20.

In the IDM, Commerce explained that it asked the GOC to provide "information about the involvement of the CCP in each" of the input suppliers, information that Commerce deemed "necessary to fully evaluate whether the purportedly privately-owned input producers are 'authorities.'" IDM at 55. Commerce stated that the GOC's responses were insufficient because "the GOC did not provide any *government* documentation to support its claim that the individually-owned suppliers were not government authorities." *Id.* at 58 (emphasis supplied). The GOC submitted certifications from the input suppliers denying any CCP influence, but Commerce explained that those certifications were "not the government documents" required and were "*pro forma* in nature, lacking particular details for examining possible government involvement in each company." *Id.* at 55.

Commerce explained further that "the company statements the GOC did provide do not definitively deny the involvement by the government or the CCP in these suppliers; rather, they merely state rhetorically that even if there was some CCP presence in the company, it has no bearing on the company's management and operations." *Id.* at 58. On this basis, Commerce determined that none of the company statements "actually address[es] whether any of the supplier's individual owners, managers, or board [sic] of directors are in fact CCP officials." *Id.*

Commerce concluded that without "government documentation, [Commerce could not] conclude that there is no official CCP presence in any of the . . . input

suppliers." *Id.* Accordingly, Commerce determined that the GOC withheld necessary information and, therefore, applied an adverse inference that the CCP exerts "meaningful control over the [input suppliers] and their resources." *Id.*

Baroque argues that Commerce determined incorrectly that the GOC withheld necessary information. Baroque argues that the GOC provided full responses to Commerce's inquiries and that Commerce failed to explain what precise necessary information was missing and why. Baroque Br. at 29; *see also supra* background Section II.A.

In the IDM, Commerce stated that the GOC's company statements and narrative denials of CCP influence, without supporting government documentation, did not provide sufficient detail regarding the extent of CCP involvement in the suppliers. IDM at 58. Commerce explained that it requires more than mere company statements because "[p]ublicly available information indicates that Chinese law requires the establishment of CCP organizations 'in all companies, whether state, private, domestic, or foreign-invested' and that such organizations may wield a controlling influence in the company's affairs." *Id.* at 57 (citing *Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,741 (Dep't of Commerce Jul. 7, 2021) and accompanying IDM (Dep't of Commerce June 28, 2021) at cmt. 5).

As an example, Commerce noted that, in the final results of the 2019 MLWF administrative review, the GOC acknowledged that one input supplier contained a primary party organization. *Id.* There, the GOC included a summary report which "indicate[d] the influence of the CCP over the employees in the company." *Id.* (quoting

*Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,305 (Dep't of Commerce June 16, 2022) and accompanying IDM (Dep't of Commerce June 10, 2022) at cmt. 4).  Commerce added that its "request for information from the GOC is a request for government information independent from company information."  *Id.* at 58.

In sum, Commerce explained adequately that the GOC's responses did not include supporting *government documentation* — and not just internal company statements or verbal affirmations — regarding the extent of CCP involvement in the suppliers and that Commerce had previously required the GOC to submit government documentation to demonstrate that input suppliers were not authorities.

Therefore, the court concludes that Commerce determined reasonably that the GOC did not provide information necessary for Commerce to analyze whether certain of Baroque's input suppliers are government authorities.

### 2. Whether Commerce provided the GOC with notice and an opportunity to remedy its deficient responses

The court turns next to whether Commerce provided the GOC with adequate notice and an opportunity to remedy its deficient responses, as required by 19 U.S.C. § 1677m(d).

Baroque argues that "Commerce did not provide the GOC with any notice that the specific information provided regarding the [] suppliers at issue was deficient in any way."  Baroque Br. at 31.  Baroque notes that neither the nine entities question nor the CCP officials question in the Initial Questionnaire requested supporting documentation. *Id.* at 30.

Baroque asserts further that Commerce sent the GOC supplemental questionnaires that did not explicitly reference any deficiencies in the GOC's initial responses, thereby denying to the GOC an opportunity to remedy any deficiency such as a failure to provide government documentation. *Id.* at 31. As a consequence, Baroque contends, Commerce's application of AFA based on the GOC's failure to cooperate fully with Commerce requests for information runs contrary to the requirements of § 1677m(d).

The government argues that: (1) Baroque failed to exhaust its administrative remedies because it never raised a § 1677m(d) argument during the administrative proceeding; and (2) Commerce complied with § 1677m(d) "by requesting verifiable information and asking specific questions regarding CCP presence and influence in the supplemental questionnaire." Def. Br. at 30-33.

On the first point, the court concludes that the pure-question-of-law exception to administrative exhaustion applies here.

The pure-question-of-law exception to administrative exhaustion applies "when (1) plaintiff raises a new argument; (2) this argument is of a purely legal nature; (3) the inquiry requires neither further agency involvement nor additional fact finding or opening up the record; and (4) the inquiry neither creates undue delay nor causes expenditure of scarce party time and resources." *Saha Thai Steel Pipe Pub. Co. v. United States*, 46 CIT __, __, 605 F. Supp. 3d 1348, 1366 (2022) (quoting *Zhongce Rubber Grp. Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1276, 1279 (2018)).

All four requirements are met here. Baroque has raised for the first time whether Commerce failed to provide any notice of deficiency to the GOC as required by §

1677m(d).  This Court has previously held that whether "Commerce complied with the

notice requirement [of § 1677m(d)] is a purely legal question" where "the facts relevant

to that inquiry are present on the record [and] [n]o further agency involvement is

required for the Court to consider the question."  *Id.*  Here, the only question before the

court is whether Commerce's questionnaires provided the GOC with adequate notice

and an opportunity to respond.  Commerce's questionnaires are before the court and

the court cannot identify any additional factual development or agency involvement that

would be required before the court considers this issue.  Further, the parties have not

raised any concerns about scarce resources or time.  Therefore, the court will consider

Baroque's objection on the merits.

   The court concludes that Commerce did not fulfill its obligations under §

1677m(d).

   Section 1677m(d) requires that if Commerce determines that a response to a

request for information does not comply with the request, Commerce "shall promptly

inform the person submitting the response of *the nature of the deficiency* and shall, to

the extent practicable, provide that person with an opportunity to remedy or explain the

deficiency."  19 U.S.C. § 1677m(d) (emphasis supplied).

   The questions are, therefore: (1) whether Commerce adequately informed the

GOC that its responses were deficient for want of government documentation; and (2)

whether Commerce provided the GOC with an opportunity to remedy that deficiency.

For the following reasons, the court concludes with respect to both questions that

Commerce did not.

In the "Input Producer Appendix" to the Initial Questionnaire, Commerce requested information pertaining to the ownership and structure of Baroque's input suppliers, as well as the presence or involvement of any CCP entities in those suppliers. *See* Initial Questionnaire at II-34 to II-38; *see also supra* background Section II.A (detailing the nine entities question, the CCP officials question and related records and government sources questions). Neither the nine entities question nor the CCP officials question requested that the GOC provide supporting government documentation and the GOC did not provide any such documentation.

In the government sources question, Commerce did inquire specifically as to *whether* there existed government source documents to analyze the involvement of CCP-related entities in the input suppliers. *See* Initial Questionnaire at II-37. This question did not, however, request that the GOC provide supporting documentation in the event that such government source documents existed.[7] In response, the GOC provided an admittedly nonresponsive answer, stating that there "is no central informational database to search for such information." GOC IQR, Ex. LTAR-1 at LTAR-69.

In the cover letter to the Supplemental Questionnaire, Commerce informed the GOC that Commerce "identified certain areas in the initial questionnaire response submitted by the GOC for which [Commerce] require[d] additional information."

---

[7] At oral argument, the court asked the government whether the government sources question requested government documentation. Oral Arg. Tr. at 39:12-15. The government admitted that the question did "[n]ot necessarily" do so. *Id.*

Supplemental Questionnaire at 1.  However, Commerce did not elaborate further in the cover letter what these "certain areas" were.

In the Supplemental Questionnaire, Commerce then reiterated the nine entities question and the CCP officials question nearly verbatim from the Initial Questionnaire, without any reference to the GOC's initial responses or explanation as to what Commerce found lacking in those responses.  *See id.* at 7 ("[P]lease identify whether any owner, director, or manager is a member or representative of any of the [nine] entities"; "[P]lease identify which owners, managers, and directors were Chinese government or CCP officials during the POR.").  Commerce did not identify a lack of government documentation as a deficiency in the GOC's initial responses nor did Commerce request that the GOC provide any government documentation in its supplemental responses.[8]  Additionally, Commerce did not identify the GOC's response to the government sources question as deficient nor did Commerce reiterate the question in any form.  *See id.*

This Court has held that "Commerce satisfies its obligation under § 1677m(d) to place the respondent on notice of the nature of a deficiency in its initial questionnaire response where a supplemental questionnaire '*specifically point[s] out* and request[s] clarification of [the] deficient responses,' and *identifies the information needed* to make the required showing."  *Hyundai Steel Co. v. United States*, 45 CIT __, __, 518 F. Supp.

---

[8] In the Supplemental Questionnaire, Commerce did request, for the first time, that the GOC provide supporting documentation for its responses to the verification and CCP Opinion questions.  *See* Supplemental Questionnaire at 7-8; *see also supra* background Section II.A.  However, neither of these questions explicitly requested *government* documentation and the GOC did not provide any government documentation in its supplemental responses.  *See* GOC SQR at 10-11.

3d 1309, 1322-23 (2021) (alterations in original) (emphasis supplied) (quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)); *see also Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (holding that Commerce satisfied its obligation under § 1677m(d) when the respondent "failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified [the respondent] of that defect").

Here, Commerce failed to satisfy its obligation under § 1677m(d) because Commerce did not "specifically point[] out and request[] clarification" of the deficiency (i.e., the lack of government documentation) in the GOC's initial responses and did not identify government documentation as "the information needed to make the required showing." *Maverick Tube Corp.*, 857 F.3d at 1361; *see also Hyundai Steel Co.*, 45 CIT at __, 518 F. Supp. 3d at 1322 ("Broadly drawn initial or supplemental questionnaires may not sufficiently place a respondent on notice of the nature of the deficiency, and deprive it of the opportunity to remedy that deficiency.").

Commerce's repetition alone of the nine entities and CCP officials questions was not sufficient to provide the GOC with notice that its initial responses to those questions were deficient.  This Court has held previously that "[s]imilarities in questions between the initial and supplemental questionnaire alone do not serve as evidence that Commerce found the initial questionnaire response deficient." *Cf. Hyundai Heavy Indus. Co. v. United States*, 44 CIT __, __, 485 F. Supp. 3d 1380, 1402 (2020) (rejecting petitioner's "assumption that Commerce's issuance of a supplemental questionnaire containing a question similar to one posed in the initial questionnaire establishes that Commerce found the [initial] response . . . deficient").

Commerce's failure to identify specifically the deficiency in the GOC's responses and identify what information could be provided to cure that deficiency denied the GOC the "opportunity to remedy or explain the deficiency," as mandated by § 1677m(d). Notably, Commerce's questionnaires did not specifically request government documentation.[9]

Commerce's omission with regard to the supplemental nine entities and CCP officials questions stands out given that Commerce complied with the requirements of § 1677m(d) for other questions in the same questionnaire.  For example, supplemental question four notes that in the Initial Questionnaire, Commerce requested that the GOC provide "original and translated copies of laws, regulations or other governing documents cited by the GOC in the Export Buyer's Credit Response."  Supplemental Questionnaire at 4.  Commerce then stated clearly in the question that the GOC's initial response was deficient because the GOC "did not provide the 2013 amendment" to the Export Buyers' Credit Program Administrative Measures.  *Id.*  Last, Commerce requested precisely the information the GOC needed to provide to respond fully: "Please provide the 2013 amendment and guidelines to the above-mentioned laws."  *Id.*

It is well established that the burden of creating an adequate record rests with a respondent, *see ABB Inc. v. United States*, 42 CIT __, __, 355 F. Supp. 3d 1206, 1222 (2018); however, Commerce is "obligat[ed] to let the respondent know what information [Commerce] really wants."  *Ta Chen Stainless Steel Pipe v. United States*, 23 CIT 804,

---

[9] At oral argument, the government admitted that Commerce's questionnaires did not request specifically government documentation.  *See* Oral Arg. Tr. at 39:12-15, 40:10-18 ("[I]f you're asking, was there [a] specific requirement in the questionnaire itself saying you have to give us government documentation?  I don't believe that the questionnaire specifically asked that.").

820 (1999); *see also Queen's Flowers de Colombia v. United States*, 21 CIT 968, 980, 981 F. Supp. 617, 628 (1997) (stating that an "alleged response deficiency cannot support application of [AFA] where the information sought was apparently never requested").

The GOC "cannot logically be faulted for failing to provide information beyond the scope of the question that Commerce asked." *Jinan Yipin Corp. v. United States*, 31 CIT 1901, 1916, 526 F. Supp. 2d 1347, 1360-61 (2007). If Commerce viewed government documentation from the GOC as necessary information, Commerce was "obligat[ed] to let the [GOC] know." *Ta Chen*, 23 CIT at 820; *see also Jinan Yipin Corp.*, 31 CIT at 1914, 516 F. Supp. 2d at 1359 ("If . . . it was essential . . . for Commerce to be provided with [certain] information . . ., then *Commerce needed to request that specific information*." (emphasis supplied)).[10]

Accordingly, Commerce did not comply with its obligations under § 1677m(d) and as a result Commerce's application of AFA to find that certain of Baroque's input suppliers were government authorities is not in accordance with law. *See* 19 U.S.C. § 1677e(a) (stating that Commerce may make determinations on the basis of facts available "subject to" the requirements of § 1677m(d)).

The court directs Commerce, on remand, to: (1) identify with specificity the deficiencies in the GOC's initial or supplemental responses to the nine entities, CCP officials and other related questions; (2) describe clearly the nature of each deficiency and what information could correct that deficiency; (3) if Commerce continues to

---

[10] Recognizing this at oral argument, the court noted to the government that the "point of a questionnaire is you're seeking to get information from someone and you're most likely to get that information . . . if you're very precise." Oral Arg. Tr. at 46:16-19.

determine that supporting government documentation is necessary information, request that information explicitly from the GOC; and (4) provide the GOC an opportunity to remedy any specified deficiencies.

## CONCLUSION

In conclusion, the court remands Commerce's Final Results.  For the foregoing reasons, it is hereby

**ORDERED** that Commerce's calculation of the plywood benchmark is remanded for further explanation; it is further

**ORDERED** that Commerce's decision to apply AFA to find certain of Baroque's input suppliers to be government authorities is remanded for compliance with § 1677m(d); it is further

**ORDERED** that Commerce shall file its remand results within 90 days following the date of this Order; it is further

**ORDERED** that within 14 days of the date of filing of Commerce's remand results, Commerce shall file an index and copies of any new administrative record documents; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the Court.

**SO ORDERED**.

/s/     Timothy M. Reif
Timothy M. Reif, Judge

Dated:      April 3, 2025
         New York, New York