C-570-971
Remand
Slip Op. 25-36
POR: 01/01/2020 – 12/31/2020
**Public Document**
E&C/OVIII: JS/LJS

*Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation*
*v. United States*
**Court No. 23-00136, Slip Op. 25-36 (CIT April 3, 2025)**
**Multilayered Wood Flooring from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation v. United States*, Consol. Court No. 23-00136, Slip Op. 25-36 (April 3, 2025) (*Remand Opinion and Order*). These final results of redetermination concern the final results of the 2020 administrative review of the countervailing duty (CVD) order on multilayered wood flooring from the People's Republic of China (China).[1]

In the *Remand Opinion and Order*, the Court remanded Commerce to explain its conclusion that it is appropriate to include data from United Nations (UN) Comtrade and International Tropical Timber Organization (ITTO) in the benchmark for the benefit calculation of the provision of plywood for less than adequate remuneration (LTAR) program, and to reexamine its application of adverse facts available (AFA) to find that certain of the companies that supplied inputs to Riverside Plywood Corp., (Riverside) and its cross-owned affiliate Baroque Timber Industries (Zhongshan) Co., Ltd. (Baroque) are government authorities. As

---

[1] *See Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 FR 34828 (May 31, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

discussed below, Commerce has further explained its selection of the data for the plywood

benchmark and has complied with its obligation to apply AFA to find that certain of Baroque and

Riverside's input suppliers are government authorities.  On August 22, 2025, Commerce released

its Draft Remand to interested parties.[2]  On September 3, 2025, we received comments from

Baroque.[3]  No other interested party filed comments.

As discussed below, pursuant to the Court's *Remand Opinion and Order*, Commerce has

addressed parties' comments regarding the inclusion of certain data from UN Comtrade and the

ITTO in the benchmark for plywood, and its application of AFA to find that certain input

suppliers to be government authorities within the meaning of section 771(B) of the Tariff Act of

1930, as amended (the Act).

## II.     BACKGROUND

On February 4, 2022, Commerce initiated an administrative review of the CVD order on

multilayered wood flooring from China for certain producers and exporters of subject

merchandise for the period of review (POR) January 1, 2020, through December 31, 2020.[4]  On

March 10, 2022, Commerce selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.

(Senmao) and Riverside as mandatory respondents.[5]  On March 14, 2022, Commerce issued its

initial questionnaire to the Government of China (GOC),[6] and on March 28 and April 4, 2022,

Senmao and Riverside, respectively, timely filed their affiliation questionnaire responses.[7]

Between April 20 and May 12, 2022, the GOC, Senmao, and Riverside, including its cross-

---

[2] *See* Draft Results of Redetermination, *Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation v. United States*, Consol. Court No. 23-00136, Slip Op. 25-36 (CIT 2025), dated August 22, 2025 (Draft Remand).
[3] *See* Baroque's Letter, "Comments on Draft Remand," dated September 3, 2025 (Baroque's Draft Remand Comments).
[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 6487 (February 4, 2022).
[5] *See* Memorandum, "Respondent Selection," dated March 10, 2022.
[6] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated March 14, 2022 (Commerce's CVD Questionnaire).
[7] *See* Senmao's Letter, "Section III Affiliations Questionnaire Response," dated March 28, 2022; and Riverside's Letter, "Riverside Plywood Affiliation Response," dated April 4, 2022.

owned affiliate Baroque, filed initial questionnaire responses.[8]  Between June 23 and September

13, 2022, Commerce issued supplemental questionnaires to the GOC and Riverside.[9]  From July

14 to October 21, 2022, the GOC and Riverside timely filed responses to Commerce's

supplemental questionnaires.[10]  On October 11, 2022, the petitioner,[11] Senmao, and Riverside

submitted data for Commerce to consider using as benchmarks in the benefit calculations for

various LTAR programs.[12]  On October 20, 2022, Senmao, Riverside, and the petitioner

submitted rebuttal benchmark comments.[13]  On November 1, 2022, Riverside submitted

additional data for Commerce to consider using as benchmarks in the LTAR program subsidy

rate calculations.[14]

    On December 22, 2022, Commerce published the *Preliminary Results* of this

administrative review in the *Federal Register*.[15]  In the *Preliminary Results*, Commerce found

that Riverside and Baroque had domestically purchased plywood, veneer, and other input

products for LTAR from suppliers that were "authorities" based on AFA.[16]  For the calculation

---

[8] *See* Senmao's Letter, "Section III Questionnaire Response," dated April 20, 2022; *see also* Riverside's Letter, "Riverside Plywood Initial Questionnaire Response," dated May 12, 2022 (Riverside's IQR); and GOC's Letter, "GOC Section II Questionnaire Response," dated May 11, 2022 (GOC's IQR).
[9] *See* Commerce's Letters, "Section II Supplemental Questionnaire," dated June 23, 2022; "Section III Initial Questionnaire Response," dated June 23, 2022; "New Subsidy Allegation questionnaire," dated July 26, 2022; "New Subsidy Allegation Questionnaire," dated July 26, 2022; "New Subsidy Allegation Initial Questionnaire Response," dated August 24, 2022; and "New Subsidy Allegation Initial Questionnaire Response," dated September 13, 2022.
[10] *See* GOC's Letter, "GOC Supplemental Questionnaire Response," dated July 14, 2022 (GOC's SQR); *see also* GOC's Letter, "GOC Second Supplemental Questionnaire Response," dated October 21, 2022 (GOC's SQR2); Riverside's Letter, "Riverside Plywood First Supplemental Response," dated July 15, 2022; Riverside's Letter, "Riverside's New Subsidy Allegation Questionnaire Response," dated August 16, 2022; and Riverside Plywood's Letter, "Riverside Plywood New Subsidy Allegations Supplemental Response," dated September 9, 2022.
[11] The petitioner is the American Manufacturers of Multilayered Wood Flooring and its individual members.
[12] *See* Petitioner's Letter, "Benchmark Pricing Information," dated October 11, 2022 (Petitioner's Benchmark Data); *see also* Riverside's Letter, "Benchmark Data Submission," dated October 11, 2022 (Riverside's Benchmark Data); and Jiangsu Senmao's Letter, "Benchmark Submission," dated October 11, 2022 (Senmao's Benchmark Data).
[13] *See* Jiangsu Senmao's Letter, "Rebuttal Benchmark Submission," dated October 20, 2022; *see also* Riverside Plywood's Letter, "Benchmark Rebuttal," dated October 20, 2022 (Riverside's Benchmark Rebuttal); and Petitioner's Letter, "Rebuttal Benchmark Pricing Information," dated October 20, 2022 (Petitioner's Benchmark Rebuttal).
[14] *See* Riverside Plywood's Letter, "Second Benchmark Submission," dated November 1, 2022 (Riverside's Second Benchmark Data).
[15] *See* Multilayered Wood Flooring from the People's Republic of China:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2020, 87 FR 78644 (December 22, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[16] *See Preliminary Results* PDM at 14-18 and 52-56.

3

of the plywood benchmark, Commerce used world merchandise trade data from UN Comtrade and the New Zealand official statistics database (*i.e.*, Stats.NZ), as well as pricing data from the ITTO. In the *Final Results*, published on May 31, 2023, Commerce continued to rely on data from UN Comtrade, Stats.NZ, and the ITTO, for the calculation of the plywood benchmark.[17] Commerce made no changes in the *Final Results* with respect to its determination to apply AFA to find that all of the companies that supplied inputs to the mandatory respondents, including Riverside and its cross-owned affiliate Baroque, are government authorities.[18]

## A. Commerce's Plywood for LTAR Benchmark

Riverside, including its cross-owned affiliate Baroque, reported purchases of plywood during the POR.[19] As noted above, interested parties submitted data for use in Commerce's benchmark calculations to determine the benefit conferred by Riverside and Baroque's purchases of plywood for LTAR. Riverside provided monthly pricing data for plywood from Brazil, Ghana, and Peru, some of which denote the grade and species.[20] Riverside also provided: (1) certifications from its suppliers that all plywood purchased by Baroque during the POR was "made of eucalyptus with C/D grade only"; (2) an expert's statement regarding the plywood industry and the HS subheadings proposed by the petitioner and Senmao; (3) pictures of eucalyptus veneer that Baroque's suppliers used to produce the plywood it purchased during the POR; and (4) general information concerning the grading and pricing of plywood.[21] The petitioner submitted world merchandise trade data from UN Comtrade and Stats.NZ to value plywood based on various Harmonized System (HS) subcategories.[22] Senmao also provided

---

[17] *See Final Results* IDM at Comment 7C.
[18] *Id*. at Comment 4.
[19] *See* Riverside's IQR at 19-23 and Exhibits 11a and 11b.
[20] *See* Riverside's Benchmark Data at 2 and Exhibit 2.
[21] *See* Riverside's Benchmark Rebuttal at 2 and Exhibits 4, 5, and 7; *see also* Riverside's Second Benchmark Data at 2 and Exhibits SB-1 and SB-2.
[22] *See* Petitioner's Benchmark Data at 2 and Exhibits 1-A and 2.

world merchandise trade data from UN Comtrade to value plywood.[23]  The petitioner submitted rebuttal comments arguing that Riverside's benchmark data are not representative of global plywood prices, based on a comparison with different price data from the ITTO.[24]

In the *Preliminary Results*, Commerce relied on tier two "world market price" benchmarks pursuant to 19 CFR 351.511(a)(2)(ii) to measure the adequacy of remuneration for the provision of plywood to Riverside and its cross-owned affiliate Baroque.[25]  For plywood, Commerce included the UN Comtrade, Stats.NZ, and ITTO data to calculate its benchmarks.[26] In doing so, Commerce explained that, "it is Commerce's practice to average multiple world market prices, pursuant to 19 CFR 351.511(a)(2)(ii)."[27]

In the *Final Results*, Commerce addressed, *inter alia*, arguments about the composition of its plywood benchmark from Riverside.[28]  Commerce explained that it was reasonable to benchmark Baroque's plywood purchases using various HS subheadings in the UN Comtrade data and Stats.NZ data, because "the plain language of these HS subheadings appears to describe the plywood products that Baroque Timber reported purchasing."[29]  Commerce disagreed with Riverside's argument that because the UN Comtrade and Stats.NZ data are not grade specific they should be excluded from the plywood benchmark for being overly broad and instead rely solely on ITTO price data.[30]  Specifically, Commerce stated that regardless of its claims that Baroque only purchased C/D grade plywood during the POR, the evidence Riverside cites "does not demonstrate that UN Comtrade data and Stats.NZ data are inappropriate to benchmark

---

[23] *See* Senmao's Benchmark Data at 1 and Attachment 3.
[24] *See* Petitioner's Benchmark Rebuttal at 2 and Exhibit 1.
[25] *See Preliminary Results* PDM at 11-14 and 45.
[26] *Id*. at 46-47.
[27] *Id*. at 46; *see also* 19 CFR 351.511(a)(2)(ii) ("Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability.").
[28] *See Final Results* IDM at Comment 7C.
[29] *Id*. at 74 (citing *Preliminary Results* PDM at 45-47; Petitioner Benchmark Data at 2 and Exhibit 1-A; and Senmao Benchmark Data at 1 and Attachment 3).
[30] *Id*.

Baroque{}'s plywood purchases, as Riverside argues."[31]  In explaining its reasoning, Commerce relied on its practice which is to average multiple world market prices as stipulated in 19 CFR 351.511(a)(2)(ii).[32]

## B. Commerce's Application of AFA to Find Certain of Riverside's Input Suppliers to be Government Authorities

As stated above, Riverside, including its cross-owned affiliate Baroque, reported purchasing plywood and other input products during the POR.[33]  Commerce requested information from the GOC regarding the companies that produced these inputs purchased by Riverside and Baroque during the POR, in order to evaluate whether the producers are "authorities" within the meaning section 771(B) of the Tariff Act of 1930, as amended (the Act).[34]  The GOC provided certain of this information pertaining to the ownership and structure (e.g., articles of association) for a small subset of these companies.[35]  This included statements from the GOC and the suppliers themselves that there is no primary party organization in the suppliers and that none of the owners, board members, or managers of the suppliers are government or Chinese Communist Party (CCP) officials in any of the nine entities.[36]  Commerce repeated its request for this information from the GOC for all of the reported input suppliers in a supplemental questionnaire, and the GOC provided certain company information

---

[31] *Id*. at 74-75.
[32] *Id*. at 76.
[33] *See* Riverside's IQR at 24-26 and Exhibits 11a and 11b.
[34] *See Preliminary Results* PDM at 14-15 (citing Commerce's CVD Questionnaire at II-5 to II-9 and II-24 to II-28).
[35] *Id*. at 15; *see also* GOC's IQR at Exhibits LTAR-1 and LTAR-2.
[36] Commerce understands that for each level of Government, *i.e.*, central, provincial, municipal, county, township and village ("county, township, and village" will hereafter be referred to collectively as "local"), there are corresponding:  (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), and (8) the Discipline Inspection Committees of the CCP.  Commerce also understands that, in accordance with the CCP Constitution, a (9) CCP committee, branch, or "primary organization" needs to be formed in any enterprise with three or more party members, regardless of state-ownership.  We refer to officials of any of these 9 entities as "Government or CCP officials."  *See* Commerce's CVD Questionnaire at II-40.

for two additional input producers, including the same certified statements provided in the GOC's IQR denying any role for the CCP in company operations.[37]

In the *Preliminary Results*, Commerce found that the GOC had withheld information requested of it regarding the CCP's role in the ownership and management of these input suppliers and that Commerce must rely on facts available in conducting its analysis of the producers that supplied the mandatory respondents with certain inputs during the POR.[38] Specifically, Commerce stated that the declarations from the input producers on CCP involvement in company operations were insufficient, and that government documentation, independent of the input suppliers, was necessary for fully evaluating the influence and control the GOC (through the CCP) has over the input suppliers.[39]   Commerce also noted that, moreover, the GOC had not provided any of the requested information for the large majority of input suppliers.[40]   Therefore, Commerce found that the GOC failed to cooperate by not acting to the best of its ability to comply with its requests for information.  Consequently, Commerce determined that an adverse inference was warranted in the application of facts available to find that all companies that supplied inputs to the mandatory respondents (including Riverside and Baroque) were "authorities" within the meaning of section 771(5)(B) of the Act.[41]

In the *Final Results*, Commerce addressed arguments from interested parties that the subset of suppliers that provided certain of the requested company information were not "authorities."[42]   Commerce explained that the certifications that the GOC had provided were not the required government documentation necessary to support its claims with respect to this subset of input suppliers, and that the certifications were "*pro forma* in nature, lacking particular

---

[37] *See* GOC's SQR at 8-11 and Exhibit SQ-2.
[38] *See Preliminary Results* PDM at 15-18.
[39] *Id*. at 16-17.
[40] *Id*.
[41] *Id* at 17-18.
[42] *See Final Results* IDM at Comment 4.

details for examining possible government involvement in each company."[43]  In its reasoning in the *Final Results*, Commerce relied on *Citric Acid from China 2012*, where a local GOC entity, *i.e.*, a CCP Village Committee, provided a certified letter indicating that the owner of the input suppliers was not a Party Committee Secretary to find that two input suppliers with common ownership were not authorities.[44]  Commerce explained that this type of government documentation, rather than statements or certifications from the company, was necessary for its analysis of the GOC/CCP's control in the companies that supplied inputs to the mandatory respondents.[45]  On this basis, Commerce continued to apply AFA in the *Final Results* to find all input suppliers, including the subset that provided certifications and other government documentation, to be "authorities" within the meaning of section 771(5)(B) of the Act.[46]

## III.    REMAND OPINION AND ORDER

In the *Remand Opinion and Order*, the Court concluded that Commerce did not adequately address certain record evidence relating to the benchmark data used to calculate the benefits for Baroque's purchases of plywood for LTAR.[47]  Specifically, the Court found that Commerce did not sufficiently take into account record evidence and Baroque's arguments that the UN Comtrade data are flawed because they include grade A and B plywood, and remanded Commerce to justify the UN Comtrade data's use in the plywood benchmark in light of the alleged flaws.[48]  Specifically, the Court remanded to Commerce to explain adequately its conclusions in light of record evidence and Baroque's arguments that the data used in the

---

[43] *Id.* at 55.
[44] *Id.* at 58 (citing *Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014) (*Citric Acid from China 2012*), and accompanying IDM at Comment 2).
[45] *Id.*
[46] *See Final Results* IDM at Comment 4.
[47] *See Remand Opinion and Order* at 10-15.
[48] *Id.* at 13-14.

plywood benchmark in the *Final Results* are appropriate to value Baroque's purchases of plywood.[49]

The Court also held in the *Remand Opinion and Order* that Commerce did not satisfy its obligations under section 782(d) of the Act before applying AFA to find that certain companies that supplied inputs to Baroque and Riverside are government "authorities" within the meaning of section 771(5)(B) of the Act.[50] Specifically, the Court found that Commerce failed to properly notify the GOC that Commerce required official documentation from the government or the CCP in its initial or supplemental questionnaire to the GOC prior to applying AFA.[51] Consequently, the Court directed Commerce on remand to: (1) identify with specificity the deficiencies in the GOC's initial or supplemental responses to the nine entities, CCP officials and other related questions; (2) describe clearly the nature of each deficiency and what information could correct that deficiency; (3) if Commerce continued to determine that supporting government documentation is necessary information, request that information explicitly from the GOC; and (4) provide the GOC an opportunity to remedy any specified deficiencies.[52]

Therefore, Commerce addresses below the Court's order to further explain its decisions to include certain benchmark data in the plywood benchmark and fulfills its obligations to notify the GOC of deficiencies with its response prior to applying AFA. Based on the information provided by the GOC, Commerce continues to find that certain companies that supplied inputs to Riverside and Baroque during the POR are government authorities.

---

[49] *Id*. at 15 and 32.
[50] *Id*. at 24-32.
[51] *Id*. at 29-31.
[52] *Id*. at 31-32.

A.    **Commerce's Calculation of the Plywood for LTAR Benchmarks**

Commerce's tier two benchmarking practice is set forth in section 351.511(a)(2)(ii) of its

regulations, which states:

> If there is no useable market-determined price with which to make the comparison
> under paragraph (a)(2)(i) of this section, {Commerce} will seek to measure the
> adequacy of remuneration by comparing the government price to a world market
> price where it is reasonable to conclude that such price would be available to
> purchasers in the country in question. Where there is more than one commercially
> available world market price, {Commerce} *will* average such prices to the extent
> practicable, making due allowance for factors affecting comparability (emphasis
> added). [53]

Based on this regulation, Commerce has a longstanding preference to average multiple

commercially available world market prices when they are available on the record. The

question, therefore, is whether to exclude a world market price from its benchmark.

Commerce's decision to exclude data from a benchmark is done on a case-by-case basis and

based on a careful examination of record evidence.

Riverside argues that the UN Comtrade and Stats.NZ data should be excluded from the

benchmark calculation because the data includes plywood products unlike those it purchased

(*i.e.*, are overly broad), which Riverside argues results in a distorted tier two benchmark price.

Commerce addresses this evidence in detail below and continues to find that record evidence

does not support this position. In reaching this conclusion, Commerce also notes that its

regulations require comparing the purchase price of government goods to a "world market price"

that takes into account "factors affecting comparability," thereby instructing the creation of a

broad benchmark price of comparable products available to the purchaser, not one that precisely

matches the reported purchases.[54] As the U.S. Court of Appeals for the Federal Circuit (Federal

Circuit) explained in *Essar Steel*, Commerce's benchmarks do not need to be "identical" to the

---

[53] *See* 19 CFR 351.511(a)(2)(ii).
[54] *Id*.

purchased good, because "Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue."[55]

Evidence provided by Riverside sufficiently demonstrate that Baroque's plywood purchases were entirely C/D grade plywood made of eucalyptus[56] and that the plywood industry is influenced by grade and species, with higher grades and slower growing species being more expensive.[57]  Record evidence also indicates that UN Comtrade and Stats.NZ data include multiple grades of plywood.

Despite these considerations, Commerce continues to find that it is appropriate to include the UN Comtrade and Stats.NZ data in the benchmark average because (1) record evidence does not indicate that the UN Comtrade/Stats.NZ data are distortive, as it does not provide data regarding the mix of different plywood grades contained in the UN Comtrade/Stats.NZ data; and (2) the UN Comtrade and Stats.NZ data provide significant benefits over the ITTO data which indicate that the disputed data sets may be more accurate benchmarks.

_Record evidence does not demonstrate that UN Comtrade and Stats.NZ data are distortive._

In evaluating record evidence on the comparability of available benchmark data and the purchase of input products under an LTAR program, Commerce must consider the connection between record evidence and the benchmark data and/or the reported input purchases.  In this respect, Commerce finds that the record evidence cited by Baroque does not provide information on the composition of the UN Comtrade/Stats.NZ data.  Specifically, nothing on the record indicates the mix of different plywood grades contained in the UN Comtrade/Stats.NZ data.  Therefore, the record evidence does not support a conclusion that the UN Comtrade/Stats.NZ

---

[55] _See Essar Steel Ltd. v. United States_, 678 F.3d 1268, 1273-1274 (Fed. Cir. 2015) (_Essar Steel_).
[56] _See_ Riverside's Benchmark Rebuttal at Exhibits 5 and 7.
[57] _See_ Riverside's Second Benchmark Data at Exhibit SB-1

data result in a distortion of the benchmark price applied to Baroque's purchases because record evidence shows that these data include some degree of products that are a different type of plywood.

While more specific benchmark data are preferable, Commerce cannot conclude that broader data, such as global merchandise trade data from UN Comtrade and Stats.NZ, are distortive for benchmarking purposes because they include different grades or variations of a product. Without evidence in support of the specific composition of these data (*e.g.*, how much of the UN Comtrade or Stats.NZ data is one grade of plywood or another), such a conclusion that the data contains a distortive amount of non-comparable product grade would be speculative. No party has argued that the UN Comtrade/Stats.NZ data are not inclusive of C/D grade plywood, nor that other grades of plywood cannot be used in the production of subject merchandise. Rather, the argument for the distortion of the HS subheading data rests solely on the result of a pricing difference, which cannot be solely attributed to the grade of the benchmark data based on the information provided by parties on the record for the reasons explained below.

The price difference between the UN Comtrade/Stats.NZ data and the ITTO data cannot be solely attributed to the grade of the plywood based on the information provided by parties on the record. The record evidence Baroque cites is reflective of its plywood purchases and of general industry characteristics but is not tied to the UN Comtrade/Stats.NZ data and does not provide dispositive evidence as to the composition of the HS subheading data on the record. The only evidence directly pertaining to the UN Comtrade/Stats.NZ data is the affidavit from Chunping Dai, which provides conclusory statements that it is "inaccurate" to benchmark Baroque's plywood purchases with data that does not distinguish by grade.[58] None of the evidence provided by Riverside describes the prevalence of different plywood grades in the

---

[58] *Id.* at Exhibit SB-1, paragraph 18.

global merchandise trade, or in a particular plywood market, such that Commerce can infer or "make allowances for" differing plywood grades in calculating the plywood benchmark. Without this evidence, the UN Comtrade data might consist mostly of sales of grade C or D grade plywood, that might be more reflective of Baroque's C/D grade plywood purchases than the ITTO data, which are based on the prices of B/C grade, BB/CC grade, C/C grade, and C/CC grade plywood.[59]   Absent such record evidence to support Baroque's claims, Commerce cannot evaluate Baroque's alleged distortion caused by including the grade-inclusive UN Comtrade against the distortion of not including that data in the plywood benchmark.  Indeed, absent such information, Baroque's claims that the ITTO data would be more comparable to its actual purchases are speculative.

Separately, Commerce also has a practice of relying on benchmark data reflecting the narrowest category of products encompassing the purchased product.[60]  However, in cases where Commerce has excluded benchmark data on this basis, it does so because the data does not encompass the type or category of input purchased at all.[61]  This practice does not extend to excluding data that encompasses the type or category of input purchased, just because the data also encompasses other types or categories of the same input (*i.e.*, broad data).  Benchmark data containing different categories of merchandise (*e.g.*, different grades of plywood) can still be suitable for benchmarking purchases of a narrower category of merchandise (*e.g.*, Baroque's

---

[59] *See* Riverside's Benchmark Data at Exhibit 2.  The ITTO reports indicate that the Ghana export plywood prices are for "BB/CC" grade, the Brazil domestic plywood prices do not indicate grade, the Brazil export plywood prices are for "C/CC" grade, and the Peru export plywood prices are for "B/C" and "C/C" grade.
[60] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 FR 34828 (July 23, 2018)(*China Solar 2015*), and accompanying IDM at Comment 3; and *Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 FR 3110 (January 20, 2016) (*Uncoated Paper from China*), and accompanying IDM at 25-26.
[61] *See, e.g.*, *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 FR 9274 (March 5, 2018) (*China Aluminum Foil Investigation*), and accompanying IDM at Comment 16 (revising the benchmark to exclude alloyed ingot where the respondent demonstrated that it purchased only unalloyed aluminum ingot); and *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 FR 6866 (January 25, 2021), and accompanying IDM at Comment 1.

purchases of C/D grade plywood), if that data is still comparable to the purchases in question. Doing so can still be consistent with Commerce's practice of creating benchmarks reflecting the "narrowest category" of the purchased merchandise if data for different categories of the merchandise cannot be isolated then excluded, so long as Commerce still takes into account "factors affecting comparability" in line with its regulations. This is inclusive of products not necessarily purchased by the respondents, but which are nevertheless comparable and available on the world market.

_UN Comtrade and Stats.NZ Data meet standards that are not satisfied by the ITTO data._

UN Comtrade and Stats.NZ data satisfy certain aspects of Commerce's standards for benchmarks under a tier two world market price that are not met by the ITTO data, such that continuing to include UN Comtrade data results in a benchmark that is arguably more comparable to Baroque's reported purchases. By extension, calculating a benchmark that does not include the UN Comtrade and Stats.NZ data would contravene Commerce's statutory and regulatory requirements. Primarily, the UN Comtrade data is significantly more reflective of a broad world market price than the ITTO data, encompassing global export data from 97 countries and a large number of transactions of plywood made of a variety of species (_i.e._, including eucalyptus under HS subheading 4412.33).[62]

In comparison, the ITTO data for which Baroque argues should be used to benchmark its purchases are comprised of bi-monthly price quotes from three countries (Brazil, Ghana, and Peru) for mostly specific destination markets (_i.e._, "EU market" and "domestic" for Brazil and "Mexican market" for Peru) for plywood made of pine, ceiba, ofram, asanfina, parica, copaiba,

---

[62] _See_ Petitioner's Benchmark Data at Exhibit 1-A; _see also_ Senmao's Benchmark Data at Attachment 3. We also note that the plywood benchmark also included world export data from New Zealand from another source, Stats.NZ.

virola, cedar, and lupuna.[63]  Notably, none of the data are for plywood made of eucalyptus, which is the species of Baroque's reported plywood purchases.[64]  The evidence cited by Baroque clearly demonstrates that species, as well as grade, impacts plywood prices, by as much as 67-75 percent according to Chunping Dai's affidavit.[65]  In previous administrative reviews of this order, Commerce excluded data from the benchmark because they corresponded only to products that were made from a species different from the reported purchases.[66]  Thus, based on species alone, the UN Comtrade data are more comparable than the ITTO data, which do not match Baroque's reported eucalyptus plywood purchases.

Finally, UN Comtrade data is significantly more reflective of a broad world market price than the ITTO data, as the UN Comtrade data encompasses global export data from 97 countries and a large number of transactions of plywood made of a variety of species (*i.e.*, including eucalyptus under HS subheading 4412.33).[67]

\* \* \*

Although the UN Comtrade and Stats.NZ data cannot be segregated to more closely reflect Baroque's C/D grade plywood, Commerce continues to find that these data are still appropriate to include in the benchmark because they are comparable to the quality of Baroque's purchases in other respects.  Riverside has not argued that Baroque's plywood purchases are not appropriately classified under the HS subheadings used in its plywood benchmark in the *Final Results*.  Additionally, there is no information on the record substantiating that the UN Comtrade

---

[63] *See* Riverside's Benchmark Data at Exhibit 2 (data for Brazil Parica Domestic Plywood Prices, Brazil Pine plywood EU Market, Peru plywood, FOB Callao (Mexican market).  We note that the Ghana prices do not specify the destination market).

[64] *See* Riverside's Benchmark Rebuttal at Exhibit 5.

[65] *Id*. at Exhibit 4; *see also* Riverside's Second Benchmark Data at Exhibit SB-1, paragraph 9.

[66] *See e.g.*, *Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Recission of Countervailing Duty Administrative Review; 2017*, 85 FR 76011 (November 27, 2020), and accompanying IDM at 38.

[67] *See* Petitioner's Benchmark Data at Exhibit 1-A; *see also* Senmao's Benchmark Data at Attachment 3.  We also note that the plywood benchmark also included world export data from New Zealand from another source, Stats.NZ.

and Stats.NZ data in question consist of or include any merchandise that cannot be used in the same or similar way to Baroque's plywood purchases, albeit including different grades. Further, it can be observed that the prices for plywood vary significantly between countries,[68] thus in making allowances for comparability in this case, and in calculating a price that "would be available" to Baroque, it is advantageous to include data that is more representative of prices in more countries in calculating the plywood benchmark. Moreover, as discussed above, the UN Comtrade and Stats.NZ data are valid commercially available world market prices that we find are comparable to Baroque's plywood purchases, therefore these prices should be averaged with other world market prices under Commerce's regulations.[69]

**B.    Commerce's Application of AFA to Find Certain of Riverside's Input Suppliers to be Government Authorities**

As explained below, Commerce continues to determine that government documentation is necessary for its analysis of Riverside and Baroque's input suppliers. As directed by the Court, we issued a supplemental questionnaire to the GOC explicitly requesting government documentation to support its questionnaire response in the underlying review with respect to certain input suppliers.[70]  The GOC continued to decline to provide *any* government documentation in response. Instead, the GOC provided responses to questionnaires it sent to the input suppliers in question and asserted this information is sufficient for Commerce's analysis.[71]

---

[68] *See* Petitioner Benchmark Rebuttal at Exhibit 1, p. 5-9.
[69] *See* 19 CFR 351.511(a)(2)(ii).
[70] *See* Commerce's Letter, "Supplemental Questionnaire Pursuant to Court Remand," dated June 24, 2025 (Remand Supplemental Questionnaire).
[71] *See* GOC's Letter, "Remand Supplemental Questionnaire," dated July 11, 2025 (GOC's Remand SQR) at 2-5 and Exhibits RSQ-1 and RSQ-2.

Therefore, we continue to find that the application of AFA is warranted to find Riverside and Baroque's input suppliers to be government authorities.

On June 24, 2025, Commerce issued a supplemental questionnaire to the GOC regarding deficiencies in the information provided in its initial and supplemental questionnaire responses.[72] In the Remand Supplemental Questionnaire, Commerce requested that the GOC "provide government documentation, such as CCP records, supporting the GOC's claim that no individual owners, members of the board of directors, or senior managers who were Government or CCP officials during the POR" as it reported in its initial questionnaire responses.[73] The Remand Supplemental Questionnaire also asked the GOC to reconcile certain contradictory statements on the record and to provide documentation from the input suppliers substantiating the reported roles, decision-making, and affiliations of senior staff.[74]

The GOC timely filed its questionnaire response on July 11, 2025.[75] In response to Commerce's request that the GOC provide government (including CCP) documentation in support of its claim that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials during the POR, the GOC stated that "there is no central governmental database to search for the requested information … therefore the GOC cannot provide government documentation as requested by Commerce."[76] The GOC contends that the response received directly from the input suppliers is sufficient support for the claim in its questionnaire response that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials during the POR. The GOC also asserts "there is no record evidence suggesting otherwise" and that, as such, "the burden is

---

[72] See Remand Supplemental Questionnaire.
[73] Id. at 5 (citing GOC's IQR at Exhibit LTAR-1, pages LTAR-2 to LTAR-14; GOC's SQR at 8-11; and GOC's SQR2 at 4-5 and Exhibit SQ2-3).
[74] Id. at 4-6.
[75] See GOC's Remand SQR.
[76] Id. at 4.

no longer with the GOC to further prove the negative but is with the party making the allegation to present evidences {*sic*} proving otherwise.  There is no such evidence."[77]

This refusal to provide information demonstrates the GOC's failure to cooperate to the best of its ability, and its assertion that solely company information is sufficient for our analysis is incorrect.  Commerce determines what information is necessary for its analysis—not the GOC.[78]  Commerce has previously explained why such government information is necessary and outlines the reasons below.  However, we note that in the *Remand Opinion and Order*, the Court found our reliance on government documentation to analyze for this purpose to be reasonable in this case.  Therefore, we do not revisit the necessity of government documentation for our analysis in detail.

As stated in the Public Bodies Analysis Memo, Commerce's practice is to treat enterprises in China as public bodies (*i.e.*, authorities) for CVD purposes, even with no formal government ownership, if Commerce determines that the GOC exercises meaningful control over the enterprise.[79]  As described in the *Preliminary Results*, record evidence demonstrates that the CCP exerts significant control over economic activities in China.[80]  As stated in the *Preliminary Results,* record evidence also demonstrates that the GOC exercises meaningful control over private entities and uses them to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector.[81]

---

[77] *Id.* at 4-5.
[78] *See ABB Inc. v. United States*, 355 F.Supp.3d 1206, 1222 (CIT 2018) ("Commerce prepares its questionnaires to elicit information that it deems necessary to conduct a review, and the respondent bears the burden to respond with all of the requested information and create an adequate record.").
[79] *See* Memorandum, "China Statistical Yearbook Memo," dated June 24, 2022, at Attachment 1 (Public Bodies Analysis Memo), p. 28-29.
[80] *See Preliminary Results* PDM at 16 (citing Memorandum, "Placing Documents on the Record," dated June 24, 2022 (Additional Documents Memorandum) at Attachments "Section 129 Determination of the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe; Light-Walled Rectangular Pipe and Tube; Laminated Woven Sacks; and Off-the-Road Tires from the People's Republic of China:  An Analysis of Public Bodies in the People's Republic of China in Accordance with the WTO Appellate Body's Findings in WTO DS379" and "The relevance of the Chinese Communist Party for the limited purpose of determining whether particular enterprises should be considered to be 'public bodies' within the context of a countervailing duty investigation").
[81] *Id.* (citing Public Bodies Analysis Memo, p. 35-36 and sources cited therein).

Although the GOC states that it cannot provide the requested information because there is no central GOC database, Commerce did not specify in its request for government documentation to support the GOC's claim that such documentation must be derived from a central government database.

Section 782(c) of the Act states that:

{i}f an interested party, promptly after receiving a request from {Commerce}, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and *suggested alternative forms in which such party is able to submit the information*, {Commerce} shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party (emphasis added).

In its response, the GOC did not suggest any alternative form in which it could provide the requested government documentation. To the contrary, the GOC refused Commerce's open-ended request for supporting government documentation because "there is no central governmental database" where such information could be searched.[82] Commerce did not limit the scope of its question for the purpose of allowing the GOC opportunity to provide the government documentation that best supports its claim. Moreover, the GOC's response does not establish whether there are other government databases containing the information at the provincial or any other level of government.

In addition, the GOC's response implies that it is unable to provide any CCP records at all. The GOC in its supplemental questionnaire response states that "the industry and commerce administration does not require companies to provide such government information."[83] This statement focuses exclusively on the GOC's official governmental bodies and ignores the existence of *any* CCP records, which are specifically requested in Commerce's Remand

---

[82] *See* GOC's Remand SQR at 4
[83] *Id.*

Supplemental Questionnaire. The GOC's assertion implies that the CCP, at all levels, maintains no records *or any other mechanism* by which it could determine the individual owners, members of the board of directors, or senior managers of the companies that supplied inputs to the mandatory respondents are officials of the CCP. For example, the GOC could have provided screenshots from a national, or sub-national CCP database with the results when searching for each individual owner, member of the board of directors, and senior manager of the input suppliers.

As noted above, in *Citric Acid from China 2012*, the documentation Commerce accepted to find an input supplier to not be an authority was documentation from the CCP. Thus, the GOC has previously been able to provide documents from the CCP specifically and gives no explanation why it is unable to do so here. The GOC has previously provided government documentation in *Citric Acid from China 2012* relating to the status of individual owners, members of the board of directors, or senior managers of the input suppliers as officials of the GOC and/or CCP.[84] Accordingly, Commerce finds that the GOC has failed to provide information requested by Commerce, within the meaning of section 776(a)(2)(A) of the Act. Further, as the GOC has provided government documentation on this issue in prior CVD proceedings, Commerce finds that the GOC has failed to cooperate by not acting to the best of its ability to comply with this request for information. Therefore, Commerce continues to find, as it did in the *Final Results*, that reliance on AFA is warranted.

Having properly notified the GOC of the deficiencies with its questionnaire responses, Commerce has fulfilled its obligation under section 782(d) of the Act, prior to applying AFA. As stated above, the GOC continued not to provide requested government, including CCP, documentation in support of its claim that no individual owners, members of the board of

---

[84] *See Citric Acid from China 2012* IDM at Comment 2.

directors, or senior managers of the companies that supplied inputs to Riverside and Baroque were GOC or CCP officials during the POR. This information is necessary for Commerce's analysis, because of the meaningful control the GOC exercises throughout the Chinese economy, including in ostensibly private entities, as detailed above. Therefore, Commerce continues to find, based on AFA, that the producers that supplied inputs to Riverside and Baroque are "authorities" within the meaning of section 771(5)(B) of the Act, and, thus, that such producers provided a financial contribution in supplying certain inputs to these respondents for less than adequate remuneration within the meaning of section 771(5)(D)(iii) of the Act.

## IV.    INTERESTED PARTY COMMENTS

As noted above, we received comments on Commerce's draft results of redetermination from Baroque.[85]  In its comments, Baroque challenges Commerce's continued inclusion of UN Comtrade and ITTO data in the benchmark for plywood.  Baroque also argues that Commerce erred in continuing to apply AFA to find certain of its input suppliers to be government authorities.  No other interested party provided comments.  We address Baroque's comments below.

**Issue 1:**    **Whether to Revise Commerce's Plywood for LTAR Benchmark**

*Baroque's Draft Remand Comments:*

The following is a verbatim summary of argument submitted by Baroque (citations omitted). For further details, *see* Baroque's Draft Remand Comments at 3-12.

> {Commerce} should revise its benchmark finding in the Draft Remand and find that the ITTO data is the only viable benchmark source on the record to value plywood in this review. {Commerce} and the Court found that plywood grade has a significant impact on price. {Commerce} in its Draft Remand also acknowledges that: (1) "the plywood industry as a whole is delineated by grade"; (2) "Baroque {}'s plywood purchases consisted solely of C/D grade plywood"; and (3) Baroque's plywood is generally consistent with industry descriptions of lower grade plywood. {Commerce} finally acknowledges that the UNComtrade data is not delineated by grade while the ITTO data is grade specific. By averaging the UNComtrade data with the ITTO data, {Commerce} knowingly includes high grade, high priced

---

[85] *See* Baroque's Draft Remand Comments.

plywood of a quality different than Baroque's plywood in the benchmark. This distorts the benchmark and creates a benefit from differences in product quality rather than a benefit from subsidized pricing. This is contrary to the statute and the regulations, which require that quality be taken into account in benchmark selection.

The regulations do not *require* that the UNComtade data be used in this case and {Commerce's} statement that it is creating a "world' benchmark by using the numerous prices within the UNComtrade data is misplaced. The "world market price" phrasing in the regulation only means a market price outside the target country; it does not mean numerous prices or an amalgamation of prices to create a "global" price. This is evidenced by the fact that {Commerce} averages prices where there is more than "one commercially available world market price" on the record. 19 C.F.R. § 351.511(a)(2)(ii). Averaging would not be expressly mentioned or required if the "world price" meant "multiple" prices in the first place. Further, the first step in {Commerce's} benchmark analysis under the regulation is to first determine whether the benchmark price is viable and can be used. If the benchmark price cannot be used because it is too broad and not specific enough, then the regulation does not require averaging. At bottom, {Commerce} is not required to automatically average every price on the record without analyzing whether the price is appropriate in the first place.

**Commerce's Position:**

We continue to include the ITTO data, the UN Comtrade data, and Stats.NZ data in the Plywood for LTAR benchmark under 19 CFR 351.511(a)(2)(ii). Baroque argues that in continuing to include data that are not grade-specific, Commerce has failed to take into account prevailing market conditions, as required in the Act, in calculating the benchmark to evaluate the adequacy of remuneration for a purchased good.[86] More broadly, Baroque claims that because the global merchandise trade data from UN Comtrade and Stats.NZ, and non-grade-specific ITTO data do not match the quality standard (*i.e.*, grade of plywood) of the purchased good, Commerce is not calculating the subsidy benefits as accurately as possible, as it is required to do.[87] We disagree, and, for the reasons set forth below, continue to find the UN Comtrade, Stats.NZ, and non-grade-specific ITTO data each comprise world market prices that are

---

[86] *Id.* at 2.
[87] *Id.* (citing *Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007); *see also Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994)).

comparable to Baroque's purchases of plywood and are properly included in the benchmark, consistent with 19 CFR 351.511(a)(2)(ii). Thus, we continue to find it appropriate to include both datasets in the plywood benchmark for these final results of redetermination.

Consistent with the *Remand Opinion and Order*, Commerce analyzed the record evidence regarding Baroque's purchases of plywood, including information about the quality grading system and pricing in the industry.[88] Nevertheless, Commerce concluded that this evidence is not demonstrative of the composition of the benchmark data on the record and thus cannot not serve as the basis to conclude that such data are overly broad as Baroque asserts.[89] Indeed, as Commerce explained, without knowledge of the actual grade composition by percentage of each of the datasets, including the ITTO dataset, it's speculative to say that *any* dataset is necessarily more reflective of Baroque's purchases of C/D grade. In addition, Commerce reasoned that benchmark data containing different categories of merchandise, such as different grades of plywood, may still be suitable for benchmarking purchases of just one category of that merchandise, so long as the different categories are still comparable to the purchases in question.[90] Baroque argues that this reasoning is inconsistent with the Act.[91]

Section 771(E) of the Act sets forth the following for determining the benefit conferred by purchases for LTAR:

> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions or purchase or sale.

Baroque argues that in the Draft Remand, Commerce did not properly consider "quality" as required by the Act by not excluding the UN Comtrade and Stats.NZ from the plywood

---

[88] *See* Draft Remand at 11-12.
[89] *Id*. at 10-11.
[90] *Id*. at 14-15.
[91] *See* Baroque's Draft Remand Comments at 3-4.

benchmark.  However, Commerce has considered grade in its analysis and notes that grade is just one characteristic of the "quality" of Baroque's plywood purchases.  As stated in the Draft Remand, "neither UN Comtrade/Stats.NZ nor ITTO data perfectly reflect the characteristics of Baroque's reported plywood purchases."[92]  Further, Commerce explained how the UN Comtrade data and Stats.NZ describe products that are more comparable to Baroque's plywood purchases than the ITTO data in certain aspects.[93]  However, because no one dataset on the record represents the best benchmark in all aspects (*i.e.*, such that excluding other datasets would yield a more comparable benchmark) as explained in detail below, we find that it is appropriate to continue including the UN Comtrade/Stats.NZ data and the ITTO data in Baroque's plywood benchmark.

First, as directed by the *Remand Opinion and Order*, we reconsidered the record evidence Baroque provided and summarized our conclusions in the Draft Remand, which are also stated in the "Commerce's Calculation of the Plywood Benchmark" section above.  However, because this record evidence does not directly describe the UN Comtrade or Stats.NZ data, Commerce found that it cannot conclude that the UN Comtrade/Stats.NZ data are overly broad or result in a distortion of the benchmark price.[94]  Baroque does not comment on Commerce's explanation that the cited record evidence is not clearly applicable to the data Baroque is seeking to exclude from the benchmark.[95]  Instead, Baroque challenges Commerce's analysis of the similarity between Baroque's plywood purchases and the available benchmark information, including the UN Comtrade and Stats.NZ data.[96]

---

[92] *See* Draft Remand at 10-11.
[93] *Id*. at 16-17.
[94] *Id*. at 14-15.
[95] *See* Baroque's Draft Remand Comments at 3-12.
[96] *Id*. at 3-6.

As an initial matter, Baroque claims that our analysis in the Draft Remand focused on "comparability" rather than "specificity" is contrary to record evidence and the statute.[97]  We note that "comparability" is the regulatory standard stated in 19 CFR 351.511(a)(2)(ii).  Moreover, Commerce considers the similarity of the purchases in the benchmark information to the purchases in question (*i.e.*, specificity), including product quality and other "prevailing market conditions" established in section 771(E) of the Act, as part of this "comparability" analysis.

As noted above, we find that the data from UN Comtrade and Stats.NZ are comparable to Baroque's plywood purchases because such purchases would be classifiable in the HS subheadings used in the *Final Results* and certain of the HS subheadings used are more specific than the ITTO data in terms of wood species.[98]  In addition, using the UN Comtrade and Stats.NZ data results in a more robust benchmark because it includes numerous real export sales of the plywood products for 97 countries.[99]  In comparison, the ITTO data represent bi-monthly price quotes of grade-specific plywood from three countries for specific destination markets.[100] Section 351.511(a)(2)(ii) of Commerce's regulations calls for the use of "a world market price where it is reasonable to conclude that such price would be *available* to the purchasers in the country in question" {emphasis added}.  Importantly, the regulation establishes that "where there is more than one commercially available world market price, {Commerce} *will* average such prices to the extent practicable." {emphasis added}.  Therefore, under this standard for adequate remuneration, if prices on the world market provided by parties are commercially available, comparable to the goods or services benchmarked, and it is practicable to average such prices,

---

[97] *Id*. at 8.
[98] *See* Draft Remand at 16-17.
[99] *See supra* "Commerce's Calculation of the Plywood for LTAR Benchmarks" section.
[100] *Id*.

the regulation calls for the inclusion of as wide a variety of prices as is available, because this is reflective of a benchmark of world market prices.

Baroque also acknowledges that "UNComtrade {and Stats.NZ} data could be used as a benchmark ... because it is potentially comparable enough."[101]  While Baroque argues that UN Comtrade/Stats.NZ data would be usable "if it was the only benchmark source on the record,"[102] Commerce's regulations under 19 CFR 351.511(a)(2)(ii) direct us to average all comparable benchmark information.  Baroque's admission here demonstrates the reasonableness of Commerce's determination to include benchmarks that are "comparable enough" in its benchmarks, and indeed would be required in accordance with 19 CFR 351.511(a)(2)(ii).

We agree with Baroque that Commerce has a well-established practice of excluding prices from its benchmarks that are not sufficiently comparable to the product in question due to encompassing an overly broad variety of products.[103]  However, such decisions are dependent on the product in question and the evidence on the record.  Most of the cases Baroque references[104] are instances where Commerce excluded data that did not describe the purchased product in favor of equivalent data that did (*i.e.*, using one HS subheading instead of another),[105] or basket categories of particular HS subheadings in favor of more specific subheadings.[106]  Commerce addressed these decisions in the Draft Remand, explaining that in cases where Commerce has excluded benchmark data on this basis, it does so because the data do not encompass the type or category of input purchased at all.  These cases are inapposite to the instant remand because the

---

[101] *See* Baroque's Draft Remand Comments at 10.
[102] *Id.*
[103] *Id.* at 6-7.
[104] *Id.*
[105] *See, e.g., China Aluminum Foil Investigation* IDM at Comment 16; *see also Uncoated Paper from China* IDM at 25-26, 28-29, and 31; and *Final Results of Countervailing Duty New Shipper Review:  Certain Softwood Lumber Products from Canada*, 70 FR 56640 (September 28, 2005), and accompanying IDM at Comment 1 (Relying only on "Region 1" instead of "other regions" as the log prices specific to the reported purchases "are reported in Region 1 of these data sources.").
[106] *See, e.g., Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 73 FR 35639 (June 24, 2008), and accompanying IDM at Comment 15.

UN Comtrade and Stats.NZ data are inclusive of Baroque's plywood purchases and there is no alternate form or method to filter such data to use in lieu of the broader datasets. These cases do not support Baroque's argument that the ITTO data are more comparable (in terms of grade) and thus should be used exclusively to calculate the benchmark. As discussed above, all three data sources in this remand represent numerous "commercially available world market prices" that are comparable to Baroque's plywood purchases, and therefore should be averaged under Commerce's regulations.[107]

There are some similarities in the fact patterns of *China Solar 2015* and the instant case; however, Baroque's reliance on *China Solar 2015* is misplaced.[108] Although in *China Solar 2015* Commerce acknowledged that the IHS Markit data were more specific to the aluminum extrusions purchased by the respondent, it continued to use the less-specific UN Comtrade data because of other weaknesses with the IHS Markit data.[109] On remand, Commerce revised the aluminum extrusion benchmark used in *China Solar 2015* to include only the IHS Markit data because the UN Comtrade data contained "several types of aluminum extrusions" beyond just the solar frames purchased by the respondent.[110] In sustaining Commerce's remand redetermination the Court explained that its concern was "that the {UN} Comtrade data appeared to include data from products unrelated to solar frames, whereas the IHS data was specific to solar frames."[111] There is no similar concern here because different grades of plywood contained in the UN Comtrade data on the record of this review are all still plywood and are all capable of being incorporated into subject merchandise. While there may be some differences in quality

---

[107] *See* 19 CFR 351.511(a)(2)(ii).
[108] *See* Baroque's Draft Remand Comments at 4 (citing *China Solar 2015* IDM at Comment 3).
[109] *See China Solar 2015* IDM at Comment 3.
[110] *See Final Results of Redetermination Pursuant to Court Remand*, *Canadian Solar Inc., et al. v. United States*, Consol. Court No. 18-00184, Slip Op. 20-23 (CIT February 25, 2020) dated June 26, 2020, available at https://access.trade.gov/public/FinalRemandRedetermination.aspx at 13-14.
[111] *See Canadian Solar, Inc. v. United States*, Slip Op. 20-149 (CIT October 19, 2020) at 13-14.

grading of the plywood encompassed by the UN Comtrade data, all are still comparable to Baroque's purchases of C/D grade plywood. Baroque has not claimed that the UN Comtrade data include products other than plywood nor has it suggested that any of the products encompassed in the HS subheadings included in the UN Comtrade data could not be used in the same way as the plywood Baroque purchased. No party has argued, at any point in the proceeding, that the plywood in the UN Comtrade and Stats.NZ data are unrelated to general production of multilayered wood flooring. Further, although record evidence demonstrates that grade affects the price of plywood, as considered in detail in the "Commerce's Calculation of the Plywood for LTAR Benchmark" section above, the evidence does not indicate the magnitude of the effect of grade on price. However, the little record evidence that does quantify the relative pricing differences between different grades of plywood reveals that this effect is relatively minor. For example, the ITTO Tropical Timber Market (TTM) reports state that in the section for "Ghana – Export Plywood Prices," which are prices for BB/CC plywood, that "Grade AB/BB {plywood} would attract a premium of 10%, B/BB 5%, C/CC 5% and CC/CC 10%."[112] Even if we did know the comparative composition of each dataset by grade, this evidence suggests a benchmark including differing grades of plywood, such as the UN Comtrade and Stats.NZ data, would not result in a distorted average of world market prices to measure the adequacy of remuneration, as Baroque contends.

We also note that Baroque's argument that non-grade-specific data are unsuitable for the plywood benchmark is contradicted by the fact that five of the six ITTO datasets Baroque asserts Commerce should rely on include higher grades of plywood or do not indicate the grade of plywood at all. The "Brazil – Domestic Plywood Prices" tables in the ITTO TTM reports merely state the species (*i.e.*, Parica), the thickness (4mm, 10mm, and 15mm), and whether the product

---

[112] *See* Riverside's Benchmark Data at Exhibit 2D, p. 6 (ITTO TTM Report: 24:7 1 – 15 April 2020 at p. 5).

is moisture resistant (MR) or weather and boil proof (WBP).[113]  Similarly, Baroque's ITTO data

from Ghana and Peru are for "BB/CC" and "B/C" grade plywood, respectively,[114] which is a

higher grade of plywood than Baroque's C/D grade plywood purchases.[115]  If, as Baroque

claims, "inclusion of products not used by the respondent makes the benchmark unviable when

alternative sources are on the record,"[116] then clearly these datasets should also be excluded.

However, we disagree, for the reasons explained above.

    Lastly, Baroque's claims that Commerce's regulations do "not require nor prefer" the use

of multiple prices, and that the reference in the regulation to "world market price" is singular, are

meritless.[117]  Section 351.511(a)(2)(ii) of Commerce's regulations plainly states that "{w}here

there is more than one commercially available world market price, {Commerce} *will* average

such prices to the extent practicable, making due allowance for factors affecting comparability"

{emphasis added}.  This regulation makes clear that when multiple comparable world market

prices are available on the record, Commerce's practice is to average them, to the extent

practicable and in consideration of comparability.  Baroque has not challenged Commerce's

averaging methodology and its arguments regarding comparability are addressed above.  Having

determined that the UN Comtrade and Stats.NZ data are comparable to Baroque's purchases, and

thus a valid "world market price," Commerce's practice dictates that such prices should be

averaged with Baroque's preferred ITTO data.  Baroque is correct that the use of "world market

price" in the regulations does not *per se* mandate that Commerce calculate a benchmark that is

---

[113] *Id.* at Exhibit 2D, p. 15 and 30 (ITTO TTM Report: 24:7 1 – 15 April 2020, pages 14 and 29).
[114] *Id.* at Exhibit 2D, p. 6 and 17 ((ITTO TTM Report: 24:7 1 – 15 April 2020, pages 5 and 16).  We note that one of the 10 products listed in the table for the plywood data from Peru is for "C/C" plywood and two of the two do not denote grade.
[115] *See* Riverside's Benchmark Rebuttal at Exhibit 7, p. 38-39.
[116] *See* Baroque's Draft Remand Comments at 11.
[117] *Id.* at 8-9.

representative of the entire world, but Commerce's regulations do require that it calculate an

average when multiple comparable world market prices are on the record, which is the case here.

**Issue 2:**    **Whether to Apply AFA to the GOC to Find Certain Input Suppliers to be Government Authorities**

*Baroque's Draft Remand Comments:*

The following is a verbatim summary of argument submitted by Baroque (citations omitted).
For further details, *see* Baroque's Draft Remand Comments at 12-17.

> {Commerce} should find that certain of Baroque's input suppliers are not
> government authorities and that {AFA} to the {GOC} is not warranted. The GOC
> in its questionnaire responses demonstrated that certain of Baroque's input
> suppliers do not have more than three {CCP} members. As a result, these
> companies do not have primary party organizations and do not have CCP officials
> within them. This information is verifiable and should have been accepted,
> preventing the use of AFA.

**Commerce's Position:**

Baroque argues that Commerce's application of AFA to find that Baroque's input

suppliers are government authorities is not supported by substantial evidence.[118]  Specifically,

Baroque contends that the GOC provided sufficient factual information to demonstrate that no

key personnel in the input suppliers in question were GOC or CCP officials and that record

evidence demonstrates that a primary party organization was not required in any of these

suppliers, thus these suppliers cannot be found to be government authorities.[119]  As explained

below, we disagree; company information is insufficient for this purpose. Further, the GOC did

not comply with Commerce's repeated requests to provide government documentation

supporting its claims about CCP influence in certain of Baroque's input suppliers. Accordingly,

we continue to find it appropriate to apply AFA to find certain of Baroque's input suppliers to be

government authorities under section 771(5)(B) of the Act that provided a financial contribution

in supplying inputs to Baroque within the meaning of section 771(5)(D)(iii) of the Act.

---

[118] *See* Baroque's Draft Remand Comments at 12-13.
[119] *Id*. at 14.

First, Baroque claims that Commerce overstates the conclusions of the Public Bodies Analysis Memo to explain the need for GOC government documentation.[120]  Baroque argues that the Public Bodies Analysis Memo only discusses CCP influence in private companies through primary party organizations, and that the GOC's questionnaire responses demonstrate that none of the relevant input suppliers have a primary party organization because no employees are CCP members.[121]  Thus, record evidence is sufficient to conclude that the input suppliers are not government authorities.[122]  However, Baroque misstates the relevance of the Public Bodies Analysis Memo and the rationale for Commerce's request for government documentation in its authorities analysis.  Even so, the GOC's questionnaire responses do not demonstrate with sufficient documentation that none of the relevant input suppliers have a primary party organization.

The Public Bodies Analysis Memo explains that Commerce's practice is to treat enterprises in China as public bodies (*i.e.*, authorities) for CVD purposes if Commerce determines that the GOC exercises meaningful control over the enterprise.  This control can exist through, *inter alia*, the establishment of primary party organizations and/or the presence of Government or CCP officials of the nine entities in the company's individual owners, members of the board of directors, or senior managers.  As explained above, record evidence demonstrates that the CCP continues to exert significant control over economic activities in China and exercises meaningful control over private entities to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector.[123]  This evidence demonstrates the need to fully evaluate each company that supplied

---

[120] *Id*. at 13.
[121] *Id*. at 13-14.
[122] *Id*. at 14.
[123] *See* Public Bodies Analysis Memo, p. 35-36 and sources cited therein.

inputs under an LTAR program, but does not alone explain why government documentation is necessary for Commerce's analysis.

In its response to Commerce's CVD questionnaire and the supplemental questionnaire issued for the purpose of this remand, the GOC stated that, to formulate its responses with respect to GOC/CCP influence, it relied solely on information provided directly by the input suppliers.[124]  However, in its initial questionnaire response, the GOC also explained that input producers are not required to report or record in their internal records and documents whether any company owners, members of the board of directors or managers are officials in the nine entities.[125]  Based on this response, we continue to find that government documentation from the GOC is necessary to demonstrate and verify whether a person has an official role within either the GOC and/or CCP.

As stated above, Commerce may find ostensibly private businesses to be government authorities if it determines that the GOC exercises meaningful control over them.  Baroque argues that the GOC provided internal work plans of each input supplier in question which purportedly confirms that there was no outside intervention in those plans or decision making.[126]  However, such documentation remains insufficient without government documentation provided by the GOC to ascertain whether any owner or other individual with significant control over the operations and decisions of the company was a Government or CCP official during the POR.

Although the GOC provided company-specific information, such as articles of incorporation, capital verification reports, company by-laws, business licenses, and internal work plans, it is insufficient without government documentation supporting the GOC's claims about GOC/CCP influence.  This company documentation is helpful in identifying the individual

---

[124] *See* GOC's IQR at Exhibit LTAR-1, p. LTAR-69; *see also* GOC's Remand SQR at 2 and Exhibit RSQ-1.
[125] *Id*. at Exhibit LTAR-1, p. LTAR-69.
[126] *See* Baroque's Draft Remand Comments at 14 (citing GOC's Remand SQR at Exhibit RSQ-2).

owners, board members, officers, and managers of the company; nonetheless, this documentation does not demonstrate on its own whether the owners and shareholders of the input suppliers have any CCP involvement. As noted by Baroque, the GOC simply repeated the responses from the input suppliers that none had primary party organizations, rather than providing confirmation or support from a source independent of the input suppliers.[127]

Baroque further claims that Commerce discounts this information in the Draft Remand because the requested "government documentation" was not provided.[128] As explained above, given the significant influence of the CCP and GOC in the Chinese economic system and the lack of public reporting requirements, company information and documentation cannot replace government documentation in our analysis of whether the GOC/CCP may exert a controlling influence over a given input supplier. Likewise, we find that the certifications on CCP influence provided by the suppliers do not provide sufficient evidence about the involvement of the GOC, including the CCP, in that company that provided inputs to mandatory respondents under an LTAR program.

Baroque also asserts that, because the GOC stated that "personal information of the employees, including whether they are CCP members, would normally be provided to the Human Resources department of the company," Commerce can verify whether the suppliers have a primary party organization and any key company personnel are Government or CCP officials.[129] Baroque is mistaken; as Commerce has previously explained, company information alone is insufficient for this purpose.[130] Based on the GOC's questionnaire responses, we continue to find that government documentation is required to substantiate whether a person has an official role in either the GOC or CCP, as explained above. Thus, verification of such

---

[127] *Id.*; *see also* GOC's Remand SQR at Exhibit RSQ-2.
[128] *Id.*
[129] *Id.*
[130] *See Citric Acid from China 2012* IDM at Comment 5.

information without the necessary corroborating government documentation would be pointless.

Additionally, as noted in the Draft Remand, the company certifications are *pro forma* in nature

and lack particular details for examining possible government involvement in each company.

Without such details, Commerce is unable to evaluate the extent of GOC/CCP involvement in

each input supplier in order to verify these certifications, as Commerce does not have any official

documentation to evaluate and review to corroborate or confirm the suppliers' mere statements.

Verification is not intended to complete the record when parties, such as the GOC in this

instance, fail to provide the necessary documentation.[131]

Baroque also argues that Commerce's request for government documentation is

unreasonable because it was not specific in the type of government documentation the GOC

should provide.[132]  However, Commerce's request for government documentation was

intentionally open-ended to allow the GOC discretion to provide whatever information it

believed would be sufficient to support its claim that no individual owners, members of the board

of directors, or senior managers of the input suppliers were GOC or CCP officials.[133]  Commerce

cannot speculate as to the forms of government documentation the GOC is able to provide that

would best demonstrate that the key persons in the input suppliers in question are not officials in

the Government or CCP or that would provide Commerce some way of confirming or verifying

the individual claims.

Based on what documentation and explanation was provided in response to its

questionnaire, Commerce would then be able to evaluate such information, and consider whether

it required additional information or explanation such that it should send a supplemental

---

[131] *See e.g.*, *Tianjin Mach. Import & Export Corp. v. United States*, 806 F.Supp.1008, 1015 (CIT 1992) ("{T}he burden of creating an adequate record lies with respondents and not with Commerce…Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." (internal citations omitted)).
[132] *See* Baroque's Draft Remand Comments at 15-16.
[133] *See* Draft Remand at 20-21; *see also* GOC's Remand Supplemental Questionnaire at 5.

questionnaire. The GOC's refusal to provide any government documentation precluded Commerce from completing this basic questionnaire response analysis. In addition, Baroque's arguments that the question is too broad ignore the fact that the GOC did not provide *any* government documentation in response. We address Baroque's specific critiques of Commerce's request for government documentation below.

As explained above, in its response to the Remand Supplemental Questionnaire, the GOC restated its initial questionnaire response that "there is no central governmental database."[134] Baroque asserts that, there being no central database, it is unclear how there could be a "national" database that the GOC/CCP could provide documentation from, as we suggested in the Draft Remand. There may be multiple national databases (*e.g.*, separate databases for each of jurisdictions where the nine entities are located) that are not in one "central governmental database." Alternatively, as discussed in the Draft Remand, the GOC appears to distinguish itself from the CCP in its questionnaire response, so perhaps there is a central database that is not "governmental" in the GOC's view because it is maintained by the CCP or a governmental entity other than "the industry and commerce administration."[135] However, Commerce has made clear within this proceeding that it would consider CCP documentation to be responsive to Commerce's request.[136]

Likewise, Baroque argues that providing documentation from a local or other sub-national database would not sufficiently answer Commerce's request for government documentation.[137] Again, such arguments are moot when the GOC has provided no government

---

[134] *See* GOC's Remand SQR at 4; *see also* GOC's IQR at Exhibit LTAR-1, p. LTAR-69.

[135] *Id*. ("There is no central governmental database to search for the requested information on whether any individual owners, members of the board of directors, or senior managers are government or CCP officials, and the industry and commerce administration does not require companies to provide such government information.")

[136] *See e.g.*, *Final Results* IDM at 58 (discussing how Commerce has previously accepted and considered certified documentation from a CCP Committee).

[137] *See* Baroque's Draft Remand Comments at 15.

documentation of any kind.  It would be up the GOC to explain how the jurisdictions of the nine

entities might overlap or not such that responses from certain of the nine entities at each level of

the Chinese government are irrelevant (if they are).

Finally, as explained above, Commerce cannot speculate what exact type(s) and form(s)

of government documentation the GOC can provide to support its claims, as only the GOC has

the understanding of what government documents it, including the CCP, maintains and what they

demonstrate.  Here, Commerce can only suggest that the GOC could have provided search

results from a membership database or its equivalent listing any official position held at the local,

provincial or other sub-national/non-central levels because the GOC did not address whether

such information exists, nor did it explain whether there was some other source for

independently confirming and documenting the GOC's claims.  Commerce's suggestion is based

merely on the fact that to believe that such access to *any* information by the GOC defies belief

for the reasons explained below.

Baroque also claims that Commerce's reliance on *Citric Acid from China 2012* is

unreasonable because the type of documentation provided in that case was only possible because

the owner had previously been a Government or CCP official.[138]  However, our reference to

*Citric Acid from China 2012* is only to illustrate that the GOC can provide documentation from

the government, including the CCP, that attests to its records of officials.  The GOC's insistence

that it cannot rely on any official source to demonstrate that the key persons in input suppliers

are not officials suggests that the CCP has no tracking of the individuals who are officials in the

nine entities.  Given that the CCP Constitution requires that all organizations with enough CCP

members form primary party organizations,[139] it strains credulity that the CCP has no records

with which it can track whether this requirement is followed.

---

[138] *Id.* at 15-16.
[139] *See* Public Bodies Analysis Memo at 35.

In short, Baroque's arguments have focused on its claims that the company information the GOC provided is sufficient for Commerce's government authorities analysis and that the GOC cannot provide government documentation that would satisfy Commerce's analysis. Commerce explained above why it requires government documentation and noted that Baroque's argument about what government documentation would be sufficient are speculative because the GOC has provided none. Moreover, Baroque does not challenge that Commerce has complied with the *Remand Opinion and Order*. Commerce issued an additional supplemental questionnaire requesting the government documentation necessary to evaluate whether Baroque's input suppliers are government authorities. The GOC again refused to provide such documentation. The GOC has, in other proceedings, provided government documentation, from the CCP specifically, to support its reported claims about GOC/CCP involvement in private companies.[140]

Therefore, Commerce continues to find that necessary information is missing from the record, that the GOC has withheld information requested of it, significantly impeded the proceeding, and has provided information that is not verifiable and, accordingly, that we must rely on facts available in conducting our analysis of Baroque's input producers.[141] As a result of repeated incomplete responses to Commerce's questionnaires, we continue to find that the GOC has failed to cooperate by not acting to the best of its ability to comply with our requests for information. Consequently, we determine that the GOC withheld information, and that an adverse inference is warranted in selecting from the facts available.[142] As AFA, we find that CCP officials are present in each of Baroque's privately-owned input producers as individual owners, managers, and members of the boards of directors, and that this gives the CCP, as the

---

[140] *See e.g.*, *Citric Acid from China 2012* IDM at Comment 2.
[141] *See* section 776(a)(2)(A) of the Act.
[142] *See* section 776(b) of the Act.

Government, meaningful control over the companies and their resources.  As explained in the Public Bodies Analysis Memo, an entity with CCP presence on its board, or in management, or in party committees, may be controlled such that it possesses, exercises, or is vested with governmental authority.[143]  Thus, for these final results of redetermination, we continue to find Baroque's input producers to be "authorities" within the meaning of section 771(5)(B) of the Act.

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Opinion and Order*, we have further explained Commerce's selection of the data to benchmark Baroque's plywood purchases and have not made changes to the benchmark used in the *Final Results*.  In addition, we issued an additional supplemental questionnaire to the GOC notifying it of certain deficiencies with respect to Baroque's input suppliers, consistent with the Court's *Remand Opinion and Order*, and, having analyzed the GOC's response, continue to find the GOC did not cooperate to the best of its ability.  Therefore, for these final results of redetermination, we are continuing to apply AFA to find that certain of Baroque's input suppliers are government authorities.  As we are making no changes from the *Final Results*, the total countervailable subsidy rate assigned to Riverside/Baroque for the POR continues to be 17.06 percent,[144] and accordingly we do not intend to issue a *Timken*[145] notice should the Court sustain these final results of redetermination.

9/24/2025

X _Chris J Abbott_

Signed by: CHRISTOPHER ABBOTT
Christopher Abbott

---

[143] *See, e.g.*, Public Bodies Analysis Memo at 33-36 and 38.
[144] *See Final Results*, 88 FR at 34829.
[145] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).

Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance