**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | | |
|---|---|---|
| ———————————————————— x | | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION , | : : : | |
| | : | |
| Plaintiffs, | : : | |
| | : | Consol. Court No. 23-00136 |
| v. | : : | **PUBLIC VERSION** |
| UNITED STATES, | : : | |
| Defendant, | : : | |
| ———————————————————— x | | |

<u>**PLAINTIFFS' COMMENTS OPPOSING REMAND REDETERMINATION**</u>

On behalf of Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation, we provide these comments in opposition to the U.S. Department of Commerce's ("Commerce")  Final Results of Redetermination Pursuant to Court Remand ("Remand") filed on September 24, 2025 (REM_PD 13).  Commerce's Remand addresses two issues: (1) the benchmark selection for plywood; and (2) the application of adverse facts available ("AFA") to the Government of China ("GOC") for the government authority determination for certain of Plaintiffs input suppliers.  For each issue, Commerce refused in its Remand to change its findings from the challenged review – the same benchmarks were used for plywood; and AFA was still warranted for the GOC.  These findings are not supported by substantial evidence and are otherwise contrary to law.

PUBLIC VERSION

I.    **COMMERCE'S CONTINUED USE OF UNCOMTRADE DATA FOR PLYWOOD IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW**

In its Opinion, the Court remanded benchmark selection issues for plywood back to Commerce for new evaluation in light of the significant evidence on the record that the UNComtrade[1] data is overly broad compared to more specific ITTO data for each of these goods. Slip Op. 25-36 at 12.  The Court concluded that "In this case, Baroque put forth 'significant arguments and evidence,' *id.* at 1117-18, 167 F. Supp. 2d at 1374, that the inability to excise grade A and grade B prices from the UN Comtrade data is a flaw causing the plywood benchmark to be skewed by higher prices not associated with Baroque's actual purchases."  *Id.* at 13.  The Court remanded the case back to "Commerce to use solely the ITTO grade specific data in its plywood benchmark calculation or explain: (1) the reason that the inclusion of the UN Comtrade data does not produce a fatally distortive benchmark; and (2) the reason that a plywood benchmark derived solely from the ITTO data would not meet Commerce's statutory and regulatory requirements..  *Id.* at 15.

In light of the Court's Opinion, the question before Commerce was, at bottom: what is its obligation under the statute and regulations when faced with two datasets, one overly broad, with an undefined distortion, and one that is more specific?  Commerce in its Remand found that the statute and regulation required it to use prices that reflected a broadly available world market price (i.e., UNComtrade), even where the dataset contained distortions caused by different grades, as long as the inputs within the price were "comparable" to the plywood and veneer

---

[1] We refer to UNComtrade and Stats.NZ collectively as "UNComtrade" since they both represent export data by HTS code.

inputs being valued, citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273-1274 (Fed. Cir. 2015).  Remand at 10, 19.

This finding, however, improperly interprets the terms "world market price" and "will average" beyond the statutory purpose of 19 U.S.C. § 1677(5)(E)(iv), discounting the undeniable distortions in the benchmark.  That statute requires that prevailing market conditions be taken into account in selecting a benchmark to evaluate the adequacy of remuneration for a purchased good.  Commerce did not properly take these conditions into account when it unreasonably interpreted these regulatory terms.  Indeed, Commerce elevated broadness of the benchmark, which is not listed in the statute or regulation, over every single market condition expressly listed in the statute.

In selecting a benchmark, Commerce must seek to calculate the subsidy benefits, if any, as accurately as possible.  *See Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007); *see also Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994) (stating that "there is much in the statute that supports the notion that it is Commerce's duty to determine margins as accurately as possible").  Commerce's goal under 19 U.S.C. § 1677 specifically is to evaluate whether the price paid by the respondent for the input was "less than adequate," signifying subsizdation from the government (i.e., put simply, that the price is lower than prices from private suppliers either domestic or world).  If Commerce knowingly uses a benchmark that is of a different quality than the input actually purchased when more specific benchmarks are on the record, and that quality affects the price of the product, it fails to accomplish its statutory mandate.  In failing to use the most specific commercially available world market prices on the record for both plywood and veneer, Commerce here has calculated

benefits for Baroque which are due to differences in product quality and not benefits caused by government interference. This is unlawful.

In its Opinion, the Court made clear that the evidence on the record demonstrates that "plywood grade has a significant impact on price." Slip Op. 25-36 at 10. In its Remand, Commerce echoes this statement explaining that "Record evidence also states that higher grade plywood, containing fewer defects in quality and appearance, have generally higher market prices than lower grade plywood, which contain more defects." Remand at 12-13. Commerce then summarizes that:

> Evidence provided by Riverside sufficiently demonstrate that Baroque's plywood purchases were entirely C/D grade plywood made of eucalyptus56 and that the plywood industry is influenced by grade and species, with higher grades and slower growing species being more expensive.57 Record evidence also indicates that UN Comtrade and Stats.NZ data include multiple grades of plywood.

*Id*. at 11.

Despite this, Commerce concluded that using the UNComtrade data is acceptable in this case because "Benchmark data containing different categories of merchandise (*e.g.*, different grades of plywood) can still be suitable for benchmarking purchases of a narrower category of merchandise (*e.g.*, Baroque's purchases of C/D grade plywood), if that data is still comparable to the purchases in question." *Id*. 13-14. And further, "Without evidence in support of the specific composition of these data (*e.g.*, how much of the UN Comtrade data is one grade of plywood or another), such a conclusion that the data contain a distortive amount of non-identical product grade would be speculative." *Id*. at 12. The acceptance of a benchmark that undeniably contains distortions, regardless of whether that distortion can be specifically quantifiable, is wrong and is inconsistent with both the statute and regulations.

The statute governing the selection of benchmarks for use in LTAR calculations provides as follows:

> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.
>
> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E)(iv). The governing regulation, 19 C.F.R. § 351.511(a)(2), sets forth the benchmark hierarchy used for LTAR programs. As in this case, when a domestic benchmark cannot be used, Commerce must select a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." And where there is more than one commercially available world market price, "the Secretary will average such prices to the extent practicable, *making due allowance for factors affecting comparability.*" The regulation does not repeat the statutorily required conditions that Commerce must consider when selecting an appropriate benchmark – i.e., "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." Commerce's benchmark selection in its proceedings, however, clearly take these conditions into account. This includes product specificity or quality. *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), IDM Comment 3 (using a more specific pricing source, IHS Market data, for solar aluminum frames rather than the UNComtrade broad HTS data); *Certain Uncoated Paper from the People's Republic of China:*

*Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), IDM at 3 ("Provision of Caustic Soda for LTAR") (using a grade specific benchmark "when the record evidence indicates that the respondent firm purchases the good in question on a grade-specific basis."); *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) (finding a species-specific benchmark for timber to be more appropriate than a generic timber value); *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), IDM Comment 1 (selecting a region-specific benchmark in order to "conduct the most accurate 'apples-to-apples' comparison between U.S. PNW and B.C. Coast log prices"); *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017) ("Aluminum Foil"), IDM Comment 16 (using an unalloyed ingot HTS provision and not an alloyed ingot HTS provision); *Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 Fed. Reg. 35,639 (June 24, 2008), IDM Comment 15 ("the relevant section of India's Harmonized Tariff Schedule which shows that that this is a basket category for all PP films that are 'flexible, plain.' Therefore, we have excluded these Indian export statistics from your benchmark calculation"); *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), IDM at 21 (where Commerce delineated by steel grade in the LTAR benefit calculation); *Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 19,657 (Apr. 28, 2017), PDM at 54-56 (where Commerce delineated by coniferous species in the LTAR benefit calculation).

### a. Neither the Regulation, Nor the Statute Prefers nor Requires a Broad Benchmark; this Cannot Be the Reason to Ignore Distortions

While Commerce agrees that grade affects[2] pricing of plywood and that the ITTO data is the only benchmark data that delineates by grade, it nevertheless found that using the UNComtrade data in the record acceptable to use for several reasons. First, Commerce states that the "regulation calls for the inclusion of as wide a variety of prices as is available, because this is reflective of a benchmark of world market prices" and that "significantly more reflective of a broad world market price than the ITTO data, encompassing global export data from 97 countries and a large number of transactions of plywood made of a variety of species (i.e., including eucalyptus under HS subheading 4412.33)." Remand at 14. These statements are inconsistent with the statute and regulation and cannot be used as the basis to ignore distortions.

The regulation does not require nor prefer the use of multiple prices around the world to create the tier 2 benchmark. Ignoring the distortions contained in the UNComtrade because Commerce believes that it is *required* to create a broad global benchmark with numerous data points is therefore contrary to law. Indeed, this elevates broadness as a selection criteria, which is not identified in the statute or regulations, over quality, which is. There is no indication in the regulation that the term "world" means multiple prices or is a reference to an amalgamation of prices to create a "global" price consistent with multiple markets. There is no preference to multiple prices as compared to one. To the contrary, the regulation consistently refers to a singular price being selected and the reference to a "world market price" expressly and unambiguously refers to "*one* commercially available world market price":

> If there is no useable market-determined **price** with which to make the
> comparison under paragraph (a)(2)(i) of this section, the Secretary will

---

[2] As discussed below, Commerce now seems to claim that these price effects are not "significant" or impactful.

> seek to measure the adequacy of remuneration by comparing the
> government price to a world market price where it is reasonable to
> conclude that such **price** would be available to purchasers in the country
> in question. Where there is more than **<u>one</u>** commercially available world
> market **price**, the Secretary will average such prices to the extent
> practicable, making due allowance for factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(ii) (emphasis added).

The regulation then describes what is to occur if there is "more than one" available world market price – they should be averaged "making due allowance for factors affecting comparability." *Id.* This unambiguous language cannot be reasonably read to require, or express a preference for, the use of multiple prices. The term "world" itself clearly does not mean multiple prices.[3] If the term "world" meant multiple prices there would not be a provision requiring that Commerce average prices where there is more than one commercially available world market price available. *See Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1362 (Fed. Cir. 2000) ("It is a long-held tenet of statutory interpretation that one section of a law should not be interpreted so as to render another section meaningless."). The only definition of "world market price" is that it is a price from outside of the target country. Thus, Commerce's desire to create a global price that is inclusive of numerous different prices is not mandated by the regulation (or the statute) and is not a reasonable basis on which to select a particular benchmark on the record. Benchmarks should only be selected based on prevailing market conditions, which includes price, quality, availability, marketability, transportation, and other conditions of purchase or sale, as directed by the statute. That is, Commerce cannot select a less

---

[3] The term "world" is not ambiguous and the Department cannot interpret the term any way it wants. The "text, structure, history, and purpose of a regulation" make clear that the term "world" only refers a price outside of the target country, nothing more, nothing less. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).

comparable benchmark and include it in the average due to its desire to create a global price. This is not mandated by the regulation.

### b. Product Specificity is Paramount

Second, Commerce reliance on "comparability" rather than specificity in this case is not supported by record evidence or the statute. In its Remand, Commerce argues that its only mandate under the regulations is to use a benchmark of comparable merchandise and that it is not required to use a benchmark of the exact same input, regardless of distractions caused by the inclusion of higher priced items. Remand at 25. While we agree that cases such as *Essar Steel* support this *general* contention, that case is distinguishable and *does not* address the situation where Commerce has two benchmark sources on the record – one broad and the other more specific.[4] We agree that the UNComtrade data could be used as a benchmark if it was the *only* benchmark source on the record because it is potentially comparable enough *and* has no other option. However, when record information shows that grade is a significant criterion for plywood that demonstrably affects the price of the product and there is a benchmark on the record that is grade specific, the UNComtrade data becomes not comparable because it leads to distortive results caused by product quality issues.

Commerce claims that it is "speculative" to argue that the UNComtrade data is distortive because it is not known how much of the UNComtrade data is grade A or B plywood. Remand at 12, 23. But it is this lack of information that makes the source so problematic. It is *certain* that the HTS provisions in the UNComtrade data include all grades of plywood. It is also certain

---

[4] In *Essar Steel*, the Court evaluated whether Australian iron ore was an acceptable tier 2 benchmark for Indian iron ore. *Essar Steel Ltd.,* 678 F.3d at 1274. There were no other benchmarks on the record for the Department to choose from in that case. *Id.* The issue was only whether the one benchmark on the record could be use if it was not identical to the Indian iron ore. *Id.*

9

that the prices within this data "vary significantly between countries."  Remand at 16.[5]  The fact

that the prices vary so much is a strong indicator that the product mix within the UNComtrade

data for each country is different.  That is, there might be some higher priced countries where

grade A and B plywood in a higher percentage of the total whereas others have C and D plywood

in a higher percentage.  Since the prices vary so much and that variance is unknown and not

quantifiable, it disqualifies the UNComtrade data source as a viable benchmark option when

more grade specific price data is on the record.

    What is not speculation is that substantial record evidence plainly establishes that grade

has a significant impact on price and that the HTS provisions used do not delineate by grade.

*See* Slip Op 25-36 at 12 ("In the IDM, Commerce acknowledged that the record demonstrated

that plywood grade has a significant impact on price and that Baroque purchased only lower

grade plywood.").  The impact of grade on plywood is not new.  The grade of plywood has been

recognized as a significant price factor in other AD/CVD proceedings.  In *Hardwood Decorative*

*Plywood from China, Indonesia and Vietnam*, the International Trade Commission created

pricing products that were segregated by grade.  *Hardwood Decorative Plywood from China,*

*Indonesia and Vietnam*, Investigation Nos. 701-TA-764–766 and 731-TA-1747–1749

(Preliminary), Pub No. 5648 at 57 (July 2025).  In that case, Petitioner made clear that "HDP

products exist on a pricing continuum in which price depends on the quality, grade, and species

of the veneer and core."  *Id*. at 15.  The hardwood decorative plywood ("HDP") in that case "has

---

[5] The Department states that "the UN Comtrade data might consist mostly of sales of grade C or
D grade plywood, that might be more reflective of Baroque's C/D grade plywood purchases than
the ITTO data, which are based on the prices of B/C grade, BB/CC grade, C/C grade, and C/CC
grade plywood."  Remand at 13.  Again, that prices vary so wildly suggests that the data does not
consist mostly of one grade.

a wide variety of uses, including but not limited to, wall panels, kitchen cabinet components, seat

backs, table and desktops, drawer sides, furniture components, recreational vehicle and trailer

components, floor underlayment, and the raw material for certain engineered (e.g.,

**multilayered) wood flooring**.”  *Id.* at 1.16 (emphasis added).  Most of the HTS provisions used

in the plywood benchmark in this case - 441233 441239 441234 441210 441232 441231

441294[6]– are identified in the scope of the HDP case.  *Id.* at 12.  This clearly shows that all

different grades are included within these HTS provisions, so much so that an AD/CVD case was

filed against numerous countries.

Commerce states that “‘comparability’ is the regulatory standard stated in 19 CFR

351.511(a)(2)(ii)[7] and that the UNComtrade date is sufficient comparable under the statute and

regulations because Baroque’s plywood would be classified under HTS provisions used[8] and

because MLWF could use any grade of plywood.[9]  What Commerce ignores is the price

distortion caused by the very comparability factors it is evaluating.

Commerce ignores this price distortion by concluding that the impact is minimal.  This

ignores both the Court’s statement that grade has a “significant impact on price” as well as

record evidence.  Commerce states that:

> although record evidence demonstrates that grade affects the price of
> plywood, as considered in detail in the “Commerce’s Calculation of the
> Plywood and Veneer for LTAR Benchmarks” section above, the evidence
> does not indicate the magnitude of the effect of grade on price. However,
> the little record evidence that does quantify the relative pricing differences
> between different grades of plywood reveals that this effect is relatively
> minor. For example, the ITTO Tropical Timber Market (TTM) reports
> state that in the section for “Ghana – Export Plywood Prices,” which are
> prices for BB/CC plywood, that “Grade AB/BB {plywood} would attract

---

[6] 4412.29 is the only one that is not.

[7] Remand at 29.

[8] Remand at 18, 29.

[9] Remand at 23

> a premium of 10%, B/BB 5%, C/CC 5% and CC/CC 10%." Even if we did
> know the comparative composition of each dataset by grade, this evidence
> suggests a benchmark including differing grades of plywood, such as the
> UN Comtrade and Stats.NZ data, would result in a distorted average of
> world market prices to measure the adequacy of remuneration, as Baroque
> contends.

Remand at 28.  This is wrong.  Baroque reported purchases of plywood during the POR were

[          ] RMB.  *See* Final Calculation at "Baroque Plywood" tab, column M (CR 181).

Thus, for simplicity, if the difference between grade B and C was 10% and Baroque's plywood

purchases were grade C and compared to a grade B benchmark, this would result in a benefit of

[          ].  When the CVD *ad valorem* rate is calculated for this, it would be 1.74%

([                              ][10]).  A 5% difference would be half this and still an above *de*

*minimis ad valorem* rate.  Therefore, this 5-10% price difference caused by a particular physical

attribute of the input results in a well-above *de minimis* CVD rate and is undeniably a major

consideration in the comparability of the benchmark.[11]  This is demonstrable proof, based on

record evidence, that the use of high grade, high priced plywood distorts the UNComtrade data.

At bottom, the statute instructs Commerce to take "quality" into account when selecting

benchmarks.  19 U.S.C. § 1677(5)(E)(iv).  UNComtrade data contains plywood of a quality not

used by Baroque, that is known but cannot be quantified, making the comparison of that data

---

[10] See Final Calculation at "Sales" tab (CR 181).

[11] In Commerce's recent change in practice for evaluating targeted dumping, it compares
different prices in various ways.  If the price difference is more than 2%, Commerce finds the
price difference "significant".  *See Certain Softwood Lumber Products From Canada: Final
Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative
Review, and Final Determination of No Shipments; 2023*, 90 Fed. Reg. 35,666 (July 29, 2025), at
V. DIFFERENTIAL PRICING ANALYSIS ("If the weighted-average net price to the given
purchaser, region, or time period falls outside of the **plus or minus two percent** band around the
weighted-average net price to all other purchasers, regions, or time periods, then the prices to
that given purchaser, region, or time period are found to differ significantly and those sales to the
given purchaser, region, or time period pass the price difference test.") (emphasis added).

with Baroque's data impossible. In contrast, because the ITTO data is grade specific, Commerce can be sure it is making a comparison at a comparable level that avoids large possible differences in prices caused by product mix. Avoiding subsidy rates due solely to product characteristics rather than market influences should be of paramount consideration to Commerce.

### c. The Requirement to Average is Not a Basis to Select Benchmarks

Finally, the regulatory requirement that world market prices be averaged does not necessitate that the UNComtrade prices be used in this case. The "will average" provision does not trump comparability. The "will average" requirement only comes into effect *after* it is determined that the particular benchmark source is a viable source within the meaning of the statute and regulation. If the price is not a valid commercially available price, then it will not be averaged. Since the UNComtrade data is not specific to Baroque's plywood, it is not a viable world market price and cannot be averaged.

Ultimately, Commerce has a choice between the devil it knows (the ITTO data) and the devil it doesn't (the UNComtrade data). Since the UNComtrde has some unquantifiable, but undeniable, level of distortion it cannot be used and Commerce must use the more similar ITTO data for the benchmark for plywood. This is the only benchmark selection that is consistent with the statute and regulation, that is supported by substantial evidence.

## II.    COMMERCE ERRED IN APPLYING AFA TO THE GOC

In its Remand, Commerce continued to find that the application of AFA was warranted for the government authority issue for Baroque's input suppliers despite the Government of China's ("GOC") remand supplemental response. Remand at 16-21. Commerce based this determination on the fact that the GOC was unable to provide "government documentation" to

prove that its managers, directors or owners were not Government or CCP officials. *Id*. This finding is not supported by substantial evidence.

First, the underlying basis of Commerce's determination is not supported by substantial evidence. Commerce explains that "Record evidence also demonstrates that the GOC exercises meaningful control over private entities and uses them to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector." *Id*. at 18. This statement is based on pages 35 and 36 of the Public Bodies Memo and overstates the analysis contained therein at n. 108. This portion of the Public Bodies Memo is primarily based on a 2006 Economist article which said:

> The party has cells in most big companies—in the private as well as the state-owned sector -- complete with their own offices and files on employees. It controls the appointment of captains of industry and, in the SOEs, even corporate dogsbodies. It holds meetings that shadow formal board meetings and often trump their decisions, particularly on staff appointments. It often gets involved in business planning and works with management to control pay.

*Id*. The memo goes on to say that:

> The role of this party presence is unclear; it may exert varying degrees of control in different circumstances. For example, based on his discussions with many private business owners, Richard McGregor notes that the stated purpose of the party committee in a private enterprise can range from a formality, to the formation of a study group, to providing "ethical" and "spiritual" guidance. However, McGregor notes that "left unstated by all the entrepreneurs was the fundamental reason for the Party's interest in the private sector. The Party's presence… was more than just a monitoring device. It was a kind of political insurance policy…to be activated in a crisis."

Thus, the sole manner in which this memo discusses at 35 CCP influence in private companies is through the primary party organizations. The memo however notes that "In accordance with the *CPP Constitution*, all organizations, including private commercial enterprises, are required to

establish 'primary organizations of the party' (or 'Party committees') if the firm employs at least three party members."

In response to this, Commerce states in its Remand that Baroque "misstates the relevance of the Public Bodies Memo and the rationale for Commerce's request for government documentation in its authorities analysis." Remand at 31. Commerce explains that "control can exist through, inter alia, the establishment of primary party organizations and/or the presence of Government or CCP officials of the nine entities in the company's individual owners, members of the board of directors, or senior managers." *Id*. This, however, is circular as the only reference for this claim anywhere on the record is the Public Bodies Memo, pages 35-36.

In its supplemental questionnaire response, the GOC confirmed that none of the relevant input suppliers had primary party organizations because none of them had more than three CCP members. GOC Remand Supp Response at Exh. RSQ-2 (REM_PR 8; REM_CR 2-5). This was based on signed statements provided by each of the suppliers, which could be confirmed by the company's own records. As the GOC explained, "the personal information of the employees, including whether they are CCP members, would normally be provided to the Human Resources department of the company." *Id*. at 9. Thus, whether the supplier has a primary party organization, and whether they have sufficient CCP members that would require a primary party organization can be verified at each of the suppliers. If the employees are not CCP *members*, they certainly cannot be CCP *officials*. In addition, the GOC also provided the internal work plans of each company and confirmation that there was no outside intervention in those plans or decision making. This information is sufficient to demonstrate that the suppliers are not government authorities and there is no information on the record that contradicts these statements. This provides an alternative means to support and verify this factual statement.

Thus, there is no gap in the record and Commerce cannot create one by requiring government documents. *See Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2022 WL 1598896, at *8–9 (Ct. Int'l Trade May 12, 2022) ("under § 1677e(a) the use of facts otherwise available is a method by which Commerce shall fill gaps in the record. It does not authorize the creation of gaps to be filled with information of Commerce's choosing.").

Commerce in its Remand discounts the company specific information submitted and states that AFA is warranted because "government documentation" was requested and was not provided to support the claim that "no individual owners, members of the board of directors, or senior managers were Government or CCP officials during the POR." Remand at 34. While the GOC responded that there was no central database with this information, Commerce explained that it "did not limit the scope of its question, for the purpose of allowing the GOC opportunity to provide the government documentation that best supports its claim." Remand at 19. And further, Commerce notes that "the GOC's response does not establish whether there are other government databases containing the information at the provincial or any other level of government." *Id*. Commerce then states that "For example, the GOC could have provided screenshots from a national, or sub-national CCP database with the results when searching for each individual owner, member of the board of directors, and senior manager of the input suppliers." *Id*. at 20. This is not reasonable.

First, the GOC already stated that there is no central database thus it is not clear how there would be a "national" CCP database – the GOC never made a distinction between the "central government" and the CCP. Commerce's questionnaire considers them one and it is reasonable for the GOC's response to refer to both.

PUBLIC VERSION

Second, the reference to "government or CCP officials" implicates the following, according to Commerce's questionnaire, 1) Chinese Communist Party (CCP) Congresses; (2) CCP Committees; (3) CCP Standing Committees; (4) People's Congresses; (5) Standing Committees of People's Congresses; (6) other Government administration entities, including village committees; (7) the Chinese People's Political Consultative Conferences (CPPCC); (8) the Discipline Inspection Committees of the CCP; and (9) a CCP committee, branch, or "primary organization." This covers every level of society in China and hundreds, if not thousands, of entities. Thus, providing some sort of limited local or sub-national CCP database, to the extent that one even exists, would not sufficiently answer Commerce's question because it would not, and could not possibly, cover all these entities.

Moreover, if Commerce believed that this type of limited "government documentation" was acceptable (i.e., only showing CCP membership) then, in accordance with 19 U.S.C. § 1677m, it should have advised the GOC after the Remand Supplemental Response was filed of this deficiency and asked the GOC more directly to provide that information. Indeed, to the extent that Commerce is stating that it is acceptable for the GOC to only provide documentation about local CCP involvement but not provide government documentation about the other entities, then Commerce should expressly state so; the question was not limited to certain entities.

Third, the continued reference to *Citric Acid from China 2012* is not appropriate or supportive of Commerce's position. In that case the issue was that for two individually owned suppliers the owner of both had been Secretary of the Party Committee of Liujiadu Village prior to the POR but no longer held that position during the POR. Commerce explained the information provided in the IDM:

> GOC provided a certified letter from the CCP Committee of the village indicating that the owner of Companies B and C held the position of Secretary from June 2009 to December 2011. 216 The Department established at verification through official government documentation provided by the GOC and the CCP (e.g., stamped originals of election notification from the CCP Committee of Lijiaxiang Town), that the owner of Companies B and C did not serve as Secretary for the Party Committee of Liujiadu Village in the PRC during the POR and that the village does not geographically overlap with the locations of the producers' operations. 217 The Department was also able to establish at verification that another person was elected to the position of Secretary for the Party Committee of Liujiadu Village on December 28, 2011, ending the owner of Companies B and C's tenure as Secretary before the POR. In addition, the December 28, 2011 election notification announced the approval of another person for Secretary of the Party Committee for the village in which Companies B and C are located.

*Citric Acid from China 2012* at IDM Cmt. 2. This type of "documentation" was only possible because the owner *had been* secretary of a specific government entity and then *was no longer* part of that entity. Thus, documentation could be provided from that specific entity that he was no longer part of it. Since this factual scenario is not present here, it is unreasonable to use the *Citric Acid from China 2012* as the basis for determining that the GOC did not act to the best of its ability in this case. Here, none of the individuals in any of the suppliers are part of any relevant authority – how could the GOC have provided similar information to *Citric Acid from China 2012.*

Fourth, Commerce fails to explain why official company human resource records that identify CCP membership would be insufficient to establish government control. If none of the employees were CCP members, then there could be no CCP officials and no control. In its Remand, in response to this argument, Commerce makes the conclusory statement that "verification of such information without the necessary corroborating government documentation would be pointless." Remand at 33-34. Commerce fails to explain further. Commerce relies on official company information all the time to demonstrate usage of

18

government subsidy programs.  It is not clear why this would not be sufficient to demonstrate whether the company itself has a primary party organization.

This is no different than the long history of the Export Buyer's Credit Program.  In those cases, the GOC failed to provide certain usage information regarding this program and, in the alternative, the respondents provided non-use certificates, which Commerce refused to accept. The court repeatedly found that Commerce must accept this alternative information.  *See Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 557 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2022) ("As has happened in several cases before this Court, although Commerce explains why it wants the information it seeks, it fails to explain why that information is necessary, i.e., why it is the only information that can verify the U.S. customers' non-use certifications.").  Indeed, the court has further cautioned "although using facts available with an adverse inference may be permissible (against the government respondent), doing so when it collaterally affects a cooperating party is disfavored." *Fine Furniture (Shanghai) Ltd. v. United States*, 36 C.I.T. 1206, 1212 n.10, 865 F.Supp.2d 1254 (2012), *aff'd*, 748 F.3d 1365 (Fed. Cir. 2014); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1325 (2018) ("Commerce may apply AFA even if the collateral effect is to 'adversely impact a cooperating party.' ... Commerce, however, should 'seek to avoid such impact if relevant information exists elsewhere on the record.'" (quoting *Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (2013))).  Here, Commerce should have accepted the alternative, verifiable information proffered even though it did not technically meet the "government documentation" request.

Commerce speculates in its Remand of the type of information that could have been provided but was not.  Commerce claims that the CCP has a central membership database and that the GOC could easily provide screen shots of that database, which then, of course,

Commerce officials would insist on verifying in person and given free rein of.  Remand at 36.
Just as the U.S. government would never give a foreign government access to a database of its
citizens, neither would the GOC, even if such a database exists.  It is absurd to suggest such a
source.  Moreover, to suggest different types of government documents *after* the issuance of the
supplemental questionnaires as a basis for the application of AFA rather than *in* the
questionnaires is particularly egregious.

     Ultimately, the GOC provided sufficient factual information to demonstrate that the
relevant suppliers are not government authorities.  The record contains: 1) the CCP constitution
that requires three party members to create a primary party organization; 2) statements from
suppliers that they do not have a primary party organization; 3) explanation that company human
resource information could be verified.  This factual information demonstrates that a primary
party organization was not required in each of these suppliers because there were not more than
three CCP members in the company. If there were no, or less than three, CCP members then
there is also support for the statements that there were no Government or CCP officials.  This
alternative information to "government documentation" is sufficient to establish that the
companies are not government authorities.

## III.    CONCLUSION

For the reasons outlined in these comments, the Court should remand this case back to Commerce with instructions to revise its benchmark and government authority determination. Commerce should use the ITTO data only to value the benchmarks for plywood and Commerce should not apply AFA to the GOC for certain of Baroque's input suppliers.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Baroque Timber Industries (Zongshan), Co., Ltd. and Riverside Plywood Corporation*

Dated: January 30, 2026

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Remand Comments, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 5,878 words—less than the 7,500 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

*Counsel for Plaintiffs Baroque Timber Industries (Zongshan), Co., Ltd. and Riverside Plywood Corporation*